Cooper Rodgers, OSB # 194439
6926 SE Ogden Street
Portland OR, 97206
Tel: 818-667-6657
Email: cooper@bluemountainsbiodiversityproject.org

Tom Buchele, OSB # 081560
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland OR  97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Attorneys for Plaintiff Blue Mountains
Biodiversity Project

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDELTON DIVISION

| | |
|---|---|
| **BLUE MOUNTAINS BIODIVERSITY PROJECT**, an Oregon nonprofit corporation, | Case No. |
| Plaintiff, | **COMPLAINT FOR VACATUR OF ILLEGAL AGENCY DECISION, INJUNCTIVE AND DECLARATORY RELIEF** |
| vs. | |
| **Craig P. Trulock**, Forest Supervisor, Malheur National Forest, in his official capacity; and **UNITED STATES FOREST SERVICE**, an agency of the United States Department of Agriculture, | |
| Defendants. | |

## INTRODUCTION

1.      This is a civil action brought by Plaintiff Blue Mountains Biodiversity Project

("BMBP") for vacatur of an illegal agency decision, as well as declaratory and injunctive relief

under the Administrative Procedure Act ("APA") (5 U.S.C. §§ 551 *et seq*.).  Plaintiff Blue

Mountains Biodiversity Project (BMBP) challenges the Defendant United States Forest Service's

("USFS") Decision Notice and Finding of No Significant Impact ("FONSI") (collectively

referred to as the "Decision"), approving the Camp Lick Project ("the Project") in the Malheur

National Forest ("the Malheur" or "MNF").  Defendant Forest Supervisor Craig P. Trulock

signed that Decision on May 27, 2020. Defendants USFS and Regional Forester Craig P. Trulock

are collectively referred to herein as "defendants" or "Forest Service." The Decision violates the

National Forest Management Act ("NFMA") and its implementing regulations and violates the

National Environmental Policy Act ("NEPA") and its implementing regulations.

2.      The Camp Lick Project is located on the Blue Mountain Ranger District within

the Malheur National Forest. The planning area is located in Grant County approximately 10

miles northeast of the city of John Day, Oregon. According to the Forest Service "The Camp

Lick planning area is located in a regionally focused, priority watershed and encompasses

approximately 40,000 acres in the Upper Camp Creek, Lower Camp Creek, and Lick Creek

subwatersheds that drain into the Middle Fork John Day River." August 2017 Final

Environmental Assessment ("FEA") at 3. These watersheds are all part of, and will be referred to

as, the John Day River Middle Fork Watershed.

3.      The Camp Lick Project features approximately 12,000 acres of commercial

logging. FEA at 36. This includes nearly 10,000 acres of tractor yarding, a process where toppled

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

trees are dragged through the forest by heavy equipment, causing soil compaction and erosion. *Id*. Also included is l0 miles of "temporary" road construction. *Id*. Temporary roads are often active for years, and have permanent effects to the soil, including compaction and erosion like tractor yarding does. The tractors and "temporary" roads will be used to log large trees, over 21 inches Diameter at Breast Height (DBH), and trees inside protected old growth stands that are generally protected from logging by Forest Plan provisions, often referred to as the Eastside Screens, that prohibit the logging of such large trees and trees within old growth areas. The Camp Lick Project relies on illegal site-specific forest plan amendments to allow the logging of large trees and logging within old growth stands that are below the historical range of variability (HRV).

4.      BMBP has participated in the Camp Lick Projects administrative process since the beginning. BMBP submitted scoping comments May 28th, 2016 about the scale of the project, the natural values of the project area, and the use of forest plan amendments to log large trees the Forest Service would otherwise not be allowed to log. BMBP commented on the draft Environmental Assessment on March 15th, 2017. When the USFS published the FEA and its draft decision  on August 23, 2017, BMBP filed a timely objection on October 10th. Then, the Forest Service did not issue a final decision for more than two years.

5.      BMBP submitted a Request for Supplemental Environmental Analysis and sent it to the Forest Service in January 2020, asking that significant changes in condition and new information about timber sales be incorporated into a new supplemental analysis. Without acknowledging our request, the Service released a three-page "Supplemental Information Report" stating that the new conditions and new timber sales, namely Ragged Ruby, Austin, and

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

Bark, would not change its analysis of the project's impacts and issued a Final Decision Notice and FONSI on May 27, 2020.

6.    On June 1, 2020, BMBP filed a FOIA request, seeking information on the consultation process and the two-year delay. The response BMBP received to that FOIA request disclosed additional ways the underlying NEPA process was arbitrary, capricious, and illegal.

7.    The Camp Lick Project's arbitrary, capricious, and illegal administrative process is in part a result of the Forest Service's continued effort to evade the Eastside Screens. The project in fact seeks to log many large trees that are legally protected by the Eastside Screens. BMBP has been involved in the public process for the Camp Lick Project at every level; we have seen this first-hand.

8.    The project contains multiple violations of NFMA. These violations include:
-Violations of the Eastside Screens; an amendment to the applicable forest plan which prohibit the logging of trees with a Diameter at Breast Height (DBH) of 21 inches or larger and logging in designated old growth forest below its historic range of variability (HRV).
-Violations of binding precedent that require Site-Specific amendments to address site specific conditions; specifically, amendments that are intended to negate the Eastside Screens.

9.    Furthermore, the project violates NEPA by:
-Failing to adequately analyze direct effects.
-Failing to adequately analyze indirect effects.
-Failing to adequately analyze cumulative effects.
    -Including a failure to use a consistent scale of analysis.

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

-Failing to give a legally sufficient purpose and need statement.

-Failing to analyze a suitably broad range of alternatives.

-Failing to update the EA with two years' worth of relevant new information.

-Failing to analyze the project with an Environmental Impact Statement, as should have been done given the projects effects, scale, and use of Forest Plan Amendments and as was done recently for similarly sized projects in this same forest.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA) and 28 U.S.C. §§ 1331 (federal question), and 2412 (costs and fees). Plaintiff has challenged a final agency action as defined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 704. Plaintiff has exhausted all required administrative remedies provided by the USFS. Plaintiff thus seeks judicial review of final administrative actions of the USFS. *See* 5 U.S.C. § 704 (actions reviewable).

11.    Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because Defendant Malheur National Forest Regional Forester Craig P. Trulock , who signed the challenged Decision Notice, is headquartered in John Day, Grant Country, Oregon, and the events or omissions giving rise to the claims occurred in Oregon.

12.    This case is properly filed in Pendleton, Oregon and properly before the Pendleton Division of this District pursuant to Local Rules 3-2 and 3-3 because Craig P. Trulock, the Malheur National Forest Supervisor who signed the challenged Decision Notice, is headquartered in John Day, Grant Country, Oregon.

## PARTIES

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

13.     Plaintiff BLUE MOUNTAINS BIODIVERSITY PROJECT is a non-profit environmental advocacy organization dedicated to the conservation of the natural ecosystems of the Pacific Northwest and the native flora and fauna they harbor. BMBP and its supporters actively participate in governmental decision-making processes on public lands, including national forests, throughout Oregon.

