Cooper Rodgers, OSB # 194439
Blue Mountains Biodiversity Project
6926 SE Ogden Street
Portland, OR 97206
Tel: (818) 667-6657
Email: cooper@bluemountainsbiodiversityproject.org

Tom Buchele, OSB # 081560
Bridgett Buss, OSB # 204997
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219
Tel: (503) 768-6736 (Buchele)
Tel: (503) 768-6825 (Buss)
Fax: (503) 768-6642
Email: tbuchele@lclark.edu
Email: bridgettbuss@lclark.edu

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| **BLUE MOUNTAINS BIODIVERSITY PROJECT**, an Oregon nonprofit corporation,<br><br>Plaintiff,<br><br>v.<br><br>**CRAIG P. TRULOCK**, Forest Supervisor, Malheur National Forest, in his official capacity; and **UNITED STATES FOREST SERVICE**, an agency of the United States Department of Agriculture,<br><br>Defendants. | Case No. 2:21-cv-01033-HL<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>ORAL ARGUMENT REQUESTED |

## MOTION

Plaintiff Blue Mountains Biodiversity Project ("BMBP") hereby respectfully moves this Court for an order, pursuant to Federal Rule of Civil Procedure ("FRCP") 56, granting it summary judgment against Defendants Craig P. Trulock ("Trulock"), in his official capacity as Malheur National Forest Supervisor and the United States Forest Service (collectively "the Forest Service" or "the Service") on its claims for relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., *see* ECF No. 1, Claim 2, Counts 1–8, ¶¶ 82–97, and on its claims for relief under the APA and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604, Claim 1, ECF No. 1, ¶¶ 80–81, on the grounds that BMBP is entitled to judgment as a matter of law. Those claims challenge the May 27, 2020, Decision Notice ("DN") and Finding of No Significant Impact ("FONSI") signed by Trulock on behalf of the Forest Service, AR27076–169, and the underlying August 2017 Final Environmental Assessment ("FEA"), AR19303–740, for the Camp Lick Project ("the Project").[1] BMBP's NEPA claims include a challenge to the Forest Service's failure to prepare a Supplemental EA ("SEA") or a Supplemental Environmental Impact Statement ("SEIS") and that claim is pled in the alternative as an arbitrary and capricious decision in violation of Section 706(2)(A) of the APA or as an illegal failure to act under Section 706(1) of the APA. ECF No. 1, Claim 2, Count 7, ¶¶ 91-94.

BMBP's motion is supported by the Administrative Record lodged with the Court on October 8, 2021, ECF No. 14; the Supplemental Administrative Record lodged with the Court on

---

[1] The Service filed its Administrative Record with the Court, *see* ECF No. 14, and a Supplemental Administrative Record, *see* ECF No. 20. BMBP will cite to the initial record as "AR____," and the supplemental record as SUPPAR____," referencing the bates numbering inserted by the Service in the lower right-hand corner of each page in its record and supplemental record.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT                                                    i

February 2, 2022, ECF No. 20; BMBP's memorandum in support of its motion for summary judgement; the supporting declarations of BMBP co-director Paula Hood ("Hood Decl."), and BMBP supporters Amy Stuart ("Stuart Decl."), Karen Lillebo ("Lillebo Decl."), and Philip Krohn ("Krohn Decl."); and the supporting declaration of Thomas Buchele ("Buchele Decl."), and its attachments.

 The Council on Environmental Quality ("CEQ") is the body responsible for promulgating NEPA regulations, found at 40 C.F.R. Part 1500. These CEQ regulations were amended in 2020, effective on Sept. 14, 2020. 85 Fed. Reg. 43,304 (July 16, 2020). However, all the citations to the CEQ regulations in BMBP's supporting memorandum are to the previous version of those regulations, which were in place during the decision-making process for the Camp Lick Project that ended in May of 2020.

 As required by Local Rule 7-1(a)(2), on March 1, 2022, BMBP conferred with counsel for the Service regarding each claim that is the subject of this motion. The parties were unable to reach a resolution. Wherefore, BMBP requests for the reasons set forth in its accompanying memorandum and supporting declarations that the Court enter judgment for BMBP on its claims and issue an order setting aside and vacating the illegally-issued DN/FONSI and FEA.

## TABLE OF CONTENTS

**Page Nos.**

MOTION ................................................................................................................ i

TABLE OF AUTHORITIES ................................................................................. v

TABLE OF ACRONYMS .................................................................................... ix

MEMORANDUM IN SUPPORT OF MOTION ................................................... 1

INTRODUCTION AND BACKGROUND ........................................................... 1

ARTICLE III STANDING ................................................................................... 5

STANDARD OF REVIEW .................................................................................. 5

ARGUMENT ...................................................................................................... 6

I.      The Forest Service has Violated NFMA ................................................. 6

        a.      The Forest Service Violated NFMA and the APA by Using Site-Specific
                Forest Plan Amendments to Address a Region-Wide Issue (Claim 1). ................. 7

        b.      Factual Background: The Eastside Screens Amendments ....................................... 8

        c.      The Forest Service's Forest Plan Amendments Violate NFMA and the
                APA Because They are Not Addressing a Unique Problem. ................................... 9

        d.      The Forest Service's Practice of Issuing Successive Site-Specific Forest
                Plan Amendments Amounts to a De Facto Significant Forest Plan
                Amendment that Must be Analyzed as Such in an EIS. ....................................... 13

II.     The Forest Service has Violated NEPA .......................................................... 14

        a.      The Forest Service Failed to Analyze Cumulative Effects on Multiple
                Resources, Including the Cumulative Effects of Multiple Site-Specific
                Forest Plan Amendments, in Violation of NEPA (Claim 2, Count 1). ................. 14

        b.      The Forest Service Used an Inconsistent and Improper Geographic Scope for
                its Cumulative Effects Analyses (Claim 2, Count 2). .......................................... 18

                i.      The Service's Cumulative Effects Analysis of Aquatic Species,
                        Habitats, and the Watershed Resource Violates NEPA and is
                        Arbitrary and Capricious ........................................................................... 19

       ii.      The Forest Service's Cumulative Effects Analyses of Resources Critical to Biodiversity Violate NEPA. ....................................................22

c.      The Forest Service Failed to Take a Hard Look at Direct and Indirect Impacts of the Project (Claim 2, Counts 3 and 4). .............................................................25

d.      The Forest Service Violated NEPA by Having an Unreasonably Narrow Purpose and Need Statement (Claim 2, Count 5). .................................................28

e.      The Forest Service Violated NEPA by Failing to Evaluate a Reasonable Range of Alternatives (Claim 2, Count 6). .......................................................................31

       i.      There are Unresolved Conflicts Surrounding Project Resources. .............31

       ii.      The Service Improperly Rejected Reasonable Proposed Alternatives ......33

f.      Project is "Significant" Under NEPA, Requiring an EIS (Claim 2, Count 8). ......35

       i.      Context ................................................................................................37

       ii.      Intensity...............................................................................................39

g.      The Forest Service Failed to Prepare an SEIS or SEA Despite Significant New Circumstances and Information (Claim 2, Count 7). ...................................42

CONCLUSION.............................................................................................................45

# TABLE OF AUTHORITIES

**Case**                                                                                          **Page Nos.**

*All. for the Wild Rockies v. Marten*, 2021 WL 5881745 (D. Mont. Dec. 13, 2021) .....................13

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004).................................................................37, 42

*Bob Marshall All. v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) ...........................................................31

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ..................36

*Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982)...............................................................................31

*Cascade Forest Conservancy v. Heppler*, 2021 WL 641614 (D. Or. Feb. 15, 2021)...................26

*Cascadia Wildlands v. BLM,* 410 F. Supp. 3d 1146 (D. Or. 2019) ................................................38

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003).......................5

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172
    (9th Cir. 2008).......................................................................................................................29

*Earth Island Inst. v. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006)................................................14

*Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000) ..................................................................5

*Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165 (D. Or. July 3, 2014)...........................6

*Great Basin Res. Watch v. BLM,* 844 F.3d 1095 (9th Cir. 2016) ..................................................26

*Idaho Sporting Congress v. Alexander*, 222 F.3d 562 (9th Cir. 2000) ....................................42, 44

*Kern v. BLM*, 284 F.3d 1062 (9th Cir. 2002)...............................................................................14

*Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989 (9th Cir. 2004)............................. *passim*

*Klamath Siskiyou Wildlands Ctr. v. Boody,* 468 F.3d 549 (9th Cir. 2006)...................................43

*Lands Council v. Martin*, 529 F.3d 1219 (9th Cir. 2008) .....................................................6, 9, 10

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008)..............................................................6

*LOWD/BMBP v. Connaughton*, 2014 WL 6977611 (D. Or. Dec. 9, 2014) .......................... *passim*

*Makua v. Rumsfeld,* 163 F. Supp. 2d 1202 (D. Haw. 2001) ..........................................................41

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) ..................................................................42

*N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ...........................25

*Nat'l Parks Conservation Ass'n v. Babbitt,* 241 F.3d 722 (9th Cir. 2001) .......................28, 35, 42

*Nat'l Parks Conservation Ass'n v. BLM,* 606 F.3d 1058 (9th Cir. 2010)......................................31

*Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th Cir. 2002) ........................................15

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005).........................39

*Nw. Env't. Advocs. v. E.P.A.*, 855 F. Supp. 2d 1199 (D. Or. 2012)...........................................5, 6

*Ocean Advocs. v. U.S. Army Corps of Eng'rs* 402 F.3d 846, (9th Cir. 2005) .................14, 28, 39

*Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2010) .....................................................25

*Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185 (9th Cir. 2019) .....................................................40

*Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028
    (9th Cir. 2001).........................................................................................................................38

*Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037 (9th Cir. 2011).........................42

*Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997) ........................................31

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) ............................................31, 35

## **Codes and Regulations**

5 U.S.C. §§ 701–706.....................................................................................................................i

5 U.S.C. § 706(1) ...............................................................................................................i, 6, 43, 45

5 U.S.C. § 706(2)(A)...............................................................................................................i, 6, 45

16 U.S.C. § 1604 ......................................................................................................................i, 41

16 U.S.C. § 1604(f)(1) .....................................................................................................................6

16 U.S.C. § 1604(f)(4) ..................................................................................................................6, 14

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

16 U.S.C. § 1604(i) .................................................................................................6

42 U.S.C. §§ 4321 et seq...........................................................................................i

42 U.S.C. § 4332(C) .............................................................................................35

42 U.S.C. § 4332(C)(iii) ........................................................................................29

36 C.F.R. § 219.13(b)(3)...................................................................................14, 18

36 C.F.R. § 220.7(b)(2)(i) .....................................................................................33

40 C.F.R. Part 1500 ...............................................................................................ii

40 C.F.R § 1500.2(e)..............................................................................................31

40 C.F.R. § 1502.9(c)(1)(ii) (2019) ..................................................................42, 45

40 C.F.R. § 1502.13 (2019) ..............................................................................29, 30

40 C.F.R. §1502.14 (2019) ...............................................................................29, 31

40 C.F.R. § 1502.14(a) (2019) ..........................................................................32, 33

40 C.F.R. § 1502.21 (2019) ....................................................................................28

40 C.F.R. § 1508.7 (2019) .....................................................................................14

40 C.F.R. § 1508.8 (2019) ...............................................................................14, 25

40 C.F.R. § 1508.8(a) (2019) ..................................................................................25

40 C.F.R. § 1508.9(a)(1) (2019) .............................................................................36

40 C.F.R. § 1508.13 (2019) ...................................................................................36

40 C.F.R. § 1508.27 (2019) .......................................................................18, 35, 37

40 C.F.R. § 1508.27(a) (2019) ..........................................................................37, 39

40 C.F.R. § 1508.27(b) (2019) ...............................................................................39

40 C.F.R. § 1508.27(b)(4) (2019) ...........................................................................39

40 C.F.R. § 1508.27(b)(7) (2019) ...........................................................................40

40 C.F.R. § 1508.27(b)(9) (2019) ..........................................................................36, 40

40 C.F.R. § 1508.27(b)(10) (2019) ...............................................................................41

**Other**

85 Fed. Reg. 43,304 (July 16, 2020) ............................................................................. ii

Altman, Bob. 2000. *Conservation Strategy for Landbirds in the Northern Rocky Mountains of Eastern Oregon and Washington*. Version 1.0. Prepared for Partners in Flight. ..........24