14.     The mission of BMBP is to protect and restore the biodiversity of the Blue Mountains region of Oregon and Washington and to educate the public about threats to forest ecosystems in Eastern Oregon. In order to further its mission and protect the interests of BMBP's supporters in preserving the biodiversity of the Pacific Northwest forests, BMBP monitors timber sales and other Forest Service activities in the Malheur, Umatilla, Wallowa-Whitman, and Ochoco National Forests.

15.     BMBP has an organizational interest in the scientifically sound management of Eastside forests, including the Malheur. The organization's mission to promote the protection and restoration of Eastside forests depends on the responsible, scientifically sound, and legally sufficient management of the Malheur National Forest by the Forest Service.

16.     BMBP's officers, staff, and supporters reside near and/or regularly visit the Camp Lick Project area. BMBP's officers, staff, and supporters derive recreational, inspirational, religious, scientific, and aesthetic benefit from their activities within the Malheur, including the area in and around the Project Area, and intend to continue to use and enjoy these areas frequently and on an ongoing basis in the near and distant future.

17.     BMBP has an organizational interest in the proper and lawful management of the Malheur. The aesthetic, recreational, scientific, and religious interests of BMBP's officers, staff, and supporters have been and will be adversely affected and irreparably injured if Defendants

continue to act as alleged herein, and affirmatively implement the decision that Plaintiff

challenges. These are actual, concrete injuries caused by Defendants' failure to comply with

mandatory duties under the National Environmental Policy Act and other federal laws. The

injuries would be redressed by the relief sought.

18.     BMBP's supporter's hike, camp, bird watch, hunt, view wildlife, photograph

scenery and wildlife, field survey and engage in other vocational, educational, scientific

observation, and recreational activities within the Malheur, including the Camp Lick Project area

and adjacent lands. The organization's membership is deeply invested in the ecological health of

the Camp Lick area individually and as a part of the Malheur Forest and Eastern Oregon forests.

The planned timber harvest and "restoration" activities limit and hinder opportunities to partake

in these recreational activities. These harms include logging of large trees and adverse effects to

water quality affecting wildlife, scenic, and scientific values. The logging of large trees will

tangibly affect our supporter's recreation in the Camp Lick area. Our supporters derive

enjoyment and satisfaction from seeing large trees as they hike and camp in their shade. Logging

those trees will deny them that experience. Our supporters birdwatch. The removal of large trees

and snags (dead standing trees) will eliminate valuable habitat for a variety of birds. Our

supporters hunt in the area. Noise and heavy equipment from logging will drive game activity

away and damaged habitat will keep game from coming back, harming the interests of our hunter

supporters. Our photographer supporters will have less scenic beauty to capture.

19.     BMBP has participated extensively in administrative actions to protect plaintiffs'

interests within the Malheur. BMBP actively participated in the entire administrative process for

the Camp Lick Project between 2016 and 2020 and has exhausted any and all available

administrative remedies. Reviewable final agency action exists that is subject to this Court's

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

review under 5 U.S.C. §§ 702 & 704. The injuries of BMBP and its members can be redressed by a formal ruling from this Court which declares Forest Service's decision, and its underlying FEA, arbitrary and capricious in violation of both the APA and NEPA, vacates the service's decision and its underlying FEA, and provide any necessary injunctive relief.

20.      BMBP's physical address is 27803 Williams Lane, Fossil OR 97830.

21.      Defendant UNITED STATES FOREST SERVICE is an agency of the United States and is a division of the Department of Agriculture, and is charged with managing the public lands and resources of the Malheur National Forest in accordance and compliance with federal laws and regulations. USFS is an agency within the meaning of the APA, 5 U.S.C. § 551.

22.      Defendant Craig P. Trulock, Malheur National Forest Supervisor, is the official responsible for deciding the type and extent of management activities in the Camp Lick Project. He signed the final Decision Notice challenged in this case. Defendant Trulock is sued only in his official capacity.

STATUTORY OR REGULATORY FRAMEWORK

National Environmental Policy Act (42 U.S.C. §§ 4321-4370(h))

23.      Congress enacted the National Environmental Policy Act ("NEPA") in 1969, directing all federal agencies to assess the environmental impacts of proposed actions that significantly affect the quality of the human environment. NEPA seeks to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. As such, NEPA obligates agencies to make available to the public high-quality information, including accurate scientific analyses, expert agency comments, and public comments, "before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b)(2019).  NEPA's public disclosure goals are twofold: (1) to ensure that the agency has

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

carefully and fully contemplated the environmental effects of its action; and (2) to ensure that the public has sufficient information to review, comment on, and challenge (if necessary) the agency's action. *See* 42 U.S.C. §§ 4321, 4332.

24.     The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies. Those regulations are found at 40 C.F.R. Parts 1500–1508 (2019). The Forest Service developed the Camp Lick Project and conducted all of the Project's NEPA analysis using, and following the requirements of, the CEQ regulations that existed and were in force up until September of 2020 (the "2019 CEQ regulations"). BMBP also has relied upon and used the 2019 CEQ regulations when commenting and objecting to the relevant project documents.

25.     The Court may review agency actions taken pursuant to NEPA under the APA.  5 U.S.C. §§ 702, 704, 706.

26.     NEPA requires all federal agencies to prepare a "detailed statement" assessing the environmental impacts of all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  This statement is known as an Environmental Impact Statement (EIS).

27.     An Environmental Assessment (EA) can be created to aid the agencies in determining whether or not a proposed activity will significantly affect the quality of the human environment. 40 C.F.R. §§1501.4(b) (2019), 1508.9 (2019). The role of the EA is to determine whether an EIS is needed or if a finding of no significant impact (FONSI) is supported. *Id*.

28.     An EA must include an adequate analysis of the environmental impacts of a project, alternatives, and must also include a consideration of the direct, indirect and cumulative impacts of the project and its alternatives resulting from all past, present and reasonably

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

foreseeable future actions. *Id.* §§ 1508.7 (2019), 1508.8 (2019), 1508.9 (2019), 1508.25(c) (2019). Cumulative impacts are impacts to the environment resulting from the incremental effects of the present action, combined with other past, present and reasonably foreseeable future actions, regardless of what agency or person undertook, undertakes or will undertake those actions. *Id.* § 1508.7(2019). "Cumulative impacts can result from individually minor but collectively significant actions." *Id.*

29.     To determine the significance of a federal action, CEQ regulations require agencies to look to both the context and the intensity of the action. 40 C.F.R. § 1508.27 (2019). Context refers to the significance of the action in regard to society as a whole, the affected region, the affected interests, and the locality. For site-specific actions, significance usually depends upon the effects in the locale. Both short- and long-term effects are relevant to the action's context. *Id*. § 1508.27(a) (2019). The intensity of the action is evaluated based on several factors, including, but not limited to, the degree to which the action affects public health or safety, the degree to which the effects on the quality of the human environment are likely to be highly controversial, and the degree to which the possible effects on the human environment are highly uncertain or involve unknown characteristics. *Id*. § 1508.27(b) (2019).

30.     For a federal agency to make a finding of no significant impact, it must present reasons why the action "will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13 (2019). The FONSI must include the EA "or a summary of it and shall note any other environmental documents related to it." *Id*.