*Considering Cumulative Effects Under the National Environmental Policy Act* 1 (1997)...............................................................................................3, 18, 19

FRCP 56 ....................................................................................................................... i, 5

FSH 1909.15 zero-code § 5 ("Definitions") ................................................................30

Local Rule 7-1(a)(2) .......................................................................................................ii

## TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BMBP | Blue Mountains Biodiversity Project |
| DBH | Diameter at Breast Height (also: "dbh") |
| DN | Decision Notice |
| DOG | Designated Old Growth |
| EIS | Environmental Impact Statement |
| FEA | Final Environmental Assessment |
| FOIA | Freedom of Information Act |
| FONSI | Finding of No Significant Impact |
| FRCP | Federal Rules of Civil Procedure |
| HRV | Historical Range of Variability |
| LOS | Late and Old Structure/Late and Old Successional |
| LRMP | Land and Resource Management Plan (also "Forest Plan") |
| RHCA | Riparian Habitat Conservation Area |
| ROG | Replacement Old Growth |
| SIR | Supplemental Information Report |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| MNF | Malheur National Forest |

## MEMORANDUM IN SUPPORT OF MOTION

## INTRODUCTION AND BACKGROUND

The Camp Lick Project, located in the Malheur National Forest ("MNF"), spans "40,000 acres in the Upper Camp Creek, Lower Camp Creek, and Lick Creek watersheds that drain into the Middle Fork John Day River." AR27082. The approved project includes 31,090 acres of prescribed burning, 12,220 acres of silvicultural treatments, including 8,190 acres of commercial logging and treatments involving 9,900 acres of tractor yarding.[1] AR19406, 27086–89, 27097. The commercial logging includes large trees ≥21" diameter at breast height ("DBH") on up to 4,700 acres and will occur within riparian habitat conservation areas ("RHCAs") on up to 600 acres and within late and old structure stands ("LOS")[2] on up to 380 acres. AR27107–8, 27093.[3]

For logging large trees ≥21" DBH and within LOS, the Service had to adopt site-specific forest plan amendments to create exceptions to region-wide restrictions on such logging, usually referred to as the Eastside Screens, or "Screens." The Service adopted those restrictions during the 1990s because earlier, excessive logging had created a region-wide shortage of large trees and LOS forest that provide essential wildlife habitat. Adopting such site-specific amendments raises legal concerns under both NFMA and NEPA. In 2014 the District of Oregon held that such site-specific amendments violated NFMA unless they addressed truly unique conditions and violated NEPA unless the Service had considered the cumulative impacts of all such amendments for the entire national forest. *LOWD/BMBP v. Connaughton*, 2014 WL 6977611, at *8–9, *28–30 (D. Or. Dec. 9, 2014). After *Connaughton*, most national forests subject to the

---

[1] This involves the use of heavy equipment that can cause detrimental soil and erosion issues.
[2] This is sometimes used interchangeably with "late and old successional." AR19310; 19332.
[3] This list of authorized activities cites to the Camp Lick Final DN, which made slight changes to the preferred action alternative that was analyzed in the Camp Lick FEA.

Screens stopped using site-specific amendments to avoid the Screens' restrictions. The MNF has continued to use them, and their use here violates NFMA and NEPA.

The Camp Lick Project is just one of many large logging projects that has occurred, or will occur, in close proximity within the Middle Fork John Day watershed, and within the broader John Day Basin as a whole. AR13012–13 (maps of John Day River sub-basins, select projects within the MNF). For example, just in the last 15 years, at least 7 projects have been approved or proposed within Middle Fork John Day Subbasin, including the Austin, Big Mosquito, Balance, Galena, Ragged Ruby, Bark, and Camp Lick Projects.[4] SUPPAR24679, 19912, 12343, 16531, 26425, 24663; AR27082. Of these, four involve amendments to the MNF Plan[5] to allow logging of trees ≥21" DBH and logging within LOS. *See infra* at 7–8; AR19710–12 (list including more past projects involving similar amendments). The size and frequency of such projects is relevant because in addition to a project's direct and indirect environmental impacts, NEPA requires analysis of the cumulative impacts from other relevant activities, such as nearby or adjacent timber sales. Activities associated with these types of projects can have cumulative negative environmental impacts, including the loss of large trees in a forest that already has a shortage of large trees, increases in sediment input into streams, and increases of in-stream temperatures. Such impacts extend, cumulatively, beyond each project's planning area because wildlife that uses the impacted forest and streams move between, as well as within, individual project planning areas. Further, water in impacted streams does not stay within project planning areas; it joins the outflows of other potentially impacted streams. These flows

---

[4] In that same time period, at least 10 projects have been approved or proposed within the broader John Day Basin, including those cited above as well as the Dove (SUPPAR23194), Magone (SUPPAR22622), and Country Road 18 (SUPPAR12053) Projects.

[5] Forest Plans are often also referred to as Land and Resource Management Plans, or "LRMPs."

MEMORANDUM IN SUPPORT OF PLAINTIFF'S                                                    2
MOTION FOR SUMMARY JUDGMENT

eventually reach the Middle Fork John Day and ultimately the John Day mainstem, which will suffer the combined impacts of sedimentation and temperature impairment flowing from all impacted streams feeding into it. *See* AR13012–16 (watershed maps).

The Service is charged with protecting streams from these very issues. This charge is leveled by PACFISH, a management strategy amending the MNF Plan which is designed to protect and restore aquatic habitat and riparian areas on lands administered by the Service, and which specifically targets watersheds that provide habitat for, among others, MCR steelhead, a threatened species under the Endangered Species Act ("ESA"). AR19439. PACFISH required the Service to establish RHCAs along with standards and guidelines to manage them,[6] AR19439; 13017, including standards addressing stream shading, temperature, and avoiding detrimental sedimentation. *Id*.; AR2050.[7] Presumably to avoid these adverse impacts, the Service typically does not extensively log, or commercially log, in RHCAs, but it is doing so for the Camp Lick Project, raising obvious concerns about direct and cumulative impacts to the streams running through RHCAs and the aquatic species in those protected streams. Almost all of those streams are already impaired because they are far too warm.

Determining the appropriate geographic scope for analyzing cumulative impacts is a critical NEPA issue that is subject to a Guidance document from the CEQ and was also addressed in *Connaughton,* 2014 WL 6977611, at *7, *9–11. Many of the Camp Lick Project's cumulative impacts analyses fail to address or follow that CEQ Guidance and make the same

---

[6] Under the MNF Plan, RHCAs are to be managed "to protect and enhance their value for wildlife, anadromous fish habitat, and water quality. Manage timber, grazing, and recreation to *give preferential consideration to anadromous fish*[.]" AR1166, 19316. Multi-use activities must be "conducted in a way to minimize impacts to riparian areas." AR19438.

[7] Stream shading is critical because it helps to regulate in-stream temperatures and provide cover for aquatic species against predation, AR19447, while avoiding excessive sedimentation avoids detrimental impacts to aquatic species, AR19449.

legal mistake that *Connaughton* found to violate NEPA: failing to properly identify or justify the geographic scope of a cumulative impacts analysis. Analyzing impacts to resources like MCR steelhead at the appropriate scale is critical when the Service itself acknowledged that the Project would "likely adversely affect" this species and its designated critical habitat. AR19490, 19492, SUPPAR23512. A proper NEPA analysis also requires that an agency start with adequate baseline data of current conditions, yet here the Service used stale temperature data for some streams. Despite the size of the Project, its direct impacts on at least 80% of the 40,000-acre planning area, its reliance on plan amendments eliminating otherwise mandatory protections, and its admitted adverse impacts on ESA-listed MCR steelhead, the Service chose to analyze Project impacts in an EA, rather than a more comprehensive Environmental Impact Statement ("EIS"). The FEA's alternative's analysis, which is supposed to be the "heart" of any NEPA analysis, only examined a single action alternative, the preferred alternative. The Service's explanation for such a cramped alternatives analysis and its FONSI that attempts to justify its failure to prepare an EIS cannot withstand scrutiny under even the most deferential judicial review.

Finally, during the three years between publishing its FEA and issuing its final Decision Notice and FONSI, the Service approved multiple additional projects, including some with site-specific amendments, in the Middle Fork John Day subbasin and larger John Day River basin. The impacts of these new projects, and the baseline stream temperature data not included in the FEA, triggered the need for supplemental NEPA analysis and public comment. Instead, the Service attempted to use an internal Supplemental Information Report ("SIR") to address this new information. Any and all of these NFMA and NEPA violations justify the entry of summary judgment under the APA for BMBP and vacatur of the Service's DN, FONSI and FEA.

## ARTICLE III STANDING

BMBP has Article III standing to bring this action because its members have standing to sue in their own right, the interests BMBP seeks to protect are germane to its purpose, and individual members' participation is not necessary for the Court to provide relief. *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000). Hood Decl., ¶¶ 3–6. BMBP's members have standing because they have suffered an injury in fact that was caused by the challenged action, and is likely to be redressed by the requested relief. *Laidlaw*, 528 U.S. at 180–82. BMBP's supporters, officers, and staff hike, camp, hunt, photograph and view scenery and wildlife, and engage in other vocational, educational, scientific observation, spiritual, and recreational activities within the MNF including the Camp Lick Project area and adjacent lands. *See* Stuart Decl. ¶¶ 8–16, 21–22; Lillebo Decl. ¶¶ 6–8; Krohn Decl. ¶¶ 6–12. *See generally Friends of the Earth*, 528 U.S. at 180–81. These interests are directly threatened by the Camp Lick Project, Stuart Decl. ¶¶ 13–14, 16–17, 28; Lillebo Decl. ¶¶ 7–8; Krohn Decl. ¶¶ 13–15, constituting injury in fact. These injuries were caused by the illegal 2017 FEA and 2020 DN/FONSI. Had the Service conducted a proper NEPA analysis, its decision may have been different. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 975–76 (9th Cir. 2003). As such, causation and redressability are satisfied and BMBP's members have standing.

## STANDARD OF REVIEW

BMBP's claims regarding the Forest Service's violations of NEPA and NFMA are governed by the APA. In APA cases, courts use summary judgment procedures under FRCP 56 to "determine whether the evidence in the administrative record permitted the agency to make that decision as a matter of law." *Nw. Env't. Advocs. v. E.P.A.*, 855 F. Supp. 2d 1199, 1204 (D. Or. 2012). The APA instructs courts to "hold unlawful and set aside agency action, findings, and

conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); and to "compel agency action unlawfully withheld." *Id*. § 706(1). For an agency decision to withstand APA scrutiny the agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165, *3 (D. Or. July 3, 2014). An agency's action is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to evidence before the agency or is so implausible that is could not be ascribed to a difference in view or the product of agency expertise." *Nw. Env't Advocs*., 855 F. Supp. 2d at 1204.