31.     Significant new information requires that the party proposing the project conduct a supplemental analysis under 40 C.F.R. § 1502.9. This requirement applies equally to both

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

Environmental Impact Statements and Environmental Assessments. *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000).

EA Requirements

32.     All EAs must include (1) a description of the need for the project, (2) a description of the proposed action and alternative(s), (3) a discussion of the environmental impacts of the proposed actions and alternative(s), and (4) a note of the agencies and persons who were consulted throughout the process. 36 C.F.R. § 220.7(b). Importantly, an EA needs to "provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]". 40 C.F.R. § 1508.9(a)(1) (2019).

33.     NEPA requires that all agencies "study, develop, and describe appropriate alternatives to recommend courses of action." 42 U.S.C. § 4332(2)(E). This requirement "extends to all such proposals, not just . . . [environmental] impact statements." 40 C.F.R. § 1507.2(d) (2019). The EA shall also provide sufficient evidence and analysis of the environmental impacts of the proposed action, as well as the alternative(s). 36 C.F.R. § 220.7(b)(3)(i).

34.     NEPA requires agencies to take a hard look at the environmental consequences in any EA before taking a major action. This includes considering all foreseeable direct and indirect impacts, as well as cumulative impacts.

35.     After completing an adequate EA, the agency shall prepare either an EIS or a FONSI. An agency must prepare an EIS when it makes a determination that the action has the potential to significantly affect the environment. 36 C.F.R. § 220.6(c). A FONSI will be prepared if the action causes no significant effect to the human environment; but the agency must provide

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

a convincing statement of reasons to explain how the impacts are insignificant. 40 C.F.R. §

1508.13 (2019).

**National Forest Management Act (16 U.S.C. §§ 1600-1614)**

36.      The National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq*., is the

primary statute governing the administration of national forests. Agency actions taken pursuant

to NFMA are reviewable under the APA. 5 U.S.C. §§ 702, 704, 706.

37.      NFMA requires the Forest Service to develop and implement a land and resource

management plan (LRMP or Forest Plan) for each unit of the National Forest System. 16 U.S.C.

§1604. Forest Plans guide natural resource management activities forest-wide, setting standards,

management area goals and objectives, and monitoring and evaluation requirements. A Forest

Plan must provide for multiple uses for the forest, including: recreation, range, timber,

watershed, and wildlife and fish purposes. *Id*. § 528.

38.      Under NFMA all permits, contracts, and other instruments for the use of National

Forest System lands "shall be consistent with the land management plans." *Id*. § 1604(i).

Therefore, after a Forest Plan is developed, all subsequent agency actions, including site-specific

actions, must comply with NFMA and the governing Forest Plan.

39.      During the 1990s, the Forest Service amended the MNF and every other forest

plan in Oregon and Washington east of the Cascade Mountains by adopting the so-called

"Eastside Screens." The Eastside Screens were designed to address the Forests' deficiency of

large trees resulting from decades of over-logging. The Screens prohibit logging in old forests

that are below their historical range of variability, and, prohibit logging trees over 21 nches in

diameter at breast height (dbh) both inside and outside old forests.

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

40.     Forest Plans may be amended at a site-specific level for individual projects. 16 U.S.C. § 1604(f)(4). However, site-specific forest plan amendments must have "at least some characteristics unique to a site to support a site-specific amendment." *LOWD/BMBP v. Connaughton*, No. 3:12–cv–02271–HZ., 2014 WL 6977611 (D.OR, Dec. 9, 2014) at *30, quoting *Lands Council*, 529 F.3d.

### Administrative Procedure Act (5 U.S.C. § 701-706)

41.     Section 702 of the APA, 5 U.S.C. § 702, provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."

42.     Under section 704 of the APA, 5 U.S.C. § 704, "final agency action" is reviewable.  A final agency action is one that marks the consummation of the agency's decision-making process and one by which rights or obligations have been determined or from which legal consequences flow. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

43.     Under section 706 of the APA, 5 U.S.C. § 706, "The reviewing court shall – (1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; … [or] (D) without observance of procedure required by law …"

44.     NEPA and NFMA do not contain specific judicial review provisions, and the Forest Service's actions governed by those statutes, such as the Camp Lick Vegetation Project Decision Notice, are therefore subject to judicial review under the APA.

**ADDITIONAL FACTS GIVING RISE TO THE PLAINTIFF'S CAUSE OF ACTION**

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

**NFMA**

45.     Camp Lick is part of a series of large logging projects, within the Malheur National Forest and within the watershed of the Middle Fork of the John Day River that use site-specific plan amendments that, for essentially identical reasons, allow the Forest Service to evade the protective restrictions of the Eastside Screens and log large and old trees. It should be noted that the Eastside Screens exist to address a shortage of large trees on the Eastside; this shortage has not been resolved and continues to this day. Prior to the publication of the Camp Lick FEA in 2017, the Forest Service had made amendments to the Malheur's Forest Plan allowing the removal of trees over 21 inches DBH for ten individual projects. FEA at 400-402. Recent examples include projects like Big Mosquito and Ragged Ruby. The Big Mosquito Project utilized site specific plan amendments to log large trees and harvest in old growth below HRV, just like Camp Lick. *Id*. at 402 and 406. Furthermore, these amendments for separate projects in the same Forest feature remarkably similar justifications: the removal of Grand Fir and the promotion of Ponderosa Pine and Western Larch. *Id*.  The Ragged Ruby Project, still in scoping at the time the 2017 Camp Lick FEA but since published and decided upon, also utilizes amendments allowing the logging of large trees and logging in old growth below HRV. *Id*. at 404 and 407. The rational for these amendments is once again the removal of Grand Fir and the promotion of Ponderosa Pine. Ragged Ruby ROD at 30. It is remarkable how similar the amendments and given justifications are for Big Mosquito, Ragged Ruby, and Camp Lick. All three projects are even located in the same watershed. There is one notable difference: Ragged Ruby was analyzed through an EIS, not an EA like Camp Lick.

46.     The Forest Service did not stop using these amendments after the Camp Lick EA was finalized in 2017. The USFS continued to propose such site-specific plan amendments

14

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

targeting large Grand Fir during the subsequent two years before the USFS issued its final Camp

Lick decision. For example, the Austin Project, proposed after the 2017 Camp Lick FEA and

currently under analysis by the MNF, is also proposing to use plan amendments to log large trees

and log in old growth below HRV.  Austin Project Scoping Package at 25 and 26.

47.    The web of recent projects and site-specific amendments can be confusing. The

following table shows recent projects in the Malheur, most within the Middle Fork of the John

Day Watershed, most using Forest Plan amendments very similar to those proposed for Camp

Lick, and whether they are proposed or completed.

| Project | Approximate Beginning of Scoping | Date Completed | EA or EIS? | 21-inch limit exception | Logging in HRV | Changes to Old Growth Units | Watershed | Acres of Commercial Activity |
|---|---|---|---|---|---|---|---|---|
| Galena | March 2009 | September 2013 | EIS | No | No | Yes | Middle Fork John Day | 8,363 |
| Big Mosquito | March 2014 | September 2015 | EA | Yes | Yes | Yes | Middle Fork John Day | 8,600 |
| Camp Lick | May 2016 | May 2020 | EA | Yes | Yes | Yes | Middle Fork John Day | 12,000 |
| Magone | February 2015 | May 2017 | EIS | No | No | Yes | Upper John Day | 7,135 |
| Ragged Ruby | March 2017 | December 2020 | EIS | Yes | Yes | Yes | Middle Fork John Day | 6,097 |
| Austin | July 2019 | Under Analysis | N/A | Yes | Yes | Yes | Middle Fork John Day | 28,000 |

Table 1.