## ARGUMENT

## I.    The Forest Service has Violated NFMA.

NFMA requires a two-step management approach for national forests. First, the Service must develop a LRMP, for every national forest. Each LRMP must "form *one integrated plan* for each unit of the National Forest System. 16 U.S.C. § 1604(f)(1) (emphasis added). After the Service develops a LRMP, "all subsequent agency action, including site-specific plans . . . must comply with the NFMA and be consistent with the governing forest plan." *Lands Council v. McNair*, 537 F.3d 981, 989 (9th Cir. 2008) (en banc) (citing 16 U.S.C. § 1604(i)). Although NFMA allows the Service to amend LRMPs "in any manner whatsoever," 16 U.S.C. § 1604(f)(4), the Service must provide a rational basis for doing so, especially if it proposes a site-specific amendment, limiting the geographic scope of the amendment to what is otherwise an integrated, forest-wide plan. *See Lands Council v. Martin*, 529 F.3d 1219, 1225–28 (9th Cir. 2008).

a.  **The Forest Service Violated NFMA and the APA by Using Site-Specific Forest Plan Amendments to Address a Region-Wide Issue (Claim 1).**

The Camp Lick Project includes three site-specific amendments to the MNF Land and Resource Management plan ("LRMP" or "forest plan"), two of which illegally allow logging in hundreds of acres of LOS that are below historical range of variability ("HRV")[8] and allow for the logging of thousands of trees ≥21". AR27107–08.[9] The two challenged amendments exempt the Camp Lick Project from the otherwise mandatory requirements of the Screens. *Id*. AR2320–21. The Service claims it needs to implement these site-specific amendments to reduce competition stress for fire-resistant Western Larch and Ponderosa Pine and shift forest composition to HRV. AR19394–95. However, the presence of supposedly fire-susceptible Grand fir and Douglas fir in dry Eastside forests is not a site-specific problem since they exist throughout the Middle Fork John Day watershed, the MNF, and the Eastside region as a whole.

In the past, the Service has attempted to use similar illegal site-specific amendments to the Screens in other eastern Oregon national forests to address the same forest and region-wide conditions. *Connaughton*, 2014 WL 6977611, at *2 ("The [illegal] amendment would help 'maintain declining desired tree species, such as ponderosa pine and western larch, by reducing competition with over represented large grand fir.'"). The Service is currently implementing similar amendments and addressing similar conditions in projects such as Big Mosquito and Ragged Ruby, and is continuing to propose them for future projects, such as Austin, as well.

---

[8] HRV is the "historical pattern and abundance of structural stages within watersheds, using pre-settlement…conditions as a reference point. It involves the determination of whether a particular sale might critically alter the abundance of any structural stage within the project area." AR2225.
[9] The first adopted site-specific amendments changes dedicated old growth ("DOG") units designations, replacing them with replacement old growth ("ROG") stands. AR27106. BMBP does not challenge this amendment because it is used here to appropriately address characteristics unique to those stands within the Camp Lick Project area.

SUPPAR19930–32, 26441–43, 24701–02. Using such site-specific amendments to address, in a piecemeal fashion, forest conditions that exist throughout the MNF, and the entire region, violates NFMA by allowing the agency to avoid considering the forest-wide management implications and the environmental cumulative impacts of these amendments. If the Service believes the Screens prohibit the accomplishment of the management goals outlined in the MNF's LRMP, AR1105–07, the agency should have proposed and evaluated forest-wide amendments and the associated forest-wide impacts of curtailing the Screens' restrictions.

### b. Factual Background: The Eastside Screens Amendments

In 1992, Monitoring Reports for national forests in eastern Oregon and Washington expressed concern over forest conditions due to over-logging. *See* AR2229–31. These reports acknowledged that "excess timber cutting can conflict with promoting forest health" and that "the number of trees available for nesting has been declining," AR2229–30, as have wildlife, numbers. *Id*. The reports also concluded that prior logging practices "have left numerous treated acres on the Forest without adequate dead tree densities to meet the habitat and needs of primary excavators." *Id*.[10] After additional analysis, over 113 scientists concluded that "eastside ecosystems are stressed and unstable" because of "management practices of this century that have reduced diversity … and long-term productivity." AR2231.

Because of these scientific findings in 1993 the Regional Forester issued an Interim Direction that established new standards for timber sales in Eastside forests, including the MNF. AR2320, 2222. In addition to other requirements, the Eastside Screens' Standard 6(d) prohibits logging "live trees" greater than or equal to 21" dbh (the "21" Rule") and logging within LOS

[10] Primary cavity excavators are wildlife species such as the pileated woodpecker that require large dead or defective wood habitat. This is sometimes referred to as "snag" habitat. AR22789.

stages that are below HRV. AR2276–77. This direction is intentionally restrictive and requires

the Eastside forests to use the standards to "screen" timber sales, AR2321, "to preserve future

planning options until completion of the [regional] Eastside EIS," which will assess "risks to

species, ecological groupings of species, and habitats" throughout the Eastside forests, and "will

provide long term direction for ecosystem management" in the Eastside forests. AR 2223. In

1994 and 1995, the Regional Forester extended a modified version of the Screens pending

completion of the regional Eastside EIS. AR2323, 2474. Despite the previous emphasis on the

need for a region-wide EIS addressing this issue, in 2003, a new Regional Forester suggested

site-specific amendments may be appropriate to sidestep the Screens. AR2481. In her 2003

Guidance letter she suggested "site-specific" amendments to avoid the limitations of the 21"

Rule and no logging in stands below HRV limitation. *Id*.[11] However, she also noted recent

science emphasized the continuing importance of the Screens and "reinforce[d] the importance

of retaining and recruiting large, old trees in the eastside landscape." *Id*.

### c. The Forest Service's Forest Plan Amendments Violate NFMA and the APA Because They are Not Addressing a Unique Problem.

The Service's site-specific forest plan amendments for the Camp Lick Project violate

NFMA because the agency improperly limited the geographic scope of the amendments to the

Project area even though the purported need for the amendments is forest-wide, and therefore

inherently not site-specific. *See Connaughton*, 2014 WL 6977611, at *29–30 (finding no rational

basis for the Service's use of site-specific amendments where they did not address "unusual or

unique aspects of the site itself") (citing *Lands Council v. Martin*, 529 F.3d at 1228). A decision

---

[11] The Regional Forester explained that implementation of the Screens had created substantial management implications throughout the Eastside forests and "presented challenges," perhaps because the Service could not authorize as much commercial logging. *See* AR2481.

MEMORANDUM IN SUPPORT OF PLAINTIFF'S                                                    9
MOTION FOR SUMMARY JUDGMENT

that purports to "amend" the forest-wide, integrated plan by allowing something the forest plan specifically prohibits for a one-time, site-specific timber sale acts as a *de facto* exception to otherwise integrated and mandatory requirements. These exceptions, and many others implemented within the John Day River watershed and the MNF, are an attempt to evade the otherwise required in-depth analysis of a forest-wide amendment to the MNF's LRMP.

The Ninth Circuit addressed the legitimacy of using site-specific amendments in *Lands Council v. Martin*, where the court found that "the Forest Service's decision to limit the scope of [an] amendment [must be] informed by *site-specific characteristics* and Forest Service expertise." 529 F.3d at 1228 (emphasis added). To appropriately justify its decision to limit the scope of these amendments, the Service must articulate "a rational connection between the facts found and the choices made." *Id*. Relying on *Martin*, in *Connaughton*, the District of Oregon found that such site-specific characteristics must be "*unique to the Project area* to support the site-specific amendment." 2014 WL 6977611, at *30 (emphasis added). The court went on to state that "[s]imply explaining the purpose of the Project, the desired conditions for the Forest, or stating that the amendment is site-specific because it was designed for a specific site, does not satisfy the rational connection between the facts found and the choice made required by [*Martin*]." *Id*. In *Connaughton*, the Service chose to use site-specific amendments to the Wallowa-Whitman National Forest LRMP for the Snow Basin Project to allow for commercial logging within LOS stands below the HRV and of live trees greater than or equal to 21" dbh in order to "reestablish and retain resilience of forest ecosystems across the [Project] landscape." *Id*. at *1–2. The court determined that, although the amendment was specifically designed for the project site, the lack of unique characteristics present at the project site compared to the rest of

the forest made the Service's decision to enact a site-specific amendment arbitrary and capricious. *Id*. at *30.[12]

Here, the Service has not provided any unique characteristics of the Camp Lick Project site that would justify the two challenged site-specific amendments creating exceptions to the Screens' ban on logging trees larger than 21" dbh, AR27107–08, and to the Screens' restriction on logging in LOS below HRV. AR27108. Each amendment describes the forest conditions that supposedly justify the amendment, but there is no suggestion that those conditions are unique to the Project area. The section of the FEA that does purport to address "uniqueness" of the Camp Lick Project lists factors that exist throughout the MNF and the region. AR19718.

In section 3.4.12.2.4 of the Camp Lick FEA, *Uniqueness of the Proposed Forest Plan Amendment*, rather than describing conditions unique to the Camp Lick Project planning area, the Service instead simply establishes conditions that exist within the project area. *Id*. The Service notes that 80% of the forested area is overstocked, 50% is "extremely susceptible" to crown fire, and parts of the area are outside HRV in regards to Douglas and Grand fir, but provides no information as to why—or even if—these characteristics are unique to the Camp Lick Project. *Id*. Indeed, the title of the section itself seems to be missing the point of

---

[12] Following the decision in *Connaughton*, the Regional Forester issued a revision to the 2003 Guidance on the implementation of the Screens and site-specific amendments in 2015. AR20605–06. In that letter ("2015 Guidance"), the Regional Forester stated that NEPA documents for the use of site-specific amendments should include "(1) a description of the characteristics that are *specific* to the project area, (2) an explanation of the connection between these characteristics and the amendment, and (3) an explanation of why the amendment is necessary to reach the desired conditions in the project area." AR20605 (emphasis added). This guidance misinterprets the holding in *Connaughton*: site-specific amendments can only be justified by characteristics *unique* to the project site. 2014 WL 6977611, at *30. All project sites have characteristics that exist specifically at the site, but if the same specific characteristics exist throughout the region, those characteristics are not unique.

*Connaughton*'s holding, as it is not the amendment that must be unique, but rather the planning area characteristics the amendment is supposed to be addressing.

The fact that the Camp Lick Project site's characteristics are not unique within the John Day River watershed or the MNF as a whole is evidenced by the use of objectively similar site-specific amendments in a number of adjacent and nearby logging projects. For example, the Service approved site-specific amendments to create exemptions to both the 21" Rule and logging in LOS below HRV in three other projects (Big Mosquito, Ragged Ruby, and Austin), SUPPAR19930–32, 26441–43, 24702; *see also* ECF No. 1, ¶ 47, Table 1, all of which are within the John Day River watershed. The Camp Lick Project DN states the overall purpose of the project "is to restore forest resiliency by reestablishing and restoring forest structure and pattern, vegetation composition and diversity, and riparian communities to conditions that are more resilient to natural disturbance processes, including insect and disease infestation and wildfire." AR27082. Objectively similar Purpose and Need statements can be found in NEPA documents for the Big Mosquito, Ragged Ruby, and Austin projects, all seeking to promote forest health and resiliency in the face of complex disturbance regimes including wildfire, drought, insects, and disease. SUPPAR19920, 26426, 24682. The Service's response to each of these statements was the same: amending the Screens requirements in order to allow logging of Grand fir and Douglas fir greater than or equal to 21" and logging in LOS below HRV. AR27107–08; SUPPAR19930–32, 26442–43, 24701–2. Clearly, the prevalence of supposedly fire-susceptible Grand fir and Douglas fir in dry forest stands in the MNF is not a characteristic unique to any one project site. The Camp Lick Project site-specific amendments do not address characteristics unique to the project site, in violation of NFMA. *Connaughton*, 2014 WL 6977611, at *30.