48.    BMBP has nothing against Ponderosa Pine, it is an iconic species of great value to

BMBP's supporters and staff. However, projects like Camp Lick, Big Mosquito, Ragged Ruby,

and Austin are not really about promoting Ponderosa Pine or Western Larch. The logging of

large trees in projects such as Camp Lick, etc., is primarily driven by economic interests rather

than true forest restoration. As we noted in our objection to the Camp Lick project "Old trees are

15

subject to far more competition stress from young small trees (up to 8-12-14 inches dbh) that are far more numerous due to past logging and fire suppression than large 90 to 150-year-old Douglas-fir and grand fir." Camp Lick Objection at 8. To reiterate, the Eastside Screens were created to address a dearth of large trees. Removing large Grand Fir and Douglas Fir will contribute to that dearth of large trees. The Forest Service should preserve the large trees it has.

49.    However, there is still more compelling evidence that these amendments do not seek to address site specific conditions, but are in fact part of a larger pattern, where site specific amendments are used to log large trees. In May of 2020, a few weeks before the Forest Service issued the Camp Lick decision, the Forest Service initiated the public involvement process for amending the Eastside Screens to remove the limits on harvest for trees over 21 inches dbh. Forest Plans Amendment: Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington EA at 6. If the alleged need to remove large trees was site specific, a region wide amendment would not be necessary. The Plan Amendment EA even references the practice, stating "In practice over the past several decades, site specific diameter limits have been applied through prescriptions to meet project goals after Forest Plan amendments to harvest trees over 21 inches diameter have been completed." *Id*.

50.    The Forest Service's site-specific amendments to the Malheur Forest Plan in the Camp Lick DN are illegal. Forest Plans, under NFMA, apply to the forest as a whole, based on documented needs and conditions for the overall health and longevity of the particular forest. 16 U.S.C. § 1604(b) and (f). In the FEA, the Forest Service states their intention to use site-specific amendments "to improve the resiliency, processes, and functions of the [Project area]." FEA at 1. The amendments described in the FEA would be exceptions to the Eastside Screens—a rule adopted in forests east of the Cascades prohibiting the Forest Service from authorizing timber

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

companies to harvest trees exceeding 21 inches DBH. Courts have held that site-specific forest plan amendments must have "at least some characteristics unique to a site to support a site-specific amendment." *LOWD/BMBP v. Connaughton*, 2014 WL 6977611, at *30, quoting *Lands Council*, 529 F.3d at 1228. The FEA fails to identify any unique characteristics in the Camp Lick area that justify the two site-specific amendments to the Eastside Screens. The Forest Service primarily attempts to rationalize the amendment as a means to reduce competition for older ponderosa pine and western larch. FEA at 23. According to the Forest Service, "[t]he combination of timber harvest and fire suppression gradually converted the dry forests from primarily long-lived, early-seral species (ponderosa pine and western larch) to a higher proportion of late-seral species (grand fir and Douglas-fir)." FEA at 395. The Forest Service itself concedes that this amendment is not unique. FEA at 400 ("Recent [amendments to the Eastside Screens] have been proposed to shift species composition, protect old ponderosa pine and western larch[.]) There is a correct way to programmatically amend the Eastside Screens: by programmatically amending the Eastside Screens as they just did in January of 2021, 7 months after approving the Camp Lick site specific amendments. That the Forest Service has taken that course of action shows that site-specific amendments, such as the ones at issue here, were never intended to address site specific conditions.

## NEPA

51.     Violations of NEPA also occur. In their effort to log large trees, the Forest service failed to comply with the procedural requirements that NEPA imposes.

52.     The Camp Lick Final Environmental Assessment exists to explain the purpose and need of the action, state the proposed action alternatives, and to determine whether or not the

Camp Lick Project is likely to have a significant effect on the environment. The planners define Camp Lick's purpose and need as the following:

-Maintain and improve landscape vegetation resiliency and resistance to disturbances such as wildfire, drought, and insects and diseases by managing for desirable forest composition, stocking levels, and pattern.

-Promote the resistance and resiliency of forest stand structure, composition, and density given the historical fire regime, to reduce the potential impacts of wildfire.

-Maintain or improve biodiversity and habitat for fish and wildlife species present in the planning area, taking into account changes in climatic conditions.

-Protect and maintain historical properties.

-Contribute to the social and economic health of those enjoying multiple uses in the Camp Lick planning area.

Camp Lick FEA at 7-8. To fulfill these purposes and satisfy these needs, the planners proposed the following action alternatives. Alternative One was the "No Action Alternative" a required analysis of what would happen if the agency did nothing. Alternative Two is the proposed action, finalized in the Decision Notice with minimal changes. No other proposed alternatives received in depth analysis, the choices were the project as proposed or nothing at all.

53.    NEPA also requires planners to analyze the potential environmental effects of the project: direct, indirect, and cumulative. These analyses require certain levels of background work. Cumulative effects analysis requires that the planners of a project define a consistent geographic scope in which they will analyze cumulative effects. The Camp Lick EA never

18

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

properly defines this geographic scope. The various cumulative effects analyses use several different geographic scopes, while some analyses fail to describe a scope at all. This scope is how the planners decide which adjacent projects they will include as cumulative effects. They should then go about the business of identifying those projects and analyzing their effects cumulatively. Direct and indirect effects are somewhat simpler to analyze. The Planners must look at the actions proposed and determine the immediate effects, and the consequences of those immediate effects.

Cumulative Effects

54.     The Camp Lick's cumulative analysis is inadequate. Some effects are analyzed insufficiently, others are not analyzed at all. These failures are compounded by the two-year delay between the draft decision and the final decision, which will be discussed later in this complaint.

55.     First, the Forest Service failed to adequately analyze effects to two aquatic species: Redband Trout and MCR Steelhead. MCR Steelhead also are a protected species under Endangered Species Act. Large percentages of suitable Redband trout and MCR Steelhead habitat across the Malheur will be cumulatively impacted by multiple back-to-back timber sales. The Camp Lick project, in combination with the Big Mosquito and Magone projects would potentially affect over 20% of MCR steelhead suitable habitat across the Forest. See Big Mosquito FEA at 136; Magone FEIS at 389. Camp Lick FEA at 142. Add to that the percentage of habitat within the Ragged Ruby project area that may be affected, and the percentage of suitable MCR habitat affected is higher still. Similarly, examined in combination, the Big Mosquito, Magone, Camp Lick, and Ragged Ruby projects could affect up to approximately 14% of suitable Redband trout habitat across the Forest. Magone FEIS at 124; Big Mosquito

19

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

FEA at 127 and 136; Camp Lick FEA at 143; Ragged Ruby FEIS Aquatics Report at 28 and 40.