An example of an appropriate review of a Project site's uniqueness can be found just west of the MNF, in the Ochoco National Forest. In July of 2019, the Service published its Final EIS for the Black Mountain Vegetation Management Project, a dry forest restoration project covering approximately 15,800 acres. SUPPAR24763. Although the Service initially considered the use of a site-specific amendment to exempt the Project from the 21" Rule, it ultimately determined "[t]he conditions in the Black Mountain project area are not unique and occur elsewhere on the Ochoco National Forest, therefore a project specific amendment would not be applicable to this project." SUPPAR24796.

If the Service believes it needs to establish exceptions to the Screens to address the forest health issues identified in the Camp Lick DN the Service should have proposed a forest-wide amendment to the MNF LRMP instead of repeatedly using site-specific amendments, including the two illegal Camp Lick amendments, to address a forest-wide problem. Doing so improperly allows the Service to bypass any public consideration of the regional or forest-wide management implications of those amendments and is arbitrary and capricious.

### d. The Forest Service's Practice of Issuing Successive Site-Specific Forest Plan Amendments Amounts to a *De Facto* Significant Forest Plan Amendment that Must be Analyzed as Such in an EIS.

The site-specific amendments the Service approved in the Camp Lick Project, AR27106–08, although facially limited to the Camp Lick Project, have actually been used in essentially the same form, for at least twelve other site-specific projects on the MNF. AR27312 When a national forest repeatedly adopts the same site-specific amendment, those amendments are "significant" under 16 U.S.C. § 1604(f)(4). *All. for the Wild Rockies v. Marten,* 2021 WL 5881745, at *17–18 (D. Mont. Dec. 13, 2021); *see also supra* at 14–18, regarding significant cumulative impacts of all site-specific amendments. Such a significant amendment requires

additional public participation procedures, *see* 16 U.S.C. § 1604(f)(4), which did not occur here, and an EIS, 36 C.F.R. § 219.13(b)(3), which also was not prepared for this Project.

**II.      The Forest Service has Violated NEPA**.

NEPA requires agencies to take a "hard look" at their actions by considering all foreseeable direct, indirect impacts and cumulative impacts. *Earth Island Inst. v. Forest Serv.*, 442 F.3d 1147, 1159 (9th Cir. 2006), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); 40 C.F.R. §§ 1508.7, 1508.8 (2019); *see also Klamath Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993–97 (9th Cir. 2004) (applying NEPA's hard look requirement to EAs). The hard look requirement includes "both a complete discussion of relevant issues as well as meaningful statements regarding the actual impact of proposed projects." *Earth Island*, 442 F.3d at 1172. The Service's NEPA analysis failed to take a hard look at many of the Project's cumulative and direct impacts and failed to use up-to-date baseline stream temperature data when addressing impacts to the Project planning area's streams.

> **a.    The Forest Service Failed to Analyze Cumulative Effects on Multiple Resources, Including the Cumulative Effects of Multiple Site-Specific Forest Plan Amendments, in Violation of NEPA (Claim 2, Count 1).**

The cumulative effects of a project "must be fully analyzed in any EA for that project." *Kern v. BLM*, 284 F.3d 1062, 1078 (9th Cir. 2002). These are the effects on the environment that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[,]" 40 C.F.R. § 1508.7 (2019), and which may "result from individually minor but collectively significant actions taking place over a period of time." *Id*. An agency must provide a "useful analysis" with a certain level of "quantified or detailed information." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005). Conclusory statements about "possible effects" or "some risk" do not satisfy NEPA's mandate

that the agency take a "hard look." *Klamath Siskiyou*, 387 F.3d at 995. Moreover, cumulative effects analysis requires the agency to define and apply a consistent geographic scope in which to analyze cumulative effects. *See Connaughton*, 2014 WL 6977611 at *9–11. The geographic scope determines which nearby projects will be included in the analysis, agencies "must provide support for its choice of analysis area" in the record. *Id*. at *9, citing *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002).

The Service failed to take a hard look at the cumulative effects of its site-specific amendments for two related, yet distinct reasons: (1) it failed to analyze the cumulative impacts of past, present, and reasonably foreseeable future actions on the MNF as a whole, *see Native Ecosystems*, 304 F.3d at 897, and (2) the analysis it did perform was inadequate under NEPA, providing only conclusory statements and no objective quantification of impacts of past, present, and reasonably foreseeable projects on the MNF. *See Klamath Siskiyou*, 387 F.3d at 995.

The Service is required to analyze the cumulative impacts of its site-specific amendments at the forest scale. *Connaughton,* 2014 WL 6977611 at *8–9. Here, it is unclear exactly what scale the Service used to analyze the amendments' cumulative impacts. Although the Service claims to analyze the impacts at the Middle Fork John Day River watershed level, the Ranger District level, and the forest-level as a whole, this analysis does not go beyond the conclusory statements regarding the percentage of land area affected by the amendment at each level. AR19713. Additionally, the Service ends this section stating that "[a]ll other past or ongoing projects with amendments to remove trees greater than or equal to 21 inches DBH on the [MNF] are located in different geographical areas than the Camp Lick Project," leaving serious doubts as to the consideration the Service actually gave to the forest-wide impacts in approving the site-specific amendments at issue in this Project. *Id*.

The Service also failed to consider the cumulative impacts of the site-specific amendments used in the Camp Lick Project in relation to other site-specific amendments on the MNF using more than conclusory statements or comparisons. In *Klamath Siskiyou*, the court found the Service's reliance upon tables "describing the current condition and desired future condition" of the project area to lack the required "useful analysis." 387 F.3d at 994–95. Similar to *Klamath Siskiyou*, here, the Service provided a series of tables containing acreage numbers for the areas impacted by past and future site-specific amendments allowing logging of large trees ≥21" DBH. *See* AR19710–14, Tables 65 and 66. In its accompanying narrative the Service then purports to total the impacted acres and compares them to the total acres of the entire MNF and other smaller areas. AR19713.[13] Such acreage calculations are "a necessary component of a cumulative effects analysis, but it is not a sufficient description of the actual environmental effects that can be expected from logging those acres." *Klamath Siskiyou,* 387 F.3d at 995.

But other than this insufficient comparison of acreages, there is no useful analysis of the cumulative impact from the actual loss of large trees across the MNF, which includes loss of necessary wildlife habitat and decreased efficiency in carbon sequestration. Indeed, the fundamental flaw underlying this "analysis" is it appears to assume the acres where logging large trees has not been recently authorized are currently well-stocked with large trees that provide wildlife habitat. That assumption however is flatly inconsistent with the conditions that lead to the Eastside Screens Amendments and which, as recently as 2015, the regional forester has confirmed still present a problem. AR20607 (citing science finding that large, hollow grand fir are rare on the landscape and have declined from historical conditions). The Service's

---

[13] There is no clear discussion/indication of what projects/acreages these totals include and exclude. *See* AR19713.

cumulative impacts analysis fails to address the impacts of authorizing the logging of large firs

on thousands of acres when the entire forest already lacks sufficient large trees that provide

wildlife habitat and other ecological functions. Rather than addressing this critical issue, at

multiple points, the Service alleges that past timber sales that authorized large tree logging have

"*likely* recovered with the growth and development of additional large trees over the last 20

years," AR19713 (emphasis added), and that "the acres on which a person *may* see trees greater

than or equal to 21["] DBH would be increased with this amendment[.]" AR19714 (emphasis

added). The Service, however, consistently fails to provide quantitative data to back up these

"likely" and "may" claims.[14] The same legal violations exist for the Service's "analysis" for the

cumulative effects of amendments allowing logging in LOS below HRV. *See* AR19715–17.

The SIR the Service published with its Final DN/FONSI does attempt a continuation of

the cumulative impacts analysis, but it is not a NEPA document, see note 32 below, and does not

satisfy NEPA's requirements in any case. AR27301–14. While the SIR provides acreages for

site-specific amendments used in Ragged Ruby and other future projects, AR27312, it provides

even less "useful analysis" of the cumulative impacts from that logging, which does not satisfy

NEPA's "hard look" requirement. *Klamath Siskiyou*, 387 F.3d at 995. Moreover, the Service

incorrectly asserts that 13 projects had been approved with amendments to allow for the logging

of trees greater than or equal to 21" dbh on the MNF, AR 27312, when there were really 14:

Parish Timber Sale, Clear Creek – 91B Analysis Area, Badger Timber Sale, Starr Rock Pit,

Thorn Fire Salvage, Soda Bear, Wolf, Elk 16, Big Mosquito, Starr Aspen, Summit, Flat,

Rattlesnake, and Camp Lick. *See* AR 19710–14, 27318–19. This number does not even include

---

[14] In other places in the record the Service admits how difficult it is to replace large trees that
currently provide habitat once they are removed from the forest. AR19504, AR20607.

MEMORANDUM IN SUPPORT OF PLAINTIFF'S                                                    17
MOTION FOR SUMMARY JUDGMENT

projects such as Ragged Ruby, Cliff Knox, and Austin that had not been approved, but were foreseeable, before the publication of the SIR, increasing this number to 17. *See* AR 27318–19.

Had the Service actually taken the required hard look at the impacts of these amendments and the intensity of their effects on the MNF, including on how the current lack of large trees in the MNF and the Eastside is likely exacerbated by the Service's repeated authorization of additional logging of large trees,[15] it would have been left with no choice but to concede this project is significant under NEPA, 40 C.F.R. § 1508.27 (2019), and therefore significant under NFMA, 36 C.F.R. § 219.13(b)(3), requiring the preparation of an EIS.

> **b. The Forest Service Used an Inconsistent and Improper Geographic Scope for its Cumulative Effects Analyses (Claim 2, Count 2).**

The CEQ issued guidance documents on necessary cumulative effects analyses. CEQ, *Considering Cumulative Effects Under the National Environmental Policy Act*, at 1 (1997) ("*Considering Cumulative Effects*").[16] Discussing the proper scope of analysis, this guidance notes that "[w]hen analyzing the contribution of [a] proposed action to cumulative effects…the geographic scope boundaries of the analysis *almost always should be expanded* [beyond the project area.]" *Considering Cumulative Effects,* Buchele Decl. Ex. C at 24 (emphasis added). Additionally, the guidance indicates that for cumulative effects analyses of "proposed action or reasonable alternative, the analysts should" do the following:

- Determine the area that will be affected by that action.
- Make a list of the resources within that zone that could be affected by the proposed action.
- Determine the geographic areas occupied by those resources outside of the project impact zone. In most cases, the largest of these areas will be the appropriate area for the analysis of cumulative effects.

---

[15] This directly contradicts the original purpose of the Screens protection of large trees. AR2222.
[16] This federal guidance document may be difficult to locate, so a copy has been submitted for the Court's convenience. *See* Buchele Decl. Ex. C at 10. Though the guidance document is not binding, courts have cited it as a consideration in their decision. *See Kern*, 284 F.3d at 1078.

*Id*. This is the process that the Service should have used when undertaking its cumulative effects analyses, but the Service never cites, much less follows, this guidance. Instead, the FEA's discussion of geographic scope are inconsistent and confused, and often times unreasonably narrow compared to the reach of the impacted resources.