In the Big Mosquito and Camp Lick projects (both located in the Middle Fork John Day

Watershed), those two projects alone could affect up to 8.3% of Redband trout habitat at the

Forest Scale. To be clear, the calculations seen above were not performed by the Forest Service,

they were performed by BMBP staff. In addition, this is only a small sampling of recent projects

that have taken place in the Forest. Many additional projects are have taken place within the last

10 years, and are currently being planned. We did these calculations at the Forest Scale, because

that was what the Forest Service provided in terms of the individual scale. However, analyzing

these effects in numerical terms at the Watershed level would have also been important step to a

strong cumulative effects analysis. These effects on the quality and suitability of the habitat are

alarming and are not analyzed in terms of cumulative effects to stream temperature, shading,

sedimentation, etc. They are also not analyzed on any consistent geographical scale.  What

percent of suitable habitat within the Forest and at the watershed scale will be impacted by

potential cumulative effects due to these projects, for both MCR steelhead and Redband trout,

especially when future projects are taken into account? The Camp Lick FEA does not answer

that critical question.

56.    Second, the Forest Service failed to address the cumulative impacts on large trees

between the Camp Lick timber sales and the nearby Big Mosquito project. Continually the Camp

Lick FEA claims in cumulative affects analysis for proposed action that all ongoing projects

retain large trees, but this is certainly not true for, Ragged Ruby, Big Mosquito, Austin, or other

projects that have used, are using, or will use forest plan amendments to allow logging removal

of existing large trees. FEA at 365–67. Large tree removal is not reducing short-term impacts to

wildlife and allowing for restoration in all ongoing projects as claimed. As such, the Forest Service's analysis is inaccurate, misleading, and arbitrary and capricious.

57.    Third, the actual cumulative impacts analysis for effects on the condition of the Middle Fork John Day watershed is missing from the Camp Lick FEA. Section 3.3.2., Watershed Condition does not sufficiently analyze the cumulative effects of past present and future projects, as foreseeable in 2017. FEA at 85-126. The cumulative effects analysis of this section relies on assumption of good outcomes from past, present, and future projects, rather than actual analysis of their effects. Rather than address specific cumulative effects from specific projects, the section frequently refers to Appendix E: Past, Ongoing, and Reasonably Foreseeable Actions. However, this appendix merely lists an assortment of activities that occurred in the past and some that may occur in the future without referencing specific projects or describing how their potential cumulative effects. A vague list of past, present, and future actions for watershed analysis included is not enough. The analysis of their combined effects needs to be in the FEA. The Service needs to show their work and explain why they came to the conclusions they came to. The Forest Service made a deliberate choice not to analyze cumulative effects to the watershed with such specificity. The Watershed Condition Cumulative effects analysis is arbitrary and capricious.

58.    Fourth, the Forest Service failed to adequately analyze the cumulative loss of snags due to the ongoing or reasonably foreseeable future logging from the Camp Lick project and other nearby past, ongoing, and reasonably foreseeable future timber sales.  (e.g., Galena, Big Mosquito, Magone, and the Ragged Ruby projects). The Forest Service must adequately analyze the cumulative loss of future large tree structure, large snag abundance, and large snag density across this broad swath of the District.

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

59.    Fifth, under the cumulative effects analysis for late and old structure (Camp Lick FEA at 391–94; Decision Notice at 62), the Forest Service did not analyze the effects of reducing large tree structure and large snag abundance and density across a large expanse of the Blue Mountain Ranger District surrounding the Camp Lick planning area through planned logging of other projects on the District (Ragged Ruby, Austin). This is inadequate as the Forest Service is well into the planning process for these other projects, and they are reasonably foreseeable.

60.    Sixth, the cumulative effects analysis is also inadequate for primary cavity excavators. The Camp Lick timber sale, in combination with other past, current, and reasonably foreseeable future timber sales, will cumulatively reduce existing and future snag habitat for primary cavity excavator woodpeckers over a large partially contiguous area and over a long consecutive time period, yet these cumulative effects to woodpeckers were not adequately analyzed in the Camp Lick FEA. Further, the lack of significant negative cumulative effects seems to be based in part on adherence to the northern Rocky Mountains Bird Conservation Plan, including advised retention of large trees, yet large trees of an unquantified number are planned for logging removal under the Proposed Action.

61.    The FEA also fails to properly define geographic scope for its cumulative effects analyses. For each resource analyzed, the agency must define a scope, justify their decision, and stick to that scope for the resource. *LOWD/BMBP v. Connaughton*, 2014 WL 6977611, * 9-10(D.OR. 2014) A prominent example is the FEA section addressing Primary Cavity Excavator/Dead and Defective Wood Habitat. This section of the FEA starts by saying that the analysis area for snags must be larger than the project planning area and includes both the Camp Creek watershed and the Grub Creek/John Day River watershed. FEA at 228. However, when examining impacts to "dead and defective wood habitats" the EA switches to a much smaller

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

analysis area: the Camp Creek watershed. FEA at 234. However, when actually discussing those

impacts the analysis switches back and forth between impacts "on a forest scale" or "across the

Forest" and impacts "across the watershed. FEA at 235. Then when the FEA makes its

"determination" regarding Dead and Defective Wood habitat, it limits itself to the "planning

area." FEA at 236. This is arbitrary and capricious, and illegal. This inconsistency continues

when the FEA addresses impacts to old growth habitat. Here the analysis area of such habitat is

vaguely defined as the Camp Lick planning area and adjacent watersheds, without specifying

which ones. FEA at 254. But then the actual analysis appears to limit itself to actions within or

immediately adjacent to the Camp Lick planning area boundary. FEA at 255. When the FEA

moves on to an old growth dependent species, the pileated woodpecker, the analysis area is then

restricted to the Camp Lick planning area. FEA at 258. This shifting of analysis area must be

justified with evidence. The Forest Service must explain why cumulative effects to old growth

habitat are addressed at a larger scale than cumulative effects to a species dependent on old

growth habitat.

62.    This inconsistency in scope of analysis for cumulative effects is not limited to

primary cavity excavators. It is a persistent problem throughout the cumulative effects analyses.

For example, the Watershed Section describes the geographic scale of analysis as follows "The

geographical scale analyzed for cumulative effects extends down to the junction of Camp Creek

and the Middle Fork John Day River." *Id*. at 97, 122. This choice of scale is not clear. The area

analyzed may "exten[d] down to the junction of Camp Creek and the Middle Fork John Day

River" but where does the area start? This phrase does not describe an identifiable set of borders,

nor does it rationalize the choice of area. The geographic scale for cumulative effects to rare

plant species is defined as the project area "due to the fact that plant populations generally do not

23

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

move significantly over time." *Id*. at 321. This is not adequate evidence for the choice of scale. Similarly, the scale of analysis for cumulative effects to Forest Vegetation is defined thusly: "All alternatives analyzed would occur within the 40,000-acre Camp Lick planning area. This is the spatial zone of influence that has been analyzed for silviculture." *Id*. at 68.  No other justification is given. The Forest Service must explain why they have chosen to exclude from their cumulative effects analysis all adjacent projects within the same forest, or the same watershed, that may have an effect on Forest Vegetation.