> i. **The Service's Cumulative Effects Analysis of Aquatic Species, Habitats, and the Watershed Resource Violates NEPA and is Arbitrary and Capricious.**

According to the Service, "the analysis area for aquatic species and the cumulative effects boundary are the same as used for aquatic habitat," AR19454, while the discussion of aquatic habitat indicates that the "cumulative effects boundary is the same as the aquatic analysis area," AR19489. In turn, the "aquatic analysis area (action area) includes the following streams and their tributaries: Camp, Whiskey, Cottonwood, Lick, West Fork Lick, Cougar, Little Trail, Trail, Coxie, East Fork Camp, Sulphur, and Eagle creeks." AR19454 (parenthetical in original). This appears to include all streams and tributaries in the project planning area*, see* AR19797–98, meaning the "aquatic analysis area" is in fact the planning area, but without clearly stating so. The only justification provided for this selected scope is that "measurable effects from proposed activities are unlikely to extend downstream of this area." AR19454. For the reasons outlined *supra* at 2–3, absent actual supporting evidence this is not adequate justification for a cumulative effects analysis boundary for flowing streams. An assumption about direct effects in the project area is not sufficient to eliminate the need for cumulative effects analysis of that extends beyond that area. The proffered geographic scope for the watershed analysis is similarly deficient; the FEA's discussion of that resource states that "the geographical scale analyzed for cumulative effects extends down to the junction of Camp Creek and the Middle Fork John Day River." AR19407, 19432. This choice of scale is not clear—the area may extend to that junction, but

where does it start? The FEA does not describe identifiable borders, nor does it rationalize the choice of area. Due to the nature of potential impacts and the resources involved, cumulative impacts to aquatic species, aquatic habitat, and the watershed resource should have been analyzed, at a minimum, at the Middle Fork John Day River watershed scale. *See* AR13012.

    The Service also failed to identify the potential for cumulative effects within its "selected" geographic scope for aquatic species and habitats analyses, and failed to apply a consistent geographic scope for its watershed analysis. The FEA states that the Camp Lick Project "would be on a similar scale and include similar types of actions as the Magone and Big Mosquito projects; the effects to aquatic habitat and species would likewise be similar." AR19456. The admission that these adjacent projects, both in the John Day watershed, have similar effects to aquatic habitat and species supports the conclusion that the Service must properly analyze the cumulative effects of those projects on aquatic habitats and species, yet its selected geographic scope (the planning area, as discussed above), precludes analysis of these adjacent projects' impacts. The Watershed Analysis fares no better. Despite having "identified" its amorphous geographical scope of analysis, the Service does not stick to that scope, whatever it actually is, and fails to sufficiently analyze the cumulative effects of past, present, and reasonably foreseeable (as of 2017) future projects within that scope. AR19399–400, 19406–08. Rather than addressing specific cumulative effects from other activities in the area, the FEA frequently refers to Appendix E, titled "Past, Ongoing, and Reasonably Foreseeable Actions." *See, e.g.*, AR19400, 19407. However, this appendix merely lists an assortment of activities that occurred in the past, and some that may occur in the future, without referencing specific projects or describing how these activities have the potential for cumulative effects. AR20094–98. Additionally, identified activities are listed at a variety of scales. *Id*. Providing a vague list of

past, present, and future actions without useful analysis to interpret the potential effects of those actions does not meet the demands of NEPA. *See Klamath Siskiyou,* 387 F.3d at 993–94.[17]

The Service further failed to compare cumulative effects within its "selected" geographic scope for aquatic species and habitat. Specifically, the Service failed to adequately analyze effects to two aquatic species: redband trout and MCR steelhead. AR19490. The Camp Lick Project authorizes tractor yarding—that is, hauling logged trees across the ground—on up to 2,600 acres in riparian and upland watershed areas. AR19354. Hauling creates pathways for sediment and pollutants to enter streams, AR19430, thereby negatively affecting aquatic species. Large percentages of suitable redband trout and MCR steelhead habitat across the Malheur will be cumulatively impacted by multiple, back-to-back timber sales in adjacent or nearly adjacent units of the forest. Importantly, the effects on the quality and suitability of redband trout and MCR steelhead habitat are not analyzed in terms of cumulative effects to stream temperature, shading, sedimentation, and other key habitat characteristics in the FEA.

The Camp Lick Project, in combination with the Big Mosquito, Magone, and Ragged Ruby projects, will potentially affect over 26% of suitable habitat for MCR steelhead across the forest. AR19452; SUPPAR17656, 17665, 21341, 25946. Similarly, when considered cumulatively, the Camp Lick, Big Mosquito, Magone, Ragged Ruby, and Rattlesnake projects could affect up to approximately 15.7% of suitable habitat for redband trout across the forest. AR19453; SUPPAR17666, 21341, 24590, 25549. In the Camp Lick, Big Mosquito, and Ragged Ruby project areas, all within the Middle Fork John Day watershed, these projects alone could

---

[17] These deficiencies could not be and are not remedied by the Camp Lick SIR because it is not a NEPA document, see note 32 below, and, in any case, its discussion of the watershed resource simply assumes improved riparian vegetation and stream channel conditions as a result of implementing the Camp Lick Project itself. AR27306.

affect up to 11.1% of redband trout habitat across the forest. AR19453; SUPPAR17656, 17666, 25949.[18] To fulfill its obligations under NEPA, the Service must analyze the cumulative impacts resulting from these projects on water quality and their resultant impacts upon these species. *Klamath Siskiyou*, 387 F.3d at 997 (observing that cumulative impacts were not properly considered where EA noted that individual projects may have impacts on water quality, but did not analyze the "combined water quality effects" of the projects).

The Service also failed to analyze cumulative effects in sufficient quantitative detail. The above figures are the result of calculations performed by BMBP staff, not the Service, because the Service did not provide these necessary calculations. These calculations involve the Forest scale because that was the only individual scale provided in the Service's NEPA analyses for each of the above projects. The Service's failure to consider these effects in numerical terms at the watershed scale also means that the agency has not performed a proper cumulative effects analysis. For all these reasons, the Service's cumulative effects analysis of aquatic species, aquatic habitats, and the watershed resource as a whole is arbitrary and capricious.

### ii. The Forest Service's Cumulative Effects Analyses of Resources Critical to Biodiversity Violate NEPA.

The Service's attempted cumulative effects analyses for primary cavity excavator species, dead and defective wood habitat, late and old structure forest, old growth habitat, and large trees all suffer from deficiencies similar to those of the aquatic resources analysis. Primary

---

[18] While the DN/FONSI does acknowledge potential combined impacts of the Camp Lick and Big Mosquito Projects on redband trout and MCR steelhead at the Middle Fork John Day scale, *see* AR27158–59 (Tables 6 and 8), it is too little, too late. It is too little because impacts to these species should have been analyzed at the forest scale, which would include impacts of the Magone, Ragged Ruby, and Rattlesnake projects. It is too late because this attempted analysis and these tables were not included in the NEPA documents where they belonged (the draft and final EAs or in a supplemental NEPA document, see *infra* at 42–45); instead only appearing three years later in the final DN/FONSI, which was not subject to public comment. *Id.*

cavity excavators and many other species are dependent upon large trees and the habitat created

by them, including the production of dead and defective wood habitat, and LOS and old growth

stands. AR19534. These types of habitat are critical to maintain and restore biodiversity – one of

the primary catalysts behind the creation of the Screens. *See infra* at 8–9. The interconnected

nature of these resources as drivers of biodiversity, as well as the fact that many species,

including multiple species of woodpecker, are by nature extremely mobile and travel beyond the

Project boundaries, strongly suggests that the cumulative effects of actions impacting these

resources should be analyzed within a broad, and consistent, geographic scope.

Instead of doing so, the Service failed to identify a consistent geographic scope for its

cumulative effects analysis of primary cavity excavator species and the dead and defective wood

habitat upon which they rely and, by extension, failed to reach a conclusion about cumulative

effects to those species and habitat within any particular scope.[19] The FEA's discussion of these

species begins by stating that the analysis area must be larger than the project planning area and

includes both the Camp Creek and Grub Creek/John Day River watersheds. AR19538. However,

when examining effects to dead and defective wood habitats, the FEA switches to a much

smaller analysis area—the Camp Creek watershed only, AR19544, but when discussing those

effects the analysis switches back and forth between the forest scale and watershed scale,

AR19545. Finally, when the FEA makes its cumulative impacts determination regarding dead

and defective wood habitat, the scale becomes the "planning area." AR19546. According to

---

[19] It is also worth noting that the Service's own Management Indicator Species Information Sheet for primary cavity excavator species states that snag data (on density and other characteristics) "can and should be developed at the forest scale." SUPPAR14845. There is no indication that the Service attempted such an analysis in the Camp Lick FEA.

Ninth Circuit caselaw, this dilution of effects is arbitrary and capricious. *See Connaughton*, 2014 WL 6977611 at *9. Agencies cannot use shifting scales of analysis to hide cumulative effects.

The Camp Lick timber sale, in combination with other past, present, and reasonably foreseeable future timber sales, will cumulatively reduce existing and future snag habitat for primary cavity excavators over a large, partially contiguous area and over a long consecutive time period. *See* SUPPAR23367 (Under existing conditions, snag habitat is already "likely to be a limiting factor for pileated woodpeckers."). However, cumulative effects to woodpecker and other species were not adequately analyzed in the Camp Lick FEA, which refers to other projects, AR19568 (pileated woodpecker), or simply to "past timber harvest projects," AR19571 (Pacific pine marten), but does not describe or attempt to quantify those projects' effects on the environment. Furthermore, the lack of significant negative cumulative effects seems to be improperly based in part on adherence to the Northern Rocky Mountains Bird Conservation Plan,[20] which is frequently mentioned in the FEA's "Primary Cavity Excavators/Dead and Defective Wood Dependent Species" section. AR19546–60. However, that Plan advises retention of large trees, Buchele Decl. Exhibit A at 24, while the Service would authorize logging an unquantified number of those same large trees under the FEA's proposed action, AR19344. For all these reasons, the Service's cumulative effects analysis of primary cavity excavators and dead and defective wood habitat is arbitrary and capricious.

The Service also failed to identify a consistent geographic scope for its cumulative effects analysis of old growth habitat. The analysis area is vaguely defined as the Camp Lick planning area and adjacent watersheds, but the FEA does not specify which watersheds. AR19564. The

---

[20] This is the shortened title used by the Service in the Camp Lick FEA for "Altman, Bob. 2000. *Conservation Strategy for Landbirds in the Northern Rocky Mountains of Eastern Oregon and Washington*. Version 1.0. Prepared for Partners in Flight." *See* Buchele Decl. ¶ 4, Exhibit A.

Service then appears to limit the scale of the analysis to actions within or immediately adjacent to the Camp Lick planning area boundary. AR19565. When the FEA moves on to discuss an old growth dependent species, the pileated woodpecker, the analysis area becomes just the Camp Lick planning area itself. AR19568. This decision to use a different scale of analysis must be supported and explained. *Connaughton,* 2014 WL 6977611 at *9–11. Specifically, the Service must explain why cumulative effects to old growth habitat are addressed at a larger scale than effects to a species dependent on that old growth habitat.