63.    The arbitrary and capricious failure to justify a choice of scale of analysis is most evident in the Aquatic Species and Aquatic Habitats sections. According to the Forest Service "The analysis area for aquatic species and the cumulative effects boundary are the same as used for aquatic habitat." *Id*. at 144. The only justification given is that "Measurable effects from proposed activities are unlikely to extend downstream of this area." *Id*. This is not an adequate justification for a cumulative effects analysis boundary. The purpose of cumulative effects analysis is to analyze the effects of a proposed action in conjunction with past, present, and future projects. An assumption about direct effects in the project area is not sufficient evidence to eliminate analyzing the cumulative effects of other projects. The planners state "The Camp Lick Project is a watershed restoration project which would be on a similar scale and include similar types of actions as the Magone and the Big Mosquito projects; the effects to aquatic habitat and species would likewise be similar." *Id*. at 146. If the planners can look at projects in the same ranger district (Blue Mountain) and openly state that the projects have similar actions and effects to aquatic habitats and species, they must justify why those projects have not been analyzed cumulatively in terms of effects to aquatic habitats and species.  Often, scale of analysis is not defined at all. The Soil Quality section says only the following "The spatial context for effects

24

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

analysis is each proposed unit." *Id*. at 307. That does not explicitly define a cumulative effects boundary, let alone justify that choice. This statement is repeated almost verbatim in the Soil Erosion section. *Id*. at 311. This is arbitrary and capricious and violates NEPA.

64.    Furthermore, the FEA Dead and Defective Wood cumulative effects analysis employs an illegal switching of scales to dilute the projects cumulative effects. According to the FEA "The area considered for cumulative effects is the Camp Creek watershed and activities within 300 feet of the planning area boundary." FEA at 234. But on the next page, the FEA makes the following statements:

> Under the proposed action alternative, changes in dead wood habitats would be considered minor on a forest scale…When the past, present, and reasonably foreseeable actions are considered in combination with the action alternative, changes in snag densities across the watershed are expected to be minor…Together with fire suppression and other landscape objectives that limit or discourage large beetle outbreaks, the project would contribute to a small negative trend in black-backed woodpecker habitat in the planning area and adjacent planning areas where similar treatments are proposed or in progress, but would not contribute to a negative trend across the Forest due to the large amount of habitat created in recent large-scale wildfires.

*Id*. at 235. Here we see the Forest Service stating an area of analysis for a resource, but then claiming that the project will have minimal effects at a watershed and Forest scale. This dilution of effects is arbitrary and capricious, according to 9th Circuit caselaw. Agencies cannot use shifting scales of analysis to hide cumulative effects to the environment. In the case at hand, the

25

Forest Service similarly and illegally dismisses short term negative effects to the project area and adjacent areas because the effects to dead wood habitat are "considered minor on a forest scale."

65.     The Forest Service also failed to analyze site-specific geographic conditions or effects on the immediate area and instead merely acknowledged negative effects to the project area without explaining what that means or analyzing the degree or severity of these effects. Furthermore, the Service never even made an explicit cumulative effects determination for their stated geographic scale, "the Camp Creek watershed and activities within 300 feet of the planning area boundary." Without justification, the area analyzed for cumulative effects switches to "the planning area and adjacent planning areas where similar treatments are proposed or in progress." These inconsistencies, coupled with the attempts to dilute cumulative effects and outright lack of analysis, are arbitrary, capricious, and illegal.

66.     These deficiencies alleged in the preceding paragraphs are examples of, and not intended to be an exhaustive list of, all the legal deficiencies in the cumulative effects analysis.

Direct Effects

67.     The Forest Service has failed to adequately analyze the direct and indirect effects of the proposed action. For example, the logging approved by the Project would remove significant forest cover, and affect runoff, erosion, sediment loading in streams, stream bank stability, large woody debris, retention and stream temperature relationships. For example, the "maintenance of ground cover over much of the [riparian restoration treatment areas] and the filtering and sediment trapping capacity of RHCAs" are directly threatened by heavy equipment use and commercial logging within the RHCAs. The Forest Service did not consider these effects

26

when evaluating the Proposed Action. FEA at 117. The Forest Service also failed to adequately address the direct effects of the chosen alternative to water quality, particularly in regards to sediment delivery. Quoting the FEA:

> There is low potential for increased inputs of point and non-point source pollutants as a result of silvicultural treatments. Point and non-point source pollutants are considered low potential because the district has a history of successfully using best management practices and project design criteria on projects. Project activities with potential to affect water quality from the silvicultural treatments include timber haul and log skidding:
>
> • Equipment operations in riparian areas or close proximity to water have the potential for accidental spill of petroleum products.
>
> • Timber haul can affect sediment delivery when accomplished during wet conditions.
>
> • Log skidding can create compacted surfaces that create pathways for sediment laden water. Best management practices would be utilized and project design criteria are prescribed for each of the following activities to prevent or mitigate these effects.

FEA at 120. The FEA then describes some of their best management practices. *Id*. This is not an analysis of direct effects. This is an acknowledgement of a potential impact and an assurance that the impact will be negligent due to alleged past successes. The analysis of direct effects should at least attempt to quantify the potential effects. The Aquatic Resources goes into more detail regarding the Service's belief that over ten thousand acres of logging using heavy equipment will not meaningfully increase sediment levels in the project areas water features, but again does not

27

attempt to quantify potential effects. Camp Lick Aquatics Report at 89. This is arbitrary and capricious, in violation of NEPA.

68.     The Forest Service also failed to adequately consider the direct and indirect effects of the Project on Snags in the Camp Lick area. Snags are dead or dying trees that are still standing. Although dead, snags provide vital wildlife habitat to a number of species in the project area. The FEA's conclusion that in the short to mid-term, planned logging and prescribed burning would maintain or only slightly decrease snag numbers is not born out by the facts. FEA at 232. Widespread removal of hazard trees, loss from prescribed fire, and loss of future snag recruitment from removal of mature and large trees over about 12,000 acres would lead to a significant decrease in short to mid-term snag abundance. The proposed activities of the project cannot be squared with the Forests Service's conclusion that snag levels would be maintained or only slightly decreased in the short to medium term. The Forest Service's conclusions are arbitrary and capricious.

69.     Additionally, The Camp Lick FEA analysis section for six of the primary cavity excavating woodpecker species lacks meaningful analysis of direct and indirect effects. FEA at 236–250. The Forest Service's analysis failed to include information as to each species' habitat needs for snags and down wood. They failed to provide detailed analysis of science-based information on the kind of habitat each species uses, the size and abundance of snags each species needs, whether they depend on down log foraging, and how well these habitat requirements would be met by the proposed action for each habitat type. There is no mention of habitat survey for any of those woodpecker species in the planning area, which are needed to determine population status and trends and viability thresholds. Similarly, there is a lack of analysis in the old growth habitat section of the highly negative effects to pileated woodpecker

28

and American marten (as well as to unanalyzed Pacific fisher) of large tree loss to logging, especially the loss of Grand Fir (which has many benefits to pileated woodpeckers; hollow firs are also used for denning by Pacific fisher). FEA at 256–268. This is an inadequate, biased, and arbitrary and capricious analysis.