Finally, the Service also failed to analyze cumulative effects to large trees, including the combined impacts of the Camp Lick Project and nearby projects. The Camp Lick FEA proposes commercial thinning on approximately 4,700 acres, which includes removing "all trees less than 21 inches [DBH]" and allows logging "grand fir and Douglas-fir greater than or equal to 21 inches DBH." AR19344. Contrary to the Service's claims, large tree removal is not reducing short-term impacts to wildlife and allowing for restoration in all ongoing projects. As such, the Service's inaccurate and misleading analysis is arbitrary and capricious.

### c. The Forest Service Failed to Take a Hard Look at Direct and Indirect Impacts of the Project (Claim 2, Counts 3 and 4).

NEPA's "hard look" requirement also applies to the direct effects of a proposed action. 40 C.F.R. § 1508.8 (2019); *see Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1100 (9th Cir. 2010). Direct effects are those that "occur at the same time and place" as the action. 40 C.F.R. § 1508.8(a) (2019). Here, the Service also has failed to take a hard look at certain direct effects of the proposed action. Pursuant to NEPA's "hard look" mandate, an agency must rely on adequate baseline data that enables the agency to carefully consider information about direct environmental impacts and may not rely on outdated data to do so. *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1083–87 (9th Cir. 2011); *Cascade Forest Conservancy v.*

*Heppler*, 2021 WL 641614, at *17–20 (D. Or. Feb. 15, 2021). Indeed, "establishing appropriate baseline conditions is critical to any NEPA analysis," because without establishing a baseline, "there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA." *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016). Here, the Service's consideration of stream temperatures suffers from numerous flaws. First, the Service failed to provide an adequate baseline for stream temperatures in the project area by using stale data. The FEA utilizes individual stream temperature data from 2004 for multiple streams in the project area, AR19443–45 (*see* fn. 1 at AR19445: "All these temperatures are from a 2004 survey, the 2016 data has not yet been processed."), but the record shows that temperature data from far more recent surveys was available, AR15556–58 (2014 and 2016 temperature data for Camp Creek); AR15561–62 (2014 and 2016 temperature data for Lick Creek). This more recent data indicates that all reaches of Camp Creek were listed with out-of-date temperature data in the FEA, and that newer data generally shows higher temperatures than the stale data. AR19443. Under Ninth Circuit case law, *N. Plains Res. Council*, 668 F.3d at 1086, the FEA's reliance on stale data was arbitrary and capricious.[21]

Furthermore, even for those streams with updated (2014 or 2016) data in the FEA, some are inconsistent with the data BMBP received in a 2019 FOIA response from the Service. The Service's FOIA response indicate that at least some streams listed in the FEA relied on highly inaccurate 7-day temperature averages. AR26375. Three examples are particularly illustrative. First, Lick Creek reach 1 is listed in the FEA with a 2016 average weekly maximum temperature

---

[21] This updated data was used in the Biological Assessment that the Service authored and provided to the National Marine Fisheries Service in 2019 pursuant to ESA consultation. SUPPAR26653–54.

of 60.45°F, but the FOIA response shows the 2014 and 2016 average temperatures at 71.87° and 68.38°, respectively. *Id.* Second, West Fork Lick Creek reach 1 is listed in the FEA with a 2016 average temperature of 58.33°, but the FOIA response shows the 2014 average temperature at 71.28°. *Id.* Third, Trail Creek reach 1 is listed in the FEA with a 2014 maximum temperature of 59.00°, but the FOIA response shows the 2014 average temperature at 72.46°. *Id.*

These unexplained discrepancies mean that the Service failed to establish the current baseline condition of streams in the Camp Lick Project area. As the FEA acknowledges, "mean maximum water temperatures are above the suitable range for salmonid species present during summer months in the planning area" for most streams, AR19447, which does not even account for the higher temperatures revealed by the Service's FOIA response or in the 2014 or 2016 data. Without this baseline knowledge, the Service cannot possibly measure the actual effects of its proposed action, violating NEPA and rendering the FEA arbitrary and capricious. Even if this stale baseline information were adequate for the 2017 FEA, the Service should have conducted supplemental NEPA analysis after becoming aware of these discrepancies. BMBP brought these issues to the agency's attention in a January 10th, 2020 letter requesting supplemental NEPA analysis. AR26367–78. However, instead of doing actual supplemental NEPA analysis, the Service simply issued an SIR with updated data for only Camp Creek reaches 1 and 8. AR27315.[22] In addition to its failure to rely on adequate baseline data, the Service failed to consider the direct and indirect effects of logging on numerous resources, particularly RHCAs. The Camp Lick Project includes "silviculture treatments" on a total of 12,220 acres, AR19346—

---

[22] Internal agency emails also reveal that when the planners first considered the need for supplemental analysis, they mischaracterized BMBP's concerns with respect to water quality, focusing on Clean Water Act (CWA) impairment to one stream in the project area instead of on the outdated and inaccurate stream temperature data. AR26379-81.

including commercial logging on 8,700 acres, AR19343—and thinning on an additional 2,300

acres in RHCAs (37% of the total RHCA acreage in the planning area), AR19349. The logging

approved by the Project would, among other effects, remove significant forest cover and impact

runoff, erosion, sediment loading in streams, stream bank stability, large woody debris retention,

and stream temperatures. AR19426–27, 19429–31. For example, in RHCAs, the "maintenance of

ground cover over much of the RHCAs and the filtering and sediment trapping capacity of

RHCAs" are directly threatened by heavy equipment use and commercial logging. AR19427.

Nonetheless, the Service concludes that risks to RHCAs from commercial logging will

"be reduced through implementation of project design criteria including rehabilitation of all

disturbed areas after work activities have been completed." *Id*. This is not an analysis of direct

effects, but rather a conclusion that attempts to obfuscate the need for a direct effects analysis.

An agency may not rely on future remedial measures to avoid taking the necessary "hard look"

in its NEPA analysis. *Nat'l Parks Conservation Ass'n v. Babbitt,* 241 F.3d 722, 733–36 (9th Cir.

2001) ("A perfunctory description, or mere listing of mitigation measures, without supporting

analytical data, is insufficient to support a finding of no significant impact."). The FEA and DN

admit measurable adverse impacts to MCR steelhead from these activities. AR27163. These

impacts require analysis that provides quantitative data. *See Ocean Advocates*, 402 F.3d at 868.[23]

### d. The Forest Service Violated NEPA by Having an Unreasonably Narrow Purpose and Need Statement (Claim 2, Count 5).

One of the only legal requirements specifically mentioned by the NEPA statute itself is

that the required NEPA analysis must include "alternatives to the proposed action." 42 U.S.C. §

---

[23] The Camp Lick Aquatics Report, which is not properly incorporated into the EA, 40 C.F.R. § 1502.21 (2019), goes into more detail regarding the agency's belief that logging in excess of 12,000 acres using heavy equipment will not meaningfully increase sediment levels in the project area's waters. But it too fails to even attempt to quantify potential effects. SUPPAR23498.

4332(C)(iii). The CEQ regulations go on to explain that the consideration and comparison of alternative courses of action "is the heart [of any NEPA analysis]." 40 C.F.R. §1502.14 (2019). Although these provisions are specifically addressing the requirements for an EIS, Ninth Circuit case law holds that federal agencies must also give full and meaningful consideration to all reasonable alternatives in an EA. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008). Identifying reasonable alternatives is a two-step process. First the agency must "*briefly* specify the purpose and need to which the agency is responding" and then, second, use that "brief" purpose and need statement to develop reasonable alternative to any proposed course of action. 40 C.F.R. § 1502.13 (2019) (emphasis added).The NEPA analysis must then "present the environmental impacts of the [proposed action] and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14 (2019).

The Camp Lick Project is a substantial undertaking calling for more than 8000 acres of commercial logging, including logging in RHCAs, tens of thousands of acres or prescribed burning, and three site-specific plan amendments, two of which eliminate LRMP provisions intended to protect biodiversity, all within a 40,000 acres planning area. Despite this, the Service only evaluated two alternatives – the no action alternative, and the Service's preferred alternative – while improperly dismissing a number of other reasonable alternatives that may have allowed the Service to avoid some of the harmful impacts of its preferred alternative. The Service did this by crafting a purpose and need statement that was anything but brief and that the Service improperly used and interpreted to avoid considering many otherwise reasonable alternatives because they supposedly would not satisfy its multi-page purpose and need statement. This "alternatives analysis" violates NEPA in multiple respects.

The FEA initially defines the purpose of the project using a relatively short paragraph, *see* AR19311,[24] but then the Service adds two pages and 24 bullet points of elaboration, AR19316–18, and goes on to include the site-specific amendments to the MNF Plan as one of the "needs" of the project, *see* AR19327. This is not the "brief statement" called for by Section 1502.13. While it may be appropriate in an EA to discuss potentially using certain specific actions like plan amendments as part of an alternative to *meet* a legitimate need, this does not mean it is appropriate to *transform those actions*, mere elements of an alternative, *into a need*. This is actually the opposite of what NEPA requires. The purpose and need must inform the selection of alternatives; alternatives should *not* inform the formulation of the purpose and need.[25] A more appropriate statement would have been one that *briefly* identified the purpose and need in a way that allowed for the formulation of actual alternatives, without including the preferred method of meeting those needs within the need itself. There is often more than one way to reach a goal, with different potential impacts, drawbacks, and advantages, and that is exactly what the NEPA alternatives analysis is intended to address. Instead, as discussed *infra*, the Service repeatedly used its lengthy and overly-specific purpose and need statement to improperly refuse to consider numerous, otherwise reasonable alternatives to its preferred alternative and to thereby avoid the comparison and sharp definition of issues that NEPA requires.

---

[24] ["T]o improve the resiliency, processes, and functions of the planning area, considering the multiple-use values for the area: improving forest health, increasing resiliency to disturbances (including wildfire), improving biodiversity and habitat for fish and wildlife species, providing abundant clean water (both for fish and downstream uses), contributing to the social and economic health of nearby communities and forest users, and protecting historical properties."
[25] Even the Forest Service Handbook acknowledges this necessary order of operations. *See* Buchele Decl. ¶ 5, Ex. B (FSH 1909.15 zero-code § 5 ("Definitions"), pg. 14 ("Proposed Action [Alternative]. A proposal made by the Forest Service to authorize or implement an action *to meet* a specific purpose and need[.]" (emphasis added))).

Courts have specifically recognized that overly-specific purpose and need statements allow "an agency to slip past the strictures of NEPA [by] contriv[ing] a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997); *Nat'l Parks Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070 (9th Cir. 2010) ("An agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative . . . would accomplish the goals of the agency's action[.]"). The Service's decision to define and interpret the project's purpose and need in unreasonably specific and lengthy terms violates this case law.

### e. The Forest Service Violated NEPA by Failing to Evaluate a Reasonable Range of Alternatives (Claim 2, Count 6).

"[A]ny proposed federal action involving unresolved conflicts as to the proper use of resources triggers NEPA's consideration of alternatives requirement, whether or not an EIS is also required."). *Bob Marshall All. v. Hodel,* 852 F.2d 1223, 1229 (9th Cir. 1988); 40 C.F.R. § 1502.14 (2019). This requirement includes an analysis of alternatives that "will avoid or minimize" a proposal's adverse effects. 40 C.F.R § 1500.2(e); *see also W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050, 1053 (9th Cir. 2013). The touchstone for the court's inquiry is whether the agency's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Cal. v. Block,* 690 F.2d 753, 767 (9th Cir. 1982). Here, the Service's alternative's analysis did neither.