70.     The project planners failed to provide an adequate baseline in regards to stream temperatures in the project area. These issues were brought to light by a BMBP Freedom of Information Act (FOIA) request, submitted to the Malheur National Forest on April 26th, 2018. BMBP compared the stream temperature data we received in our FOIA response with the Stream temperature data used in the FEA and found discrepancies. The Camp Lick Aquatics report utilizes individual stream temperature data from 2004 for multiple streams in the project area, when temperature data from much more recently was available. Our FOIA request showed that 15 streams listed in the FEA had inaccurate 7-day temperature averages; with temperatures sometimes over 10 degrees higher than what was reported in 2004 and used in the FEA. Temperature data given in the FEA for the reaches of Camp Creek were entirely inaccurate, all 8 reaches were listed with out-of-date temperatures. We brought these discrepancies to light in our January 10th, 2020 letter requesting Forest Service complete a supplemental EIS/EA. A subsequent BMBP FOIA request of Forest Service electronic communication regarding Camp Lick revealed that the Forest Service had access to substantially more correct stream temperature data, i.e. data received in BMBP's FOIA request, the entire time. This data was used in the Forest Service authored Biological Assessment provided to the National Marine Fisheries Service. It is unclear why these discrepancies occurred, and BMBP makes no allegations as to why they occurred. What is important is that these discrepancies did occur. The purpose of baseline data is to inform analysis of the action alternatives, so that the public may be informed

29

of the potential project effects and comment on them. Not only has the Forest Service failed to allow the public to comment on the actual baseline conditions, they used the actual data internally in their ESA consultation process. This discrepancy, whether a result of intentional deception or incompetence, is arbitrary and capricious, and illegal.

71.     The above legal violations and omissions regarding the direct impacts analysis are only examples of the legal problems, rather than an exhaustive list of them.

Purpose and Need/Range of Alternatives

72.     The Camp Lick Project's purpose and need is too narrow and has resulted in the Forest Service unreasonably ruling out viable alternatives that are more environmentally protective. The Forest Service rejects all non-logging alternatives by claiming they would not satisfy the purpose and need. BMBP is concerned that the Camp Lick Project's objective to create conditions that will produce vigorous trees is motivated by desire to maximize timber harvest profits. It is a sign of the Forest Service's bias to claim that not logging regionally and Forest wide scarce large trees would unduly "limit" meeting the purpose and need. FEA 56–57.

73.     The Camp Lick Project FEA should have included a full range of action alternatives. Specifically, BMBP asked for serious consideration of alternatives that do not include logging of large trees, logging in Late and Old Structure stands, logging of Replacement and undesignated Dedicated Old Growth Areas, and logging within RHCAs, and focus instead on aquatic restoration and small tree thinning up to 9 to 10 inches diameter DBH and/or prescribed burning for restoring riparian hardwood trees and shrubs and thinning denser young tree growth from past logging and possible wild fire suppression. While these are not perfect or universal solutions, they should have been considered in the context of the Camp Lick Project.

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

The Service's failure to consider any non-commercial logging alternatives is arbitrary and capricious.

Changed Circumstances and Supplementation

74.    The Camp Lick project analysis out of date, enough to render it arbitrary and capricious. The publication of a FONSI does not exempt the planning agency from further analysis. NEPA requires agencies to prepare a supplemental EIS when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii). Significant new information requires that the party proposing the project conduct a supplemental analysis under 40 C.F.R. § 1502.9. This requirement applies equally to both Environmental Impact Statements and Environmental Assessments.

75.    On January 10th, 2020, BMBP sent a request for a supplemental EA/EIS. The Forest Service received our request but never acknowledged it. As discussed above, an agency's duty to analyze its projects impacts does not disappear after a FONSI is released. We objected to the dearth of cumulative effects analysis regarding timber sales such as Magone, Big Mosquito, Galena, and Ragged Ruby, stating that "The Forest Service must adequately analyze the cumulative loss of future large tree structure, large snag abundance, and large snag density across this broad swath of the District." BMBP Camp Lick Objection at 23. The draft decision for the Camp Lick project was released more than two years earlier. In that time, newer proposed projects have rendered the project's cumulative effects analysis legally insufficient, namely the Austin and Bark proposals.  The cumulative effects of these adjacent project must be analyzed; to not do so renders the decision arbitrary and capricious.

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

76.    The only attempt to acknowledge the change in conditions over the past two years is a document released with the DN/FONSI called the "Supplemental Information Report." This document provides no meaningful analysis of changed conditions, only the conclusion that no additional analysis is required. The SIR offers only conclusions and no opportunity for public scrutiny. This abdication of responsibility renders the SIR and the DN/FONSI arbitrary and capricious, and illegal.

77.    The new information or circumstances justifying a Supplemental EA/EIS continued to occur even after BMBP made it's January 2020 request. For example, the Forest Service's January 2021 approval of significant changes to the Eastside Screens (proposed changes first made public in May of 2020, before the Camp Lick decision was finalized) also require a supplemental NEPA analysis.

<u>Necessity of an EIS</u>

78.    Ultimately, this project should have been analyzed as an EIS. Ragged Ruby, a highly similar project featuring the same Forest Plan Amendments was analyzed through an EIS document. The biggest difference between that project and Camp Lick is that Ragged Ruby is much smaller. Ragged Ruby comes in at 6,097 acres of commercial activity. Ragged Ruby ROD at 7. Camp Lick, at around 12,000 acres of commercial activity, is significantly larger than a sale in the same Forest, the same watershed, using the same Forest plan amendments. That is strong evidence that Camp Lick should have been analyzed as an EIS. The new information bolsters this conclusion. The Austin and Bark projects, along with the confusion regarding water temperatures in the project area, raise questions about significance that require an EIS to properly answer. A federal agency must prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). CEQ regulations

define "significantly" as requiring consideration of both context and intensity, with ten

significance factors listed under the latter. 40 C.F.R. § 1508.27. Because of the context and

intensity of the Camp Lick Project, the Forest Service should have completed an EIS for the

project. The EA is arbitrary and capricious.

79.     The Camp Lick project is legally untenable. The projects violations reach the core

of NEPA. From faulty effects analysis to an artificially narrowed range of alternatives, this

project simply does not pass legal muster. The NFMA violations are similarly egregious. The

Forest Plan amendments violate binding caselaw. This Project should not be allowed to go

forward in its current form.

## Plaintiff's First Claim for Relief

## (Violations of NFMA and APA by the Forest Service)

80.     Plaintiff realleges and incorporates by reference all preceding paragraphs into

each of the counts set forth below.

81.     One of NFMA's goals is comprehensive management of the national forest

system. Pursuant to this goal, NFMA requires the Forest Service to make an integrated forest

management plan for each national forest. 16 U.S.C. § 1604(b) and (f). Any actions taken on a

forest must be consistent with this management plan. 16 U.S.C. § 1604(i). Forest plans may be

amended, see 16 U.S.C. § 1604(d) and (f), but the scope of such amendments must be rationally

related to the underlying management issues. Significant amendments must comply with 16 U.S.