### i. There are Unresolved Conflicts Surrounding Project Resources.

As a result of the narrowly drawn purpose and need statement, discussed above, the Service considered a constrained range of possible alternatives consisting only of the no-action

alternative (Alternative 1) and the Proposed Action (Alternative 2). AR19339–64.[26] The FEA

acknowledges the unusual nature of this choice:

> Normally, the issues identified during the 30-day comment period and scoping period are addressed by developing alternatives to the proposed action. Instead, the issues raised by comments received during the scoping, the 30-day comment period, and collaborative process were addressed by either modifying the proposed action, or by adding project design criteria to the proposed action.

AR19335. The Service later clarifies that it "elected to modify the proposed action rather than

develop addition[al] action alternatives" because it had already narrowed the scope of proposed

activities and "further alterations to the proposed action would not fully meet the purpose and

need" nor "achieve the desired future condition[.]" AR19339. It is unclear how the Service

reached these conclusions without actually conducting analysis on those "further alterations."

*See* AR19340–19362. The Service's choice to modify its preferred alternative does not absolve it

of the duty to develop and analyze other reasonable alternatives, 40 C.F.R. § 1502.14(a) (2019),

and directly violates NEPA's requirement that the public also see analysis that compares actual

alternatives, sharply defines issues, and provides a clear basis for choice among options.

The Service attempts to justify its failure to examine additional alternatives by citing to

the proposition that "[w]hen there are no unresolved conflicts concerning alternative uses of

available resources (NEPA section 102(22)(E)), the EA need only analyze the proposed action

---

[26] As the FEA correctly notes, the no-action alternative, "Alternative 1[,] is designed to represent existing condition" and "serves as a baseline to compare and describe the differences and effects between taking no action and implementing an action alternative." AR19339. In reality, the "no-action alternative" is not an alternative in the true sense; it is merely a foil against which to evaluate other proposed alternative(s). The FEA confirms this, noting that "[t]he no action alternative… does not meet the purpose and need." *Id*. This will always be the case when the purpose and need requires *any* action, and the "no-action alternative" contemplates the opposite. In contrast, the description of the preferred alternative states "Alternative 2 is the proposed action, which responds to the purpose and need for action." *Id*.

and proceed without consideration of additional alternatives. (36 C.F.R. § 220.7(b)(2)(i))." AR19340 (parentheticals in original). While this statement may be true as a general matter, it is not applicable to the Camp Lick Project, where a number of conflicts regarding alternative uses of resources remain unresolved. For example, as discussed above, the Service amended the MNF Plan to allow for logging of large trees (≥21" dbh) and in LOS. These amendments eliminate mandatory provisions from the Eastside Screens originally designed and intended to protect biodiversity and address a shortage of wildlife habitat provided by large trees and old-growth forest. AR19327–28, 19333. Doing so committed those resources (large trees and old growth forest) to be used for commercial and economic purposes, eliminating the original, preferred use of those resource: leaving those trees in place to maintain or improve wildlife habitat, AR17506 (BMBP Preliminary EA ("PEA") comments raising habitat concerns), providing a visual backdrop for recreational opportunities, AR17492 (raising visual quality concerns), and continued carbon sequestration to combat climate change. AR17517–22 (raising climate concerns). In addition, the Service proposes to log in RHCAs, which would remove trees that provide shade for streams and help to regulate and reduce in-stream temperatures for listed MCR steelhead. AR19348–51; *see* AR17824 (comment discussing impact of riparian logging). These are examples of clear unresolved conflicts concerning alternative uses of available resources. Just because the Service decided to dismiss proposed alternatives that advance alternate uses of these and other resources does not mean that those conflicts have been resolved.

### ii.  The Service Improperly Rejected Reasonable Proposed Alternatives.

The Service briefly acknowledged and just as quickly dismissed a number of reasonable alternatives that advanced alternate uses of available resources, and which could have avoided potential negative impacts of the preferred alternative's actions. Section 1502.14(a) requires the

Service "for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." But this provision is not a substitute for the actual comparison of action alternatives required by this regulation and binding case law.

For example, BMBP proposed that the Service evaluate alternatives that do not require forest plan amendments; alternatives that do not include any logging (commercial and non-commercial) in RHCAs; that only include non-commercial logging; that do not include logging on steep slopes; that do not include logging in mixed-conifer forests; and that do not focus on resources extraction, but rather facilitate restoration activities such as fish passage repair, among others.[27] These, and other proposed alternatives, were all given short shrift.

The Service dismissed an alternative that would not allow commercial treatments in riparian areas (but would allow other treatments), insisting such an alternative failed to meet the need to "maintain and improve landscape resiliency and resistance to disturbances…to promote the resistance and resiliency of forest stand structure, composition, and density; or to maintain or improve biodiversity and habitat for fish species[.]" AR19369. Essentially, the Service is implying that the *only way* to achieve those goals is to *include* commercial treatments in riparian areas. Further, the Service's dismissal of this alternative still did not address BMBP's suggested alternative because the dismissed alternative focused on eliminating or otherwise cutting and leaving large, commercial-sized trees in riparian areas, whereas BMBP's proposed alternative would leave those trees standing but allow other restoration activities. *See* AR19369–71. Without actually analyzing the proposed alternative, the conflict regarding the riparian resources – large trees as habitat enhancing shade, or as extracted commercial product – remains unresolved.

---

[27] BMBP suggested these alternatives in its 2016 scoping comments, AR14944–65, 2017 PEA comments, AR17492–93 (Hood comments), AR17825 (Coulter comments), and 2017 Objection Comments, AR20327, 20341–43.

The Service also dismissed the possibility of an alternative that did not include an amendment to the 21" Rule "due to the limits it would place on meeting the purpose and need for the Camp Lick Project." AR19366. The Service claims that "[t]he option to remove trees of any species great than or equal to 21 inches DBH…would meet the intent of the Eastside Screens[.]" *Id*. This statement is incongruous with the actual intent of the Screens, which explicitly instructs the agency to "[m]aintain all reminant [sic] old and late seral structural live trees ≥21" dbh that currently exist within stands proposed for harvest activities." AR2277.

The Service's decision to advance only one action alternative was predicated upon the incorrect assumption that no conflicts remained concerning available resources. As a result, the Service failed to fully and meaningfully consider other proposed reasonable alternatives. As articulated by the Ninth Circuit in *W. Watersheds Project*, "[t]he existence of a viable but unexamined alternative renders an [EA] inadequate." 719 F.3d at 1050 (brackets in original).

### f.   Project is "Significant" Under NEPA, Requiring an EIS (Claim 2, Count 8).

NEPA requires that agencies prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(C). The potential "significance" of a proposed action is determined by evaluating the context of that action and the intensity of its effects within that proper context. 40 C.F.R. § 1508.27 (2019). The agency advancing or approving an action must demonstrate why an impact is not significant. *See Babbitt*, 241 F.3d at 730 (finding the Service failed to meet its burden to articulate a "convincing statement of reasons to explain why a project's impacts are insignificant").

Here, the Service has failed to articulate a convincing statement of reasons why the project's impacts are insignificant. For example, the Service failed to explain why impacts from the Camp Lick Project's extensive management prescriptions (spanning more than 80% of the

planning area) and proposed forest plan amendments are considered insignificant and

undeserving of an EIS, when nearby projects similar in size and scale (or smaller), and with

similar proposed forest plan amendments have been, or will be, analyzed in an EIS. For example,

the adjacent Ragged Ruby Project, with management prescriptions including only 6,097 acres of

commercial logging and 34,000 of prescribed burning, SUPPAR26424, 26427, 25654, and

similar approved forest plan amendments, was considered to be significant enough to analyze

within an EIS instead of an EA. SUPPAR26442, 25615–16. Similarly the nearby Galena Project,

with management prescriptions including 8,363 acres of commercial logging, SUPPAR16532,

and which did not include the above identified forest plan amendments, was also analyzed within

an EIS instead of an EA. SUPPAR15970, 15976. Additionally, as is discussed above, *supra* in

the discussion regarding cumulative effects, the Camp Lick Project is likely to have to significant

impacts when combined with the impacts of other logging projects with plan amendments.[28]

"[T]o prevail on a claim that the Forest Service violated its statutory duty to prepare an

EIS, a 'plaintiff need not show that significant effects will in fact occur.' It is enough for the

plaintiff to raise 'substantial questions whether a project may have a significant effect' on the

environment." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir.

1998). Given the analysis appearing in the FEA and any properly incorporated documents, the

Service cannot sustain a finding of no significant impact because BMBP has raised substantial

---

[28] The Service's FONSI claims to be based on the analysis disclosed in the FEA, AR27157, and, in fact it *must* be based on the FEA or another NEPA document. *See* 40 C.F.R. §§ 1508.9(a)(1), 1508.13 (2019). In at least two places the FONSI heavily relies on information that is not found in the FEA or any other NEPA document. *See infra* at 40–41 regarding intensity factor 9 (40 C.F.R. § 1508.27(b)(9) (2019)), and discussion at 44 and note 18 addressing new tables in DN, AR 27158. The FONSI's discussion of this information belongs in a supplemental NEPA analysis.

questions regarding the significance of the project's impacts. Here, the Service not only (1) failed to explain why the Camp Lick Project does not require an EIS when similar nearby projects were, or will be, analyzed in an EIS, it also (2) failed to properly define the geographic scope of the context within which project impacts would be analyzed, and (3) failed to properly consider the intensity of those impacts as required by 40 C.F.R. § 1508.27 (2019). Taken together, these considerations clearly illustrate the significance of the action and the need for an EIS.

### i. Context

Significance "must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, *and the locality*," and it "varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a) (2019) (emphasis added). For "a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole." *Id*. The failure to properly address the significance of the local impacts is a fatal and "major analytical lapse." *See Anderson v. Evans*, 371 F.3d 475, 492 (9th Cir. 2004) (agency failed to evaluate significance of authorized whaling on local whale population).

The DN/FONSI's discussion of significance does not clearly define the context of the agency's analysis. The beginning of its "context" discussion states that the "project is limited in scope" and that "[t]he decision made here applies only to the Camp Lick planning area[.]" AR27157. While this would initially seem to indicate that the Service had selected the Project planning area as the context for its significance determination, it does not provide analysis of project impacts at that scale. It is unclear from the FONSI whether the geographic scope of the significance analysis is the Project planning area, the Blue Mountains Ranger District, or the Forest as a whole. This confusion is exacerbated by the conclusion of the "context" discussion, which disclaims significant effects "within or beyond the planning area[,]" but also mentions the

effects of the Project at the "subwatershed, subbasin, district, and forest scales[.]" AR27159. This lack of clarity allows the Service redirect discussion of potential impacts by contrasting them with impacts on the Ranger District and Forest scales, effectively diluting their perceived severity. For example, the Service notes that although up to 80 percent of the planning area (approximately 31,100 acres) would be impacted by silvicultural treatments and underburning, "in context" those silvicultural impacts would "impact less than 2 percent of the Blue Mountain Ranger District and less than 1 percent of the Malheur National Forest[,]" and underburning would impact "less than 5 percent" of the District and "less than 2 percent" of the Forest. AR27157. It similarly notes that riparian treatments "will impact 37 percent (2,300 acres) of the [RHCAs] in the planning area[,]" but "[i]n context, [RHCA] restoration treatment will impact less than 3 percent of the [RHCAs] on the Blue Mountain Ranger District and less than 1.5 percent of the [RHCAs] on the Malheur National Forest." *Id*.[29] Establishing the proper setting and scale ("context") within which to evaluate the impact of an action is critical. The Service is not allowed to sweep significant impacts to the Camp Lick Project area under the rug by pointing to the vastness of the surrounding forest. *See Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035–37 (9th Cir. 2001); *Cascadia Wildlands v. BLM,* 410 F. Supp. 3d 1146, 1157–58 (D. Or. 2019) (agency cannot marginalize effects to project area by comparing them to larger surrounding watershed). Here, proposed activities will impact up to 80%, of the Camp Lick Project area, including impacts to RHCAs and LOS stands. AR27157, 27116, 27138. Because the Service focuses on highlighting the impacts at the Ranger District

---

[29] The information regarding impacts to RHCAs and steelhead habitat found in the DN, table 6 and 8, AR 27158, is not found in the FEA or in the draft DN/FONSI that the Service put out for public comment, even though BMBP has repeatedly noted that it should have been in the Service's NEPA analysis or supplemental NEPA analysis. AR20335–39, 20360–67.

and forest scales, it never fully analyzed Project impacts in the local context. AR27157–59. *Even if* those broader scales were a proper context in which to evaluate impacts, NEPA unambiguously requires the Service to *also* look at the significance of the localized impacts. 40 C.F.R. § 1508.27(a) (2019).

While the Service's failure to evaluate significance in the local context is itself sufficient to invalidate the FONSI, the record further evidences the FONSI's infirmities by demonstrating how the intensity of the impacts also raises "substantial questions" about significance.

### ii.  Intensity

The intensity element refers to the severity of impact (evaluated within the proper context) and offers several consideration factors, 40 C.F.R. § 1508.27(b) (2019), a number of which are implicated by the Camp Lick Project. The presence of even just "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocates*, 402 F.3d at 865. Taken together, these factors demonstrate the Project's significance, meriting an EIS.

For example, the agency must consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4) (2019). "A project is 'highly controversial' if there is a 'substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use.'" *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (alteration in original). There is a substantial dispute about the nature and effect of the "site specific" forest plan amendments approved for the Camp Lick Project. AR17514, 20328–335, 20337. As a general matter, the adoption of site-specific forest plan amendments is broadly recognized to be controversial. This was proven by litigation surrounding the Snow Basin Project, *Connaughton,*

2014 WL 6977611, as well as the fact that Regional Foresters have had to issue two separate guidance documents regarding the appropriate use of site-specific amendments. AR19327, 2481–84 (2003 Goodman Guidance letter); AR20605 (2015 Peña Guidance letter).

Another consideration is "[w]ether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7) (2019). "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." *Id*. This is exactly what the Service does by failing to analyze the cumulative impacts of all the MNF's projects with plan amendments and from numerous adjacent and nearby projects on a number of sensitive resources. BMBP discusses this subject at length *supra* at 14–18. This factor leans heavily in favor of significance and demonstrates the need to properly evaluate these combined impacts in an EIS.

The agency must also consider "[t]he degree to which the action may adversely affect an [ESA-listed] endangered or threatened species or its [critical] habitat[.]" 40 C.F.R. § 1508.27(b)(9) (2019). Here, all parties agree that MCR steelhead are present in the project planning area. AR19494. The DN admits and the EA itself found that the Camp Lick Project is "likely to adversely affect [MCR] steelhead and its designated critical habitat" due to impacts of roading activities and fuel treatments. AR27163. But the DN improperly tries to avoid a significance finding by relying on and interpreting findings and information from ESA compliance documents like the biological assessment and Biological Opinion, AR27163–64, which were prepared several years after the FEA, SUPPAR26533; AR26397, and therefore were not, and could not be, cited by or incorporated into the FEA or made subject to public comment. *See Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1192 (9th Cir. 2019) (late analysis without public input cannot satisfy NEPA). The scope of the required NEPA analysis regarding impacts

for ESA listed species is far broader than that required for ESA compliance documents, *see Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1218 (D. Haw. 2001), and if the Service believes there is relevant analysis is any ESA document, they need to address it in a supplemental NEPA analysis that is made available for public comment.

Finally, agencies must consider "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10) (2019). As discussed *supra* at 7–8, the Service violated NFMA by adopting site-specific amendments for forest-wide conditions. In doing so, the Service undermines its statutory obligations and creates precisely the patchwork management scheme that Congress passed NFMA to prevent. *See* 16 U.S.C. § 1604. Additionally, the Service's failure to include TMDL[30] implementation strategies in the FEA, and the potential for the proposed action to raise stream temperatures contrary to TMDL objectives and guidelines also threatens a violation of the Clean Water Act. The Service admits that "[c]urrent water temperatures exceed objectives for water temperature in nearly all streams in the analysis area" and are "above the suitable range for redband trout, and juvenile MCR steelhead, which are all present in the aquatic analysis area during the summer months." AR19459. Despite this, it still proposes actions that will decrease stream shading, which the Service acknowledges as a necessary element of maintaining appropriate in-stream temperature. AR1945. While the DN concludes that "[n]o measurable stream heating from solar radiation is anticipated due to commercial byproduct removal[,]" AR27117, this conclusion does not address temperature impacts of project activities aside from commercial logging. For example, the Service proposes to remove non-commercial trees from

---

[30] TMDLs, or "total maximum daily loads," establish the "maximum level of pollutant [including temperature] allowable in order to meet water quality standards." AR9284.

riparian areas, AR19348–51, as part of a suite of "habitat restoration activities" that "would likely result in short-term decreases to stream shade." AR19457.

Considering the context of the Project and the relevant intensity factors, it is clear that the Service has not here met its burden to articulate a "convincing statement of reasons to explain why a project's impacts are insignificant." *Babbitt*, 241 F.3d at 730. Instead, BMBP has raised substantial questions about whether this project will have a significant effect on the environment, indicating that the Service should prepare an EIS. *See, e.g., Anderson*, 371 F.3d at 488. Its decision not to do so is arbitrary and capricious.

Even if the Court finds that an EIS was not required as part of the initial NEPA analysis for the Camp Lick Project, the agency still should have completed an EIS or supplemental EA based on substantial new information and circumstances flowing from the agency's 3-year delay between completing the Camp Lick FEA and signing its final DN.

> **g.  The Forest Service Failed to Prepare an SEIS or SEA Despite Significant New Circumstances and Information (Claim 2, Count 7).**

An agency must prepare a Supplemental EA or EIS when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (2019); *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000) (holding duty to undertake supplemental analysis also applies to Supplemental EA). Such supplemental NEPA analysis is necessary when the new information bears on the "human environment in a significant manner or to a significant extent not already considered," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989), or when a project change falls "qualitatively [outside] the spectrum of alternatives that were discussed in the draft [EA]," *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011). An agency's failure to undertake an SEA/SEIS in light of significant new information is

contrary to law. *Klamath Siskiyou Wildlands Ctr. v. Boody,* 468 F.3d 549, 561–62 (9th Cir. 2006). Plaintiffs need not show that significant effects *will in fact* occur, only that new information or project changes raise substantial questions regarding significance. *See id.* The Service's failure to conduct supplemental NEPA analysis to address significant new circumstances and information was itself a failure to act and violation of NEPA and the APA. In such circumstances, the Court "shall...compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

Here, nearly three years elapsed between publication of the Service's FEA in August of 2017 and when the Final DN was completed for this project in May of 2020. In the intervening years, the Service scoped or approved additional reasonably foreseeable actions that should have been considered as part of an updated cumulative impacts analysis, such as the Austin, Rattlesnake, and Cliff Knox projects. AR27302; SUPPAR24661–74. These adjacent and nearby projects similarly feature site-specific forest plan amendments that allow the logging of trees ≥21", AR27302–04, and will have similarly negative individual and cumulative impacts to RHCAs and threatened and sensitive species.

In January of 2020 BMBP sent a letter to the Service highlighting significant new circumstances and information, including newly approved or proposed projects and much newer stream temperature data, and requested that the Service complete additional NEPA analysis to address them. AR26367–78. The Service held an internal discussion to evaluate, among other things, "what analysis to use...and how to blend the new analysis with the existing document." AR26379. This presupposed that new analysis *could* or *should* be incorporated into previous NEPA documents, without first addressing the question of whether a more detailed supplemental

NEPA analyses was required.[31] Despite this, the Service did acknowledge that new

circumstances and information *did* exist that warranted further analysis, s*ee generally* AR26379–

81, and ultimately decided to complete this analysis in a SIR for the Camp Lick Project instead

of preparing any supplemental NEPA analysis.[32] AR27299–320. Despite acknowledging some of

the concerns raised in BMBP's letter, the Camp Lick SIR fails to sufficiently analyze the

cumulative effects of the new projects and their attendant plan amendments. For example,

although the SIR acknowledges the Austin, Cliff Knox, and Rattlesnake Projects, it dismisses the

possibility of cumulative effects by stating that the "projects are located outside of the planning

area boundary" and subsequently concludes there would be no cumulative effects beyond what

was described in the FEA. AR27301–02. As discussed *supra*, an action need not occur within the

project area itself in order to contribute to the cumulative effects of that project. Ultimately,

although the SIR lists the new projects and some changed circumstances relevant to the Camp

Lick Project and lists some of the new temperature data, see discussion *supra* at 26–27, it does

not actually analyze the impacts of this new information. Similarly, although the Service

acknowledged combined impacts of the Camp Lick and Big Mosquito Projects on MCR

steelhead and RHCAs by its tardy addition to the DN of tables supposedly totaling impacted

habitat in the Middle Fork subbasin, *see* AR27158–59 (Tables 6 and 8)*,* it failed to include

information about the Ragged Ruby Project, which is located in that same subbasin, in these

totals and did not offer a "useful analysis" of the combined impacts from these projects. The

---

[31] The discussion notes do eventually touch on this, posing the question "[h]ow much additional analysis can we do before we would have to bump it up to an EIS from the EA? Can we just do an addendum?" AR26379.

[32] While an SIR may aid in the decision whether to pursue additional NEPA analysis, the SIR itself is not a NEPA document and cannot be used to fulfill the requirements for a supplemental EA or EIS, nor repair deficiencies in the original NEPA analysis. *Alexander*, 222 F.3d at 566.

Service should have addressed all of these new circumstances and information in a supplemental NEPA analysis subject to public comment rather than in a final DN and SIR.

The SIR's cursory dismissal of potential cumulative impacts stemming from additional logging projects and failure to address impacts of the amendments to the Eastside Screens and new temperature data in a supplemental NEPA analysis subject to public comment does not meet the Service's duty under 40 C.F.R. § 1502.9(c)(1)(ii) (2019). This failure to properly supplement the Camp Lick NEPA analysis in light of significant new circumstances and information violates NEPA and the APA. 5 U.S.C. § 706(1).[33]

## CONCLUSION

For the above reasons, BMBP respectfully requests that the Court grant summary judgment in its favor on all claims in its Complaint, ECF No. 1, and vacate the Forest Service's DN/FONSI and EA.

Respectfully submitted on this 3rd day of March, 2022.

s/Tom Buchele
Tom Buchele, OSB # 081560
Bridgett Buss, OSB #204997
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland, OR 97219
Tel: (503) 768-6736 (Buchele)
Tel: (503) 768-6825 (Buss)
Fax: (503) 768-6642
Email: tbuchele@lclark.edu
Email: bridgettbuss@lclark.edu

*Attorneys for Plaintiff*

---

[33] In the alternative, if the Service instead made an affirmative and conscious decision not to prepare a supplemental EA or EIS, then the agency's decision was arbitrary, capricious, and not in accordance with the law, also violating 5 U.S.C. § 706(2)(A).

MEMORANDUM IN SUPPORT OF PLAINTIFF'S                                    45
MOTION FOR SUMMARY JUDGMENT