C. § 1604(d), (e) and (f). Site-Specific plan amendments should only be used to address truly

site-specific management issues. The Camp Lick site-specific amendments are arbitrary and

capricious in violation of the APA and NFMA.

## Plaintiff's Second Claim for Relief

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

**(Violations of NEPA and APA by the Forest Service)**

82.    Plaintiff realleges and incorporates by reference all preceding paragraphs into each of the counts set forth below.

<u>COUNT ONE</u>

83.    Pursuant to NEPA, the Forest Service must discuss and analyze the project's cumulative impacts, when added to other past, present and reasonably foreseeable future actions, and their significance. 40 C.F.R. § 1508.7.

84.    For example, the FEA failed to adequately analyze the cumulative effects of this project on multiple levels. The Forest Service failed to adequately analyze effects to fish species, snags, large trees, watershed, snags, primary cavity excavators and future projects that may utilize similar Forest Plan Amendments. These failures alone were enough to render the analysis arbitrary and capricious.

85.    In the two years since the release of the FEA, multiple adjacent projects, namely Austin, Bark, and the finalized Ragged Ruby, have come to light. The potential cumulative effect of these projects must be analyzed and added to the sales the forest service knew about at the time the Draft Decision Notice was released. Failure to do so renders the FEA and decision document arbitrary and capricious in violation of the APA and NEPA.

<u>COUNT TWO</u>

86.    Agencies may choose the geographic scope of the cumulative effect analysis to an extent; however, agencies must provide support in the record for their choice of analysis area. Defendants' improper shifting of the scale of its analysis of scope cumulative impacts was not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A). This violation renders the decision arbitrary and capricious in violation of the APA and NEPA.

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

## COUNT THREE

87.    Pursuant to NEPA, the Forest Service must discuss and analyze the project's direct and indirect impacts. 40 CFR § 1508.8. For example, the Service's failure to adequately analyze effects to snag densities, RHCAs, and primary cavity excavating woodpecker species show that the Service failed to take the requisite "hard look." These failures render the decision arbitrary and capricious in violation of the APA and NEPA.

## COUNT FOUR

88.    Pursuant to NEPA, the Forest Service must provide adequate baseline data for analysis. The Service's failure to provide accurate baseline stream temperature data, despite having that data available and using for consultations, violates that requirement. Without adequate baseline data, there is no way to accurately determine effects, making a "hard look" impossible. In the absence of an adequate baseline analysis, Defendants' conclusion that project activities would not significantly affect stream temperature in the Project Area is arbitrary, capricious, an abuse of discretion and not in accordance with NEPA, in violation of 5 U.S.C. § 706(2). These failures render the decision arbitrary and capricious in violation of the APA and NEPA.

## COUNT FIVE

89.    We have maintained consistently that the Camp Lick purpose and need is too narrow and is intended to justify ecologically destructive logging. The Service rejected out of hand whether their stated needs could be met with smaller or less intensive project designs. The Forest Service's failure to take a hard look at whether its proposed logging within old forests and logging of big trees will achieve the purpose and need of the Camp Lick Project violates 5

35

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

U.S.C. § 706(2)(A). This violation renders the decision arbitrary and capricious in violation of the APA and NEPA.

COUNT SIX

90.    The Project planners failed to seriously consider any alternatives that did not feature a specific set of logging practices, including the logging of large trees. Defendants' failure to consider a reasonable range of alternatives is a violation of 5 U.S.C. § 706(2)(A). This violation renders the decision arbitrary and capricious in violation of the APA and NEPA.

COUNT SEVEN

91.    Federal regulations require Agencies to produce an SEIS when there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." CFR §1502.9(c)(1)(i-ii).

92.    The projects Ragged Ruby, Bark, and Austin represent significant new circumstances and information under even the most generous view. These are adjacent projects that feature similar effects on large, old trees. The recent changes to the Eastside Screens also justify a supplemental EA or EIS for the Camp Lick Project. The Forest Service "unlawfully withheld or unreasonably delayed" a required agency action through failing to produce an SEA or SEIS in light of new information and circumstances. 5 U.S.C. § 706(1).

93.    The "Supplemental Information Report" fails to sufficiently analyze the cumulative effects of these new projects and plan amendments, rendering that document arbitrary and capricious, in violation of NEPA. It cannot satisfy the Forest Service's obligations under CFR §1502.9(c)(1)(i-ii).

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

94.     In the alternative, if the Forest Service affirmatively and finally decided not to prepare an SEA or SEIS, that final agency action was arbitrary, capricious, not in accordance with NEPA and in violation of 5 U.S.C. § 706(2)(A).

<u>COUNT EIGHT</u>

95.     NEPA requires that Defendants prepare an EIS "in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1502.3. These agencies must complete an EIS if (1) the proposed project "is a major federal action" and (2) the proposed project may "significantly affect the quality of the human environment." *Id.* § 4332; *see also* 40 C.F.R. § 1508.18.

96.     Although NEPA regulations allow an agency to avoid preparing a complete EIS by first preparing an EA and then issuing a FONSI, 40 C.F.R. § 1508.9, the inadequate EA and underlying record here did not support the Defendants' FONSI and failure to prepare an EIS.

97.     Contrary to the Forest Services flawed determinations, the Camp Lick Project may significantly effect "the quality of the human environment" in the Camp Lick Area. The project is larger and more intensive than other projects in the same Forest and same watershed, using the same Forest Plan Amendments. New information bolsters the conclusion that this project may seriously affect the environment. Defendants' failure to prepare an EIS was not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A). This violation renders the decision arbitrary and capricious in violation of the APA and NEPA.

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

<u>PRAYER FOR RELIEF</u>

A.  Declare that the Forest Service's authorization of the Camp Lick Project violates NEPA and/or NFMA and is arbitrary, capricious, an abuse of discretion, and/or not in accordance with law under the APA, 5 U.S.C. § 706(2)(A);

B.  Vacate and set aside the final EA, FONSI, and Record of Decision for the Camp Lick Project as illegal agency actions under the APA;

C.  Enjoin the Forest Service from implementing the Record of Decision until the agency has complied with NEPA and NFMA;

D.  Adjudge and declare that the Forest Service's failure to prepare a supplemental Environmental Assessment or Environmental Impact Statement violated NEPA and the APA, 5 U.S.C. § 706(1);

E.  Pursuant to 5 U.S.C. § 706(1), order the Forest Service to prepare an Supplemental Environmental Assessment or Supplemental Environmental Impact Statement;

F.  Enter appropriate preliminary and permanent injunctive relief to ensure that Defendants comply with NEPA and NFMA, and specifically to ensure that Defendants and their agents take no further actions toward proceeding with the challenged Camp Lick Project until they have complied with NEPA and NMFA;

G.  Award Plaintiffs their reasonable costs, litigation expenses, and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq; and

H.  Grant such further relief as the Court deems just and proper.

Dated this 12th day of July 2021.

s/Cooper Rodgers_____

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF

Cooper Rodgers, OSB # 194439
6926 SE Ogden Street
Portland OR, 97206
Tel: 818-667-6657
Email: cooper@bluemountainsbiodiversityproject.org


s/Tom Buchele_____

Tom Buchele, OSB # 081560
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland OR  97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF