TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

DUSTIN J. WEISMAN (CO Bar. No. 44818)
Trial Attorney
ERIKA NORMAN (CA Bar No. 268425)
Senior Trial Attorney
United States Department of Justice
Natural Resources Section
150 M Street NE
Washington, DC 20002
Telephone: (202) 598-9063 (Weisman)
Telephone: (202) 598-0475 (Norman)
Facsimile: (202) 305-0506
dustin.weisman@usdoj.gov
erika.norman@usdoj.gov

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### PENDLETON DIVISION

| | |
|---|---|
| BLUE MOUNTAINS BIODIVERSITY PROJECT,<br><br>    Plaintiff,<br><br> v.<br><br>CRAIG P. TRULOCK, Forest Supervisor, Malheur National Forest, in his official capacity; and UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture,<br><br>    Defendants. | No. 2:21-cv-1033-HA<br><br>**DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>ORAL ARGUMENT REQUESTED |

## TABLE OF CONTENTS

I.    Introduction ................................................................................................. 1

II.   Factual Background ...................................................................................... 3

      A.    Camp Lick Project Area and Project Development History. .............................. 3

      B.    Camp Lick Project Decision Notice. ..................................................... 5

      C.    Forest Plan Amendment No. 86. ........................................................ 7

III.  Legal Background ........................................................................................ 9

      A.    National Forest Management Act ........................................................ 9

      B.    National Environmental Policy Act ..................................................... 10

      C.    Judicial Review Under the Administrative Procedure Act ............................. 11

IV.   Argument .................................................................................................. 12

      A.    The Camp Lick Project Complies with NFMA (Claim I). ............................. 12

            1.    Site-Specific Forest Plan Amendments Must Be Informed by the
                  Specific Characteristics of the Project Area, but Those
                  Characteristics Need Not Be Unique ........................................... 13

            2.    The Forest Plan Amendments Were Informed by Site-Specific
                  Characteristics, and Some of those Characteristics are Unique ............... 16

            3.    The Forest Plan Amendments Are Site-Specific Notwithstanding the
                  Forest Service's Use of Amendments in Other MNF Projects that
                  May Be Vaguely Similar to the Amendments Here. ........................... 22

      B.    The Camp Lick Project Complies with NEPA. ....................................... 27

            1.    The Forest Service Analyzed Cumulative Impacts of Past, Ongoing,
                  and Reasonably Foreseeable Projects Adequately (Claim II, Count
                  I) .................................................................................... 27

            2.    The Geographic Scope of the Forest Service's Cumulative Effects
                  Analysis is Reasonable and Appropriate (Claim II, Count II) ................ 33

                  i.    The Forest Service's Cumulative Effects Analysis of Aquatic
                        Species, Habitats, and the Watershed Resource Complies
                        with NEPA .............................................................. 33

ii. The Forest Service's Cumulative Effects Analysis of "Resources Critical to Biodiversity" Complies with NEPA. ........37

3. The Forest Service Took the Requisite "Hard Look" at Environmental Impacts (Claim II, Counts III & IV). .............................42

4. The Forest Service's Purpose and Need Statement is Not "Too Narrow" (Claim II, Count V)................................................................46

5. The Forest Service Gave Meaningful Consideration to a Reasonable Range of Alternatives (Claim II, Count VI)............................................49

i. Plaintiff's argument that "unresolved conflicts surrounding project resources" compel the analysis of additional alternatives is without merit. .......................................................51

ii. The Forest Service appropriately rejected certain proposed alternatives.......................................................................................53

C. The Forest Service was not required to prepare an EIS (Claim II, Count VIII)...................................................................................................................54

1. The "context" of Camp Lick does not require an EIS. ...........................56

2. The "intensity" of the Camp Lick Project does not require an EIS. .........58

D. A Supplemental EIS or EA is not Required (Claim II, Count VII).....................61

V. Should the Court Grant Any Relief, Defendants Request the Opportunity for Further Briefing on Remedy. .......................................................................................64

VI. Conclusion .........................................................................................................................65

## TABLE OF AUTHORITIES

**Cases**

*Alaska Survival v. Surface Transp. Bd.*,
    705 F.3d 1073 (9th Cir. 2013) ................................................................46

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
    67 F.3d 723 (9th Cir. 1995) ..................................................................49

*All. for the Wild Rockies v. Bradford*,
    856 F.3d 1238 (9th Cir. 2017) ................................................................ 9

*All. for the Wild Rockies v. Savage*,
    375 F. Supp. 3d 1152 (D. Mont. 2019)....................................................65

*Alliance. for the Rockies v. Marten*,
    No. CV 20-179-M-DWM, 2021 WL 5881745 (D. Mont. Dec. 13, 2021) .............................24

*Bark v. Northrop*,
    607 F. App'x 652 (9th Cir. 2015) ............................................................50

*Bark v. U.S. Forest Serv.*,
    393 F. Supp. 3d 1043 (D. Or. 2019)........................................................49

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
    688 F.3d 989 (9th Cir. 2012) ............................................................64, 65

*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) ................................................................11

*City of Angoon v. Hodel*,
    803 F.2d 1016 (9th Cir. 1986) ...............................................................46

*Conservation Cong. v. U.S. Forest Serv.*,
    No. 2:16-cv-00864-MCE-AC, 2018 WL 2427640 (E.D. Cal. May 30, 2018)........................50

*Ctr. for Biological Diversity v. Salazar*,
    695 F.3d 893 (9th Cir. 2012) ................................................................49

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004)................................................................10, 11

*Earth Island Inst. v. U.S. Forest Serv.*,
    697 F.3d 1010 (9th Cir. 2012) ............................................................49, 50

*Ecology Ctr. v. Castaneda*,
    574 F.3d 652 (9th Cir. 2009) ................................................................ 9

*Forest Guardians v. U.S. Forest Serv.*,
    329 F.3d 1089 (9th Cir. 2003) ...............................................................42

*Friends of Se.'s Future v. Morrison*,
   153 F.3d 1059 (9th Cir. 1998) ................................................................ 43, 46, 50

*Friends of the Bitterroot v. Marten*,
   No. 20-cv-19-M-DLC, 2020 WL 5804251 (D. Mont. Sept. 29, 2020) ............................. 15, 16

*Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983) ........................................................................ 10, 49

*Greenpeace Action v. Franklin*,
   14 F.3d 1324 (9th Cir. 1992) ................................................................ 58, 59

*Headwaters, Inc. v. Bureau of Land Mgmt.*,
   914 F.2d 1174 (9th Cir. 1990) ................................................................... 50

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
   545 F.3d 1147 (9th Cir. 2008) ................................................................... 49

*Idaho Conservation League v. Bonneville Power Admin.*,
   667 F. App'x 214 (9th Cir. 2016) ............................................................... 49

*Idaho Sporting Cong. Inc. v. Alexander*,
   222 F.3d 562 (9th Cir. 2000) ................................................................ 32, 62

*Inland Empire Pub. Lands Council v. Schultz*,
   807 F. Supp. 649 (E.D. Wash. 1992) ......................................................... 11, 31

*Klamath-Siskiyou Wildlands Center v. BLM*,
   387 F.3d 989 (9th Cir. 2004) ................................................................... 30

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) ................................................................. 11, 27, 28, 29

*Lands Council v. Martin*,
   529 F.3d 1219 (9th Cir. 2008) ............................................................. passim

*Lands Council v. Martin*,
   No. CV- 06-0229-LRS, 2007 WL 2743452 (E.D. Wash. Sept. 18, 2007) ............................. 13

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ............................................................... 10, 12

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*,
   No. 3:12-cv-02271-HZ, 2014 WL 6977611 (D. Or. Dec. 9, 2014) ............................... passim

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*,
   615 F.3d 1122 (9th Cir. 2010) ................................................................... 59

*League of Wilderness Defs.-Blue Mountain Biodiversity Project v. U.S. Forest Serv.*,
   549 F.3d 1211 (9th Cir. 2008) ................................................................... 27

*Marsh v. Or. Nat. Res. Council*,

490 U.S. 360 (1989) .................................................................... 55, 59, 62

*Modesto Irrigation Dist. v. Gutierrez*,
  619 F.3d 1024 (9th Cir. 2010) .................................................... 12

*Nat. Res. Def. Council v. Kempthorne*,
  506 F. Supp. 2d 322 (E.D. Cal. 2007) ......................................... 64

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*,
  606 F.3d 1058 (9th Cir. 2010) ................................................. 46, 48

*Nat'l Parks Conservation Ass'n v. Babbitt*,
  241 F.3d 722 (9th Cir. 2001) ...................................................... 46

*Native Ecosystems Council v. Dombeck*,
  304 F.3d 886 (9th Cir. 2002) ................................................ passim

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ................................................ 48, 49

*Native Ecosystems Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012) ...................................................... 9

*Neighbors of Cuddy Mountain v. Alexander*,
  303 F.3d 1059 (9th Cir. 2002) .................................................... 27

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
  475 F.3d 1136 (9th Cir. 2007) .................................................... 12

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ...................................................... 55

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) .................................................................... 9

*Pollinator Stewardship Council v. U.S. EPA*,
  806 F.3d 520 (9th Cir. 2015) ...................................................... 65

*Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*,
  113 F.3d 1505 (9th Cir. 1997) .................................................... 61

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ............................................................ 10, 42

*Sierra Nevada Forest Prot. Campaign v. U.S. Forest Serv.*,
  166 F. App'x 923 (9th Cir. 2006) ................................................ 64

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  100 F.3d 1443 (9th Cir. 1996) ................................................ 11, 42

*Swanson v. U.S. Forest Serv.*,
  87 F.3d 339 (9th Cir. 1996) ........................................................ 42

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) ......................................................................................10, 12

*Westlands Water Dist. v. U.S. Dep't of Interior*,
    376 F.3d 853 (9th Cir. 2004) ....................................................................10

*Wild Wilderness v. Allen*,
    871 F.3d 719 (9th Cir. 2017) ....................................................................58

*WildEarth Guardians v. Zinke*,
    368 F. Supp. 3d 41 (D.D.C. 2019) ...........................................................65

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................12, 19

**Statutes**

16 U.S.C. § 1604 ....................................................................................1, 9

16 U.S.C. § 1604(f)(4) ...............................................................................13

16 U.S.C. §§ 1600-1687 .............................................................................9

42 U.S.C. §§ 4321 ...................................................................................1, 10

5 U.S.C. § 706(2)(A) .................................................................................11

5 U.S.C. §§ 701-706 ...............................................................................1, 11

**Rules**

Fed. R. Civ. P. 56 .......................................................................................1

**Regulations**

36 C.F.R. § 219.19 .....................................................................................57

36 C.F.R. § 220.7(b)(2)-(3) .........................................................................50

40 C.F.R. § 1502.9(d)(1) ............................................................................61

40 C.F.R. § 1508.11 (2019) .........................................................................10

40 C.F.R. § 1508.27(a), (b)(1)–(10) (2019) ..................................................55

40 C.F.R. § 1508.7 (2019) .....................................................................27, 33

40 C.F.R. §§ 1501.3-1501.3(b) ....................................................................55

40 C.F.R. §§ 1501.3-1501.4(c) .....................................................................11

40 C.F.R. §§ 1502.13-.14 ...........................................................................46

**Defs.' Mot. for Summ. J & Opp'n to Pl's Mot. for Summ. J.**; *Blue Mountain Biodiversity Project v. Trulock*, Case No. 2:21-cv-01033-HA

## MOTION

Defendants move, under Federal Rule of Civil Procedure 56, for summary judgment, against Plaintiff Blue Mountains Biodiversity Project ("BMBP") on each of its claims for relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604. The grounds for this motion are set forth in detail in the memorandum submitted herewith.

In compliance with Local Rule 7-1, on April 28, 2022, the Parties conferred telephonically to resolve the dispute that informs this motion. Plaintiff opposes this motion. Therefore, Defendants request for the reasons set forth in their accompanying memorandum that the Court deny BMBP's motion for summary judgment, Pl.'s Mot. for Summ. J. & Mem. in Supp. ECF No. 24 ("Pl.'s Br."), grant Defendants' motion for summary judgment, and enter judgment for Defendants on all claims.

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

## I.    Introduction

The Forest Service, in collaboration with the Blue Mountains Forest Partners, American Indian tribes, and public stakeholders, carefully designed the Camp Lick Project (the "Project") so that it would further their shared goals of improving forest health and resiliency, improving habitat for fish and wildlife, providing clean water, and contributing to the social and economic health of nearby communities.   AR 27080, 82.

A key way the Project addresses forest health and resiliency is by working to restore the forest structures, patterns, composition, and diversity that existed historically.   *Id*.  One area of the Malheur National Forest ("MNF") that is out of sync with its historical norm is the Warm Dry plant association group within the Project boundaries, where the old forest single stratum ("OFSS") is below the historical range of variability ("HRV") and old forest multi-strata ("OFMS") is above the HRV.  AR 19333.   These forests diverge from their historical norm because there is an overabundance of young (less than 150 years), relatively large (≥21 inches diameter breast height), grand fir and Douglas fir trees.  *Id*.  Historically, these two species were not a major component of this forest type.  *Id*.  Even more problematic is that the two species compete with species, such as ponderosa pine and western larch, that were historically dominant. *Id*.  Left unaddressed, ponderosa pine and western larch would suffer increased mortality due to competition, insects, drought, and wildfire, and the Forest would be less resilient.  *Id*.  It is for these reasons that the Forest Service adopted site-specific forest plan amendments (the "Amendments") to allow the harvest of these young, large, grand fir and Douglas fir trees, so long as the trees are within two times the dripline of ponderosa pine or western larch.

AR 27107-08.  The Project decision also authorizes silvicultural treatments, riparian and upland watershed restoration, prescribed burning, and road activities.  AR 27080.

Plaintiff challenges the Project under the National Forest Management Act ("NFMA") and the National Environmental Policy Act ("NEPA"), bringing several claims under each statute. All of Plaintiff's claims lack merit.  Plaintiff's NFMA claim and related NEPA claim challenging the Amendments fail because Plaintiff erroneously applies a "uniqueness" requirement in contravention of Ninth Circuit precedent and ignores details of the Amendments which demonstrate their uniqueness, specificity, and limited nature.

Plaintiff's remaining NEPA claims also fail.  The geographic scope of the Forest Service's cumulative effects analyses complies with NEPA.  Plaintiff's claim that the Forest Service failed to take a hard look at environmental impacts, in particular with respect to stream temperatures, also fails, because the agency included and analyzed all available and fully processed stream temperature data.  The purpose and need statement for the Project is not too narrow or improperly constrained by specific Project actions or activities.

Plaintiff's claim that the Forest Service failed to analyze a reasonable range of alternatives fails, because there is no legal requirement that the agency analyze additional alternatives beyond the no-action alternative and the proposed action in an Environmental Assessment ("EA").  Further, the Forest Service decision to eliminate Plaintiff's preferred alternatives, among others, from detailed study was not arbitrary and capricious.  Plaintiff's claim that the Forest Service was required to prepare an Environmental Impact Statement ("EIS") is also without merit, because the context and intensity of the Camp Lick Project do not compel the preparation of an EIS.  Finally, the Forest Service was not required to prepare a supplemental EIS; it was proper for the agency to consider new information in a supplemental

information report and decline to prepare additional NEPA analysis after determining the effects of the Project fell within those disclosed in the FEA.

## II.    Factual Background

### A.    Camp Lick Project Area and Project Development History.

The Camp Lick Project is located within the Blue Mountain Ranger District on the Malheur National Forest in Grant County, Oregon. AR 27080, 82. The Project planning area is approximately 10 miles northeast of John Day, Oregon. AR 27082. The 40,000-acre Project planning area contains one of the top three priority watersheds for aquatic restoration on the MNF to improve Middle Columbia River steelhead habitat and improve water storage. AR 27080; AR 27109. The following is a map of the Project location (AR 19787):



The Project was listed in the MNF Schedule of Proposed Actions beginning in April 2015. AR 27154. Public input throughout the planning process shaped the Project. AR 27109.

The Project was developed by an interdisciplinary team in collaboration with the Blue Mountains Forest Partners, tribes, and public stakeholders. AR 27080. The Forest Service performed outreach to interested individuals and entities at the local, regional, and national levels, private landowners, federal agencies, tribes, and a wide array of other stakeholders, and hosted three public open houses and field trips to the Project area. AR 27129.

The Forest Service sent the scoping package to approximately 150 individuals and received a total of eight comments. AR 27155. The Forest Service considered all comments submitted during scoping, *see* AR 17144-87 (Camp Lick Preliminary Environmental Assessment App'x D—Scoping Report), and modified the proposed action in the Camp Lick Preliminary EA in response to the scoping comments. AR 27114; *see also* AR 16440. A notice of the preliminary EA was sent to approximately 350 individuals and the Forest Service held an open house on the Project, which ten people attended. AR 27155. The Forest Service responded to twelve comments in the final EA ("FEA"). *Id.*; AR 19879-20089 (Camp Lick FEA App'x D—Public Comment Report). In response to public comments, six additional alternatives were considered in the FEA, but were eliminated from detailed study. AR 27109. A total of thirteen alternatives were considered but eliminated from detailed study in the FEA. *Id.*

The Forest Service published a draft decision notice ("DN") and finding of no significant impact ("FONSI") on August 23, 2017, and received three objections. AR 27155. In response to an objection from Oregon Wild, the Forest Service made modifications to the DN/FONSI to resolve the objection. Of note, the Forest Service modified the forest plan amendment allowing the removal of trees greater than or equal to 21 inches diameter at breast height ("DBH") to include only those trees that are located within double the dripline of ponderosa pine and western larch, dropped 2.88 miles of temporary road construction, and changed 420 acres from stand

improvement commercial thinning to stand improvement biomass thinning. *Id*. The Forest Service determined after considering the context and intensity of environmental impacts, including the size, scope, and duration of the Project and planned mitigation measures, that the Project will not have a significant impact on the quality of the human environment. AR 27157-59. Relying on 150 scientific literature sources and responding to 350 others, the Forest Service determined the effects of the Project would not be highly controversial. AR 27161.

In 2020, the Forest Service prepared a supplemental information report ("SIR") to document new information or changed circumstances since the publication of the FEA. AR 27081; AR 27299. Among other topics, the SIR addressed 2014 and 2016 stream temperature data and reasonably foreseeable activities such as the Camp Lick Aquatic Restoration and Camp Valley Phase II Aquatic Restoration projects, as well as the Austin, Cliff Knox, and Rattlesnake Hazardous Fuels projects[1]. *Id*. The Forest Supervisor determined that the effects of the changed circumstances or new information fell within what those disclosed in the FEA. *Id*.

**B.    Camp Lick Project Decision Notice**.

In May 2020, the Forest Service issued the Decision Notice and Finding of No Significant Impact for the Project and Forest Plan Amendment No. 86. The purpose of the Project is to improve forest health and resiliency to drought, insects, disease, and wildfire, protect biodiversity and improve fish and wildlife habitat, provide clean water, and contribute to the social and economic health of nearby communities. AR 27080, 82. The social values and opportunities to be provided by the Project include traditional use plants, sawtimber, grazing, and

---

[1] The Camp Lick Aquatic Restoration and Camp Valley Phase II projects are the only projects located within the Camp Lick planning area. AR 27301.

Page 5 -    **Defs.' Mot. for Summ. J & Opp'n to Pl's Mot. for Summ. J.**; *Blue Mountain Biodiversity Project v. Trulock*, Case No. 2:21-cv-01033-HA

employment opportunities, and recreation. AR 27082-83.

The Decision Notice authorizes silvicultural treatments, riparian and upland watershed restoration treatments, prescribed burning, road activities, and range fence construction. AR 27080. The silvicultural treatments include 14,910 acres of thinning, including commercial thinning, lodgepole treatments, biomass thinning, western white pine restoration, and juniper encroachment treatment. *Id.*; AR 27085, 152. The silvicultural treatments were designed to return the forest to a historical range of variability, create strategic fuel breaks, and reduce fuels along strategic roads. AR 27085. The silvicultural treatments will decrease the proportion of young forest structure (from 32 to 7 percent) and increase the proportion of old forest structure (from 30 to 54 percent) and reduce the proportion of less fire-tolerant species like grand fir and Douglas-fir. AR 27110. The Forest Service estimates the Project will yield approximately 34 million board feet of commercial material, generate $7,193,892 in local income, and support 258 jobs over the next two years. AR 27085, 113.

The Forest Service selected alternative 2 with modifications.[2] AR 27083. The authorized activities are described in detail in the DN (AR 27085-101) and summarized in Table 1 (AR 27084), and include: 8,190 acres of stand improvement commercial thinning and 2,700 acres of biomass thinning, 1,700 acres of inner riparian habitat treatments, 600 acres of outer riparian habitat treatments, 31,090 acres of prescribed burning, 298 miles of road maintenance for haul, 7.8 miles of temporary road construction, 26.3 miles of road closures, and the designation of 10,100 acres of connectivity corridors. AR 27084. The commercial thinning

_____

[2] The modifications to alternative 2 in the Decision Notice include dropping 60 acres of commercial thinning, reducing 990 acres of prescribed burning, dropping 2.88 miles of temporary road construction, and adding additional limitations on the removal of trees $\geq 21$ inches DBH. AR 27083.

will reduce stand density, improve vigor, and enhance stand health by increasing the distance between tree crowns and reducing ladder fuels, along with canopy and surface fuels, to reduce the risk of crown fire. AR 27086, 153. Commercial thinning will also be performed to reduce grand fir and Douglas-fir so that stands that were historically composed of ponderosa pine or western larch can return to closer to their historic condition. AR 27087. Prescribed fire will be used in both treated and untreated stands to reduce or maintain fire behavior and severity. AR 27097, 110-11. Roads will also be used, maintained, and temporary roads constructed, to provide access for treatments. AR 27098. Roads will also be opened (3.8 miles), decommissioned (3.9 miles), closed (26.3 miles), and relocated (.7 miles) during implementation of the project. AR 27099.

The Decision authorizes riparian and upland watershed restoration treatments, including aspen restoration (80 acres), meadow restoration (115 acres) and ecological riparian treatments (2,300 acres)[3]. AR 27090-93. The Project also includes design criteria to mitigate the impacts of certain activities on Forest resources. AR 27101-02.

### C.    Forest Plan Amendment No. 86.

In connection with the Project, the Forest Service amended Eastside Forest Plan Amendment 2, Standard 6(d) to allow the removal of young (less than 150 years old), grand fir and Douglas-fir trees ≥21 inches DBH within the Warm Dry plant association group, but only within double the dripline of legacy ponderosa pine and western larch. AR 27106-07. The amendment covers approximately 4,700 acres. *Id.* The forest plan amendment will also add

---

[3] The 2,300 acres of ecological riparian treatment can be broken down further into inner riparian habitat conservation area thinning (1,700 acres) and outer riparian habitat area conservation area thinning (600 acres).

approximately 1,511 acres to the Management Area 13 network by decreasing dedicated old

growth areas by 700 acres and increasing replacement old growth acres by 2,211 acres,

approximately. *Id.* The effects of the Management Area 13 amendment will be to provide 5,253

acres of old growth habitat within the planning area to contribute to old growth habitat across the

Forest. AR 27134-36.

The Forest Service's decision to amend the Forest Plan was supported by site-specific

conditions in 100 commercial thinning units of Warm Dry plant association group stands where

grand fir and Douglas-fir trees have grown-in to such an extent that ponderosa pine and western

larch (that the Eastside Screens are intended to protect) would not survive without reducing the

number of these trees. AR 27118-19, 138. As a result of past timber harvest practices and over

100 years of fire suppression, there are grand fir and Douglas-fir trees (that are ≥21 inches DBH,

and less than 150 years old) competing with older ponderosa pine and western larch trees and

causing competition stress that increases the risk that the older ponderosa pine and western larch

trees may die as a result of insects, drought, or wildfire. AR 27119, 139, 141. By reducing the

number of younger grand fir and Douglas-fir trees, the older trees will have greater access to

water, nutrients, and sunlight, allowing them to thrive and increasing the growth, health, and

vigor of the forest. AR 27119, 123, 141. The Project planning area contains one of the top three

priority watersheds identified for aquatic restoration on the MNF and the unique riparian habitats

and fish species present in the area support a site-specific forest plan amendment that would

mitigate against the risk of catastrophic wildfire. *Id.*

In sum, the Camp Lick Project and attendant forest plan Amendments are designed to

make the forest more resilient to fire, insects, disease, and to prevent the landscape from being

"overrun by these mortality agents." AR 27126. This important project should move forward.

III.    **Legal Background**

A.    **National Forest Management Act**.

Administration of the MNF is governed by the National Forest Management Act, 16 U.S.C. §§ 1600-1687, which provides for forest planning and management at two levels: the forest level and the individual project level. At the forest level, NFMA directs the Forest Service to "develop, maintain, and, as appropriate, revise . . . [forest] plans for units of the National Forest System." *Id*. § 1604(a). A forest plan is a general planning tool that establishes the overall management direction for the National Forest unit and serves as a programmatic statement of intent to guide future site-specific decisions. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729 (1998) (noting that forest plans furnish broad, programmatic guidance).

Forest plans guide all natural resource management activities in the National Forests and must "provide for multiple use and sustained yield of the products and services," including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). At the project level, the Forest Service implements the applicable forest plan by undertaking site-specific projects which must be consistent with the plan. *See id*. § 1604(i). "[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference," *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012), and will not be disturbed unless it is plainly erroneous. *Id*. at 1052 (citations omitted). "In the face of ambiguity, [courts] 'defer to the Forest Service's reasonable interpretation of the Forest Plan's requirements.'" *All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1242 (9th Cir. 2017) (quoting *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 661 (9th Cir. 2009)).

This degree of deference is consistent with the intent of NFMA to "provide effective guidance . . . but [to] allow enough flexibility so that the professional foresters can do the job,

rather than lawyers and judges." Joint Hearings, 94th Cong., 2d Sess. 953-54 (Comm. Print 1976). "Congress has consistently acknowledged that the Forest Service must balance competing demands in managing [NFS] lands [and], since Congress' early regulation of the national forests, it has never been the case that the national forests were . . . to be 'set aside for non-use.'" *Lands Council v. McNair*, 537 F.3d 981, 990 (9th Cir. 2008) (third alteration in original) (citation and internal quotation marks omitted).

> **B.    National Environmental Policy Act**.

NEPA, 42 U.S.C. §§ 4321 *et seq.*, requires federal agencies to examine the environmental effects of proposed federal actions. *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). Unlike other environmental statutes, NEPA does not mandate particular substantive results, but only prescribes a necessary process for analyzing potential environmental effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). NEPA's "mandate to the agencies is essentially procedural" and is designed "to insure a fully informed and well-considered decision." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). "A court must avoid passing judgment on the substance of an agency's decision. Its focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citing *Robertson*, 490 U.S. at 350).

NEPA and its implementing regulations require the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11 (2019). Under certain circumstances, an agency may prepare "a more limited document, an Environmental Assessment (EA)." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (citing 40 C.F.R. §§ 1501.4(a)(b)). An agency may prepare an

EA to determine whether the impacts of an action will be significant, and if not, the agency may prepare a FONSI and forego preparation of an EIS. *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9, 1508.13. The EA itself is a "'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Public Citizen*, 541 U.S. at 757 (quoting 40 C.F.R. § 1508.9(a)).

In reviewing the sufficiency of an agency's NEPA analysis, a court should evaluate whether the agency has presented a "'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted). "Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *Id.* at 761 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). In particular, "[f]orest management is fairly viewed as the sort of technical field where courts should defer to the findings of specialized administrative agencies." *Inland Empire Pub. Lands Council v. Schultz*, 807 F. Supp. 649, 652 (E.D. Wash. 1992) (citation omitted).

### C.    Judicial Review Under the Administrative Procedure Act.

A court reviews agency compliance with NEPA and NFMA under the standard set forth in the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701-706; *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). APA review is generally limited to the administrative record that was before the agency at the time of its decision. *Dombeck*, 304 F.3d at 891-93; *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). Under the APA, a court may set aside an agency action if it determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This standard of review is "highly deferential, presuming the agency

action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotation marks and citation omitted).

The court's task in reviewing agency action under the APA is simply "to insure a fully informed and well-considered decision, not necessarily a decision [the court] would have reached had [it] been [a member] of the decisionmaking unit of the agency." *Vt. Yankee Nuclear Power*, 435 U.S. at 558. Courts must therefore uphold a reasonable agency action "even if the administrative record contains evidence for and against its decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (citation omitted). In the context of management of Forest Service lands, "Congress has consistently acknowledged that the Forest Service must balance competing demands in managing National Forest System lands." *Lands Council*, 537 F.3d at 990; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

## IV.    Argument

### A.    The Camp Lick Project Complies with NFMA (Claim I).

Plaintiff's NFMA claim suffers from at least three flaws. <u>First</u>, Plaintiff asserts, incorrectly, that the site-specific forest plan Amendments are appropriate only if there are "*unique characteristics* of the Camp Lick Project site." Pl.'s Br. 11 (emphasis added). Contrary to Plaintiff's assertion, well-established Ninth Circuit precedent makes clear that the decision to limit the scope of a Forest Plan amendment need only be "informed by site-specific characteristics and Forest Service expertise." *Lands Council v. Martin*, 529 F.3d 1219, 1228 (9th Cir. 2008). <u>Second</u>, the Forest Plan Amendments were informed by site-specific characteristics of the Camp Lick Project area. Further, contrary to Plaintiff's assertions, some of the site-specific characteristics of the Project area are unique. <u>Third</u>, Plaintiff argues, incorrectly, that the

existence of other MNF projects that have used somewhat similar site-specific amendments makes the Camp Lick Project non-site-specific. Each point is addressed below.

### 1. Site-Specific Forest Plan Amendments Must Be Informed by the Specific Characteristics of the Project Area, but Those Characteristics Need Not Be Unique.

Plaintiff applies the wrong legal standard to the Forest Service's justification for the site-specific Amendments. Specifically, Plaintiff contends that in order for the Forest Service to justify its Amendments it must point to "unique characteristics of the Camp Lick Project site." Pl.'s Br. 9-13. The Forest Service need not establish that the Project area is unique from all other areas in order to utilize site-specific amendments. Rather the Forest Service need only establish that it considered specific characteristics of the Project area. It did so here. *See infra* at IV.A.2.

Under NFMA, the Forest Service may amend a forest plan "in any manner whatsoever." 16 U.S.C. § 1604(f)(4); *see also Lands Council*, 529 F.3d at 1225 (noting that it is a "rare" instance" when the "agency's action is arbitrary and capricious for failure to provide an adequate explanation"). In *Lands Council*, the Ninth Circuit addressed the use of a site-specific plan amendment to the Eastside Screens that changed the definition of "live trees." 529 F.3d at 1223-24. The Forest Service had authorized this site-specific plan amendment for the School Fire Project area, which involved salvage harvest on 9,423 acres of the Umatilla National Forest. *Id.* at 1222. The School Fire, however, had burned 28,000 acres of the Umatilla National Forest. *Id.* The Forest Service had estimated that on 15,380 of these acres, more than 75% of the forest was damaged by wildfire. *Lands Council v. Martin*, cv- 06-0229-LRS, 2007 WL 2743452, at * 1 (E.D. Wash. Sept. 18, 2007), *aff'd in part, rev'd in part by*, 529 F.3d 1219 (9th Cir. 2008). Thus, the site-specific plan amendment for the School Fire Project area did not encompass all areas where wildfire had damaged trees on the forest. Moreover, the mortality guidelines that formed

the scientific basis for the site-specific plan amendment to the School Fire Project area were applicable to other National Forests covered by the Eastside Screens. Nonetheless, the Ninth Circuit in *Lands Council* held that "waiver of the particular requirement [of the Eastside Screens], due to site-specific characteristics and based on the Forest Service's expertise, was reasonable, even though waiver of the same requirement appeared likely in other timber sales." 529 F.3d at 1228 (citation omitted).

Despite the clear standard articulated in *Lands Council*, Plaintiff seeks to impose an additional, more demanding, "uniqueness" requirement, asserting that *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, No. 3:12-cv-02271-HZ, 2014 WL 6977611, at *27 (D. Or. Dec. 9, 2014), requires the Forest Service to disclose unique characteristics of the Project area that support issuing a site-specific amendment rather than a forest-wide amendment. Pl.'s Br. 9-13. However, Plaintiff overstates the requirement articulated in *Connaughton* and ignores the evidence in the Record of the Project area's uniqueness. *See infra* at IV.A.2

In *Connaughton*, the court held that "[s]imply explaining the purpose of the Project, the desired conditions for the Forest, or stating that the amendment is site-specific because it was designed for a specific site, does not satisfy the rational connection between the facts found and the choice made." 2014 WL 6977611, at *30. The Ninth Circuit has similarly held that the "decision to limit the scope of the amendment" must be "informed by site-specific characteristics and Forest Service expertise." *Lands Council*, 529 F.3d at 1228. Thus, *Connaughton* is consistent with *Lands Council* to the extent that it requires more from the Forest Service than a broad and cursory description "explaining the purpose of the Project, the desired conditions for the Forest, or stating that the amendment is site-specific." 2014 WL 6977611, at *30. Instead of

broad and cursory statements, the decision must be "informed by site-specific characteristics." *Lands Council*, 529 F.3d at 1228.

Plaintiff, however, stretches *Connaughton* beyond its holding. They latch onto the word "unique" and argue that it imposes a requirement for the Forest Service to "provide [] unique characteristics of the Camp Lick Project site that would justify the two challenged site-specific amendments." Pl.'s Br. 11. This is not the first time a plaintiff has relied upon *Connaughton* in an attempt to impose a standard more demanding than the Ninth Circuit's.

In *Friends of the Bitterroot v. Marten*, No. 20-cv-19-M-DLC, 2020 WL 5804251, *9 (D. Mont. Sept. 29, 2020), the plaintiff made the same argument, citing to *Connaughton*, as Plaintiff does here—"that to justify its decision to issue a site-specific amendment, the Forest Service must point to some unique characteristic in the Project area." However, the court in *Marten* rejected the plaintiff's argument, and this Court should too. *Id*. at *10.

The plaintiff in *Marten* argued that a site-specific amendment concerning elk habitat effectiveness standards violated NFMA because the site-specific characteristic—small watersheds that make up 17% of the project area—was "not a unique characteristic when that percentage is reflective of the Bitterroot National Forest at large." *Id*. at *9. In rejecting the plaintiff's argument, the court first observed that "[i]n *Lands Council*, the Ninth Circuit required that a decision to implement a site-specific amendment requires site-specific characteristics, but the [Ninth Circuit] never used the word 'unique.'" *Id*. (citation omitted) Next, the court noted that in *Dombeck*, 304 F.3d at 898, the "Ninth Circuit upheld the Forest Service's decision to issue a site-specific amendment exempting a timber sale project from compliance with a road density standard" and "deferred to the Forest Service's expertise in determining the scope of the amendment and did not require it to justify that the project area was more heavily roaded than

the rest of the forest." *Marten*, 2020 WL 5804251, at *10 (citation omitted).  The court in *Marten* concluded that "*Lands Council* and [*Dombeck*] undercut Plaintiff's argument that a site-specific characteristic must be one that is unique and therefore not present anywhere else on the forest." *Id*.  Thus, the court upheld the Forest Service's actions finding that its "belief that small watersheds justify the amendment is reasonable" notwithstanding the fact that small watersheds are not a unique characteristic "because the Forest Service articulate[d] a rational connection between the facts found and the choices made, based on a site-specific characteristic." *Id*. (internal quotation marks and citation omitted).

This Court, like *Marten*, should reject Plaintiff's call to read *Connaughton* as imposing a "uniqueness" requirement.[4]  Adopting Plaintiff's position would conflict with *Lands Council* and *Dombeck* and would improperly impose a more demanding standard than the Ninth Circuit requires.  Instead, the Court should follow the well-established, and binding, Ninth Circuit caselaw holding that the Forest Service need only show that its "decision to limit the scope of the amendment was informed by site specific characteristics and Forest Service expertise," and that those site-specific characteristics need not be unique to the project area. *Lands Council*, 529 F.3d at 1228; *see Dombeck*, 304 F.3d at 900 (deferring to the Forest Service's expertise in determining the scope of the amendment).

### 2.  The Forest Plan Amendments Were Informed by Site-Specific Characteristics, and Some of those Characteristics are Unique.

Plaintiff's NFMA claim fails because the Forest Service's "decision to limit the scope of

---

[4] Even if the Court agrees with Plaintiff that *Connaughton* imposes a requirement on the Forest Service to demonstrate the project area is unique, the Court should reject that standard. *Connaughton* is not binding on this Court and a "uniqueness" requirement would contravene the Ninth Circuit's decisions in *Lands Council* and *Dombeck*.

Page 16 -    **Defs.' Mot. for Summ. J & Opp'n to Pl's Mot. for Summ. J.**; *Blue Mountain Biodiversity Project v. Trulock*, Case No. 2:21-cv-01033-HA

the amendment[s] was informed by site-specific characteristics and Forest Service expertise." *Lands Council*, 529 F.3d at 1228. In particular, the Forest Service considered site-specific characteristics of the Camp Lick Project area such as tree species composition and its divergence from the HRV, the presence of increased stand densities and multi-layered canopies, and increased ponderosa pine and western larch mortality due to disease, insects, and uncharacteristic wildfire. AR 19705. Plaintiff does not contest that the Forest Service considered site-specific characteristics of the Project area. *See* Pl.'s Br. 11 (conceding that the Forest Service "describe[d] the forest conditions that supposedly justify the amendment"). Instead they contend, incorrectly (*see supra* at IV.A.1), that the site-specific characteristics of the Project area must be unique. *See id*. Even assuming Plaintiff's legal standard is correct, however, their NFMA claim still fails because the Forest Service did consider unique site-specific characteristics of the Camp Lick Project area.

Consistent with the Forest Plan, the Forest Service carefully designed the Camp Lick Project to, *inter alia*, "address the need to maintain and improve landscape resiliency and resistance to disturbances such as wildfire, drought, and insects and diseases by managing for desirable forest composition, stocking levels, and pattern." AR 27110. A key obstacle to this goal was the overabundance of grand fir and Douglas fir in the Project area which, historically, were "not a major component within these dry forest types."[5] AR 19708. However, "[p]ast management, including fire exclusion, has allowed the ingrowth of younger grand fir and Douglas-fir trees which have increased the risk of mortality to old ponderosa pine and western

---

[5] The Forest Service tailored the Amendments to apply solely to grand fir and Douglas fir within Warm Dry stands in the Project area. The Amendments did not apply to the Cool Moist or Cold Dry stands. This further evidence the Amendments' limited scope and site specificity.

larch due to competition induced stress, insect attacks, and uncharacteristic wildfire." *Id*. This is specifically true for the Project area where studies completed in or near the Camp Lick planning area show that "the dry forest landscapes were historically dominated by ponderosa pine" and that "[h]istorically, frequent low-severity and mixed severity fire regimes maintained ponderosa pine as the dominant species." AR 19705. Promoting historically present tree species such as ponderosa pine and western larch will "restore the drier forest landscapes to a more historically fire resistant condition, and reduce stand densities and stress due to competition." *Id*.

Using site-specific studies, the Forest Service determined that the Camp Lick Project area is outside the natural range of variation. *Id*.; *see, e.g.*, AR 19377-78 (discussing the eight mapped upland forest plant association groups and their conformity with the HRV), 19383 (discussing formal stand exams of the Camp Lick Project area), 19707-08 (Forest Vegetation Simulator Data Analyzer was used for the Project to model alternatives into the future). The Forest Service found that within the Project area, 24 percent of the Warm Dry plant association group is OFMS, while OFSS stands are rare at less than 5 percent of the Warm Dry plant association. *Id*. This is a reversal of the historical range of variability when OFMS was 5 to 20 percent of the Warm Dry upland forest and OFSS was between 15 to 55 percent. *Id*. The Forest Service also considered site-specific wildfire data, finding that "[i]n the Camp Lick planning area there has been an average of approximately 5 fire starts per year and fires averaging approximately 1.1 acres in size." AR 19708. This is a departure from the historical fire regime in the Project area that is "characterized by frequent fires (0 to 35 years) of low (surfaces fires most common) to mixed severity." *Id*.

The site-specific characteristics just discussed are but a few of the Forest Service's considerations that are tied directly to specific characteristics of the Project area. Nonetheless,

Plaintiff dismisses the Forest Service's analysis as lacking simply because Plaintiff believes there is nothing "unique" about the site-specific characteristics.[6] Even assuming there is a "uniqueness" requirement, Plaintiff is wrong for at least two reasons.

First, the site-specific characteristics just detailed—the HRV, current tree species composition, forest type, fire/insect/disease risk, and history—*are* unique characteristics specific to the Camp Lick Project area. Plaintiff is only able to support its assertion to the contrary—that "the Camp Lick Project site's characteristics are not unique within the John Day River watershed or the MNF as a whole"—by broadening out what it means to be "unique" to a level that is nonsensical. Pl.'s Br. 12. Plaintiff may be correct that the broadly stated purpose and need statement of the Camp Lick Project is similar to the broadly worded purpose and need statements of other projects, such as Big Mosquito, Ragged Ruby, and Austin. *See id.* Undoubtedly, the Forest Service likely has similarly worded purpose and need statements for forest projects through the nation because the need to restore forests to their HRV is widespread across locales and forest types. But the details matter. And here, when the details are examined instead of broad policy objectives, it is clear that the site-specific characteristics the Forest Service considered are unique. *See* AR 27119 ("Every acre of ground on the Forest is unique, although some have similar characteristics."). Plaintiff has not shown that there is another area with the

---

[6] Plaintiff's brief is confusing because at times Plaintiff claims that the Forest Service must establish that it is "addressing a *unique problem*" (Pl.'s Br 9 (emphasis added)) while at other times Plaintiff claims that the Forest Service must "provide[] any *unique characteristics* of the Camp Lick Project site." (*id.* at 11 (emphasis added)). To the extent Plaintiff's first claim rests on the theory that the identified *problem* must be unique, their claims lacks any legal support. The case Plaintiff relies upon for the uniqueness requirement, *Connaughton*, says nothing about the uniqueness or non-uniqueness of the *problem. See* 2014 WL 6977611, at *30 (discussing "*characteristics* unique to a site" (emphasis added)). Therefore, this brief will only address Plaintiff's contention that some site-specific *characteristics* must be unique.

Page 19 -    **Defs.' Mot. for Summ. J & Opp'n to Pl's Mot. for Summ. J.**; *Blue Mountain Biodiversity Project v. Trulock*, Case No. 2:21-cv-01033-HA

particular combination of characteristics of the Project area. That is, an area that shares the same forest type, HRV, species composition percentages, and wildfire, disease, and insect statistics/risks.

Second, even though it need not provide unique site-specific characteristics, the Forest Service did so. The DN noted the Project area's "unique habitat types for fish and wildlife" (AR 27082, 109, 113), described how "past fire exclusion has shifted species composition" (AR 27116), recounted how "past timber harvest ha[ve] increased the existing stand density by 2 to 3 times" (*id.*), and detailed how "large wood recruitment dominated by late seral tree species is impacting stream and valley processes due to faster decay rates" (*id.*). *See also* AR 26207-08, 27116, 27118-22. Similarly, the FEA devoted a section to describing the unique characteristics of the Project area, including that the Project area is "one of the top three priority watersheds identified for aquatic restoration on the Malheur National Forest," and that by "restoring conditions of the upland vegetation communities," this reduces the likelihood of large stand replacing wildfire events, which are a threat to "the Columbia Basin's most biologically diverse river system and globally important stronghold of wild salmon." *See, e.g.*, AR 19718.

Plaintiff attempts to downplay and dismiss the Forest Service's consideration of unique, site-specific, characteristics of the Project area by casting the analysis as merely "describ[ing] the forest conditions that supposedly justify the amendment." Pl.'s Br. 11; *see also id.* ("the [Forest] Service instead simply establishes conditions that exist within the project area"). Plaintiff misses the point—the specific forest conditions in the Project area *is* what makes the Project area unique. Plaintiff's claim that "there is no suggestion that those conditions are unique to the Project area" is absurd. *Id.* In fact, many of the unique, site-specific, characteristics discussed earlier appear in the DN under a section titled "Site-Specificity and Uniqueness" or in the FEA

under a section titled "Uniqueness of the Proposed Forest Plan Amendment."[7]  AR 19718,

27118.  Not only do the titles of these sections make clear that the site-specific characteristics

discussed are unique, the substance of the DN and FEA do as well by detailing both

quantitatively and qualitatively the specific characteristics of the Project area that, although they

may be similar to other areas in the MNF in some respects, are unique to the Project area.

Similarly, Plaintiff's reliance on *Connaughton* is misplaced.  There, the court found that

the Forest Service "fail[ed] to point to any characteristics unique to the Project area." 2014 WL

6977611, at *30.  But here the Forest Service cited to numerous unique, site-specific,

characteristics of the Project area.  Also, in *Connaughton*, the court held that "[s]imply

explaining the purpose of the Project, the desired conditions for the Forest, or stating that the

amendment is site-specific" is not sufficient.  *Id*.  But here, again, the Forest Service did far

more.  The Forest Service fully described both quantitatively and qualitatively what makes the

Project area unique.  Thus, even assuming there is a "uniqueness" requirement, the Forest

Service has satisfied that requirement.

Plaintiff's NFMA claim must fail.  The Forest Service's "decision to limit the scope of

the amendment[s] was informed by site-specific characteristics and Forest Service expertise."

*Lands Council*, 529 F.3d at 1228.  And, even assuming Plaintiff is correct that there is a

"uniqueness" requirement, the Forest Service did consider unique site-specific characteristics of

the Project area and articulated a "rational connection between the facts found and the choice

---

[7] Plaintiff quibbles with the Forest Service's wording of the title of this section because it reads "*Uniqueness of the Proposed Forest Plan Amendment*" rather than describing the uniqueness of the *Project area*.  Pl.'s Br. 11.  This is a distinction without a difference because the Forest Service explains why the Forest Plan amendment is unique from other amendments *because of the uniqueness of the Project area.  See* AR 19718.

made." *Connaughton*, 2014 WL 6977611, at *30.

### 3. The Forest Plan Amendments Are Site-Specific Notwithstanding the Forest Service's Use of Amendments in Other MNF Projects that May Be Vaguely Similar to the Amendments Here.

The Forest Plan Amendments are specifically tailored to the Project area and have not been used for any other recent or future project within the MNF. Thus, Plaintiff's contention that the Forest Service has "use[d] [] objectively similar site-specific amendments in a number of adjacent and nearby logging projects" is false. Pl.'s Br. 12. Similarly, Plaintiff's claim that the Amendments "amount to a *de facto* significant forest plan amendment" because they supposedly have "been used in essentially the same form, for at least twelve other site-specific projects on the MNF" is also false because the Amendments are fundamentally different from the amendments used in other projects.[8]  Pl.'s Br. 13.

Plaintiff focuses on two features of the Amendments: (1) their authorization to harvest in late and old structural areas "that are below historical range of variability;" and (2) the change to "allow for the logging of . . . trees≥21"." Pl.'s Br. 7. Yet Plaintiff ignores several key aspects of the Amendments that differentiate them from other, vaguely similar, forest plan amendments. For instance, Plaintiff does not acknowledge that the Amendments apply only to grand fir and Douglas fir, that trees 150 years old and older will be preserved, that only trees within double the dripline of ponderosa pine or western larch will be harvested, and that the only stands affected by

---

[8] Plaintiff also claims that in a 2003 memorandum the regional forester "suggested site-specific amendments may be appropriate to sidestep the [Eastside] Screens." Pl.'s Br. 9. Plaintiff grossly mischaracterizes the 2003 memorandum. Far from "sidestepping" the Screens, the 2003 guidance memorandum explained how prior interpretation of the Screens limited the Forest Service's ability to meet the Screens' objectives of providing late/old structure ("LOS") stands. AR 02481. Thus, the Regional Forester suggested that staff "consider site-specific Forest plan amendments where this will better meet LOS objectives by moving the landscape towards HRV, and providing LOS for the habitat needs of associated wildlife species." *Id.*

the Amendments are those within the Warm Dry plant association group.  *See* AR 27107-08.
None of the three projects—Austin, Ragged Ruby, and Big Mosquito—Plaintiff highlights share
the same carefully crafted requirements present in the Camp Lick Amendments.

Take first the Austin project amendments.  Those amendments are distinguishable
because they apply to old forest multi-strata stands within the *Cold Forest* plant association
group, and, the amendments do not limit harvest to trees within double the dripline of ponderosa
pine or western larch.  *See* SUPPAR 24702.  Next, the Ragged Ruby amendments are
distinguishable because they apply in the *Hot Dry* plant association group, and, like Austin, the
amendments do not limit harvest to trees within double the dripline of ponderosa pine or western
larch.  *See* SUPPAR 26442-43.  Finally, the Big Mosquito project amendments differ
significantly from the Camp Lick Amendments because they do not permit harvest of trees over
28 inches DBH and apply to different tree species[9].  *See* SUPPAR 19930-31.

For the reasons just discussed, Plaintiff's argument that the Camp Lick Amendments are
"objectively similar" or "the same" as the amendments in other projects is simply not true.
Pl.'s Br. 12-13.  Plaintiff's assertion is based on the misguided premise that all site-specific
forest plan amendments that contain any authorization to harvest trees ≥21 inches DBH in late
and old structure areas that are below HRV, are the same.  In reality, each amendment varies
significantly in terms of the type of stands it applies to, the species of trees at issue, the size of
the trees subject to harvest, and whether the trees harvested must be within a certain distance of

---

[9] The Big Mosquito amendments permit the harvest of grand fir only, except within aspen stands
and the riparian enhancement area, in which case both Douglas fir and ponderosa pine can be
harvested.  SUPPAR 19930-31.  These requirements are not present in the Camp Lick
Amendments.  Also, Big Mosquito's proximity limitation limits harvest to trees within double
the dripline of ponderosa pine, western larch, *or white pine*.  *Id*.  No such provision concerning
white pine is present in the Camp Lick Amendments.

the dripline of particular tree species. What the Austin, Ragged Ruby, Big Mosquito, and Camp Lick amendments demonstrate is that the Forest Service used site-specific amendments appropriately, and tailored them to the unique, site-specific, characteristics of the Project area.

Because the Camp Lick Amendments are not the same as another projects', Plaintiff's contention that all the amendments collectively constitute a *de facto* significant forest plan amendment falls flat. *See* Pl.'s Br. 13-14 (contending that the Amendments "have actually been used in essentially the same form, for at least twelve other site-specific projects on the MNF"). Plaintiff cites to *Alliance. for the Rockies v. Marten*, No. CV 20-179-M-DWM, 2021 WL 5881745, *17-18 (D. Mont. Dec. 13, 2021), for support, but that non-binding decision is inapposite. In *Alliance for the Rockies* the court found that "consistent abrogation of Forest Plan elk cover standards amount to a significant change to that Plan. *Id*. at *1. But a key difference between that case and the instant case is that in *Alliance for the Rockies* the Forest Service issued *the same* site-specific amendment at least eight times prior to the project. *Id*. at *17-18. By contrast, the Camp Lick Amendments are distinct. [10] Another key difference is that the amendment in *Alliance for the Wild Rockies* abrogated the forest plan standard entirely whereas, here, the Amendments (and those of the other projects Plaintiff cites to) are narrowly drafted exceptions to the Forest Plan targeted at the specific Project area. *See id*. Here, the Forest Plan standards remain in force, except that the Amendments create a narrow exception to the standard; an exception that is distinct from the exceptions drawn in other projects such as Austin,

---

[10] Plaintiff alleges that the Camp Lick Amendments have "been used in essentially the same form, for at least twelve other site-specific projects on the MNF," but does not explain how or why the amendments are "essentially the same." Pl.'s Br. 13. It is likely that Plaintiff is, once again, focusing exclusively on the amendment provisions regarding harvesting trees ≥21inches DBH and ignoring the plethora of other amendment limitations and qualifications, which vary greatly by project.

Page 24 -    **Defs.' Mot. for Summ. J & Opp'n to Pl's Mot. for Summ. J.**; *Blue Mountain Biodiversity Project v. Trulock*, Case No. 2:21-cv-01033-HA

Ragged Ruby, Big Mosquito, and others. Finally, the Amendments to remove trees ≥21 inches DBH cannot fairly be called a *de facto* significant forest plan amendment when only about two percent of the MNF has been subject to similar amendments during the life of the Eastside Screens. *See* AR 27318-20.

Even if the Amendments were sufficiently similar to the site-specific amendments in other projects, the Forest Service's determination that the Amendments were not significant was reasonable. As Plaintiff does in this case, the plaintiffs in *Dombeck* argued that the "Forest Service's piecemeal approach to amending the Forest Plan[] . . . violates the NFMA." 304 F.3d at 898; *see* Pl.'s Br. 8 ("Using such site-specific amendments to address, in a piecemeal fashion, forest conditions that exist throughout the MNF, and the entire region, violates NFMA.").

In *Dombeck*, the forest plan restricted road density to ensure elk habitat, but rather than close roads, the Forest Service passed a site-specific amendment that exempted the challenged timber sale from the road density requirement even though identical site-specific amendments were planned for other timber sales. 304 F.3d at 890-91, 898-900. Although identical site-specific amendments were planned for other timber sales in the forest, the Ninth Circuit held that the Forest Service's decision to analyze each amendment separately was "reasonable" and deferred to the Forest Service's determination that the amendment was not significant. *Id*. at 900. The court concluded that "separate analysis of the amendments . . . seems reasonable" given that the "amendments apply to different [] sales throughout the forest, and plaintiffs do not assert that the timber sales themselves are so related as to be, in truth, one sale." *Id*.

Comparing the facts of this case to those of *Dombeck*, three important points stand out, all of which provide strong support for upholding the Forest Service's decision. First, unlike *Dombeck*, the Amendments here are not identical to other projects. As discussed *supra*, the

Camp Lick Amendments contain numerous features not present in other projects.  Second, unlike *Dombeck* where the same activity (timber sales) was to occur across several projects, here each project (*e.g.* Camp Lick, Austin, Ragged Ruby, Big Mosquito) has distinct activities.  Third, like *Dombeck*, the project at issue here is not "so related [to other projects] as to be, in truth, one [project]." 304 F.3d at 900.  Put simply, the facts here demonstrate even more convincingly than in *Dombeck* that the Forest Service's determination that the Amendments are not significant, was reasonable.[11]  To the extent the Court may have doubts about the Forest Service's significance determination, it should afford deference to the Forest Service.  *See Lands Council*, 529 F.3d at 1228 ("site-specific characteristics and Forest Service expertise [are] the lynchpins of the deference afforded to the Forest Service's significance determination").

Because the Forest Plan Amendments were informed by site-specific characteristics of the Camp Lick Project area Plaintiff's NFMA claim must fail.  Even if there is a "uniqueness" requirement, Plaintiff's NFMA claim still fails because some of the site-specific characteristics of the Project area are unique.  Finally, this Court should not disturb the Forest Service's reasonable determination that the Amendments are not significant.  For these reasons, the Court should reject Plaintiff's NFMA claim (Claim I in their Complaint) and grant Defendant's cross-motion for summary judgement on that claim.

---

[11] It is also worth noting how infrequently the Forest Service has used site-specific amendments to the Eastside Screens.  Most timber projects on the MNF over the 25-year life of the Eastside screens have not included amendments to the Eastside Screens.  Projects that have included amendments to allow cutting of trees ≥21 inches DBH have been distributed across the MNF to accomplish a variety of specific needs including dwarf mistletoe reduction, aspen restoration, fire salvage, rock pit expansion, restoring historical tree species composition, and improving the survivability of older trees.  Also, the tree species proposed for removal has varied depending on the site-specific vegetation conditions and specific needs.

**B.      The Camp Lick Project Complies with NEPA**.

      **1.      The Forest Service Analyzed Cumulative Impacts of Past, Ongoing, and Reasonably Foreseeable Projects Adequately (Claim II, Count I)**.

Plaintiff's claim that "the FEA failed to adequately analyze the cumulative effects of [the Camp Lick Project]" is without merit.  Plaintiff asserts in the Complaint that "[t]he Forest Service failed to adequately analyze effects to fish species, snags, large trees, watershed, snags, primary cavity excavators and future projects" as a result of "this [(the Camp Lick)] project." Compl. ¶84.  To the contrary, the Forest Service did analyze the cumulative impacts to each of these resources fully and properly.[12]

NEPA regulations require that agencies consider cumulative impacts, defined as "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  40 C.F.R. § 1508.7 (2019).  The agency is to be afforded considerable deference in determining the scope of its NEPA analysis, including its determination of cumulative impacts.  *Kleppe*, 427 U.S. at 414 ("[I]dentification of the geographic area within which [cumulative effects] may occur[] is a task assigned to the special competency of the appropriate agenc[y].");  *League of Wilderness Defs.-Blue Mountain Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1218, 1220 (9th Cir. 2008);  *Dombeck*, 304 F.3d at 893-94;  *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002).  Further, NEPA does not

---

[12] The Forest Service appropriately analyzed the cumulative impacts to each of the resources listed in the Complaint.  However, Plaintiff's motion for summary judgment does not challenge the Forest Service's cumulative impacts analysis of fish species, watersheds, snags, and primary cavity excavators.  *See* Pl.'s Br. 14-18.  As a result, Plaintiff has waived its claim as to these resources.  Plaintiff's motion for summary judgment only challenges "the cumulative effects of [the] site-specific amendments," and by extension, "large trees" given that the Amendments concern the harvest of grand fir and Douglas fir ≥21 inches DBH.  Pl.'s Br. 15; Compl. ¶84.  Thus, this brief will only address large trees and future projects.

require consideration of possible environmental impacts of actions that are not imminent.
See Kleppe, 427 U.S. at 410 n.20 (NEPA "speaks solely in terms of Proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions."); id. at 402 (absent a specific proposal it is impossible to analyze environmental consequences). Here, the Forest Service fully considered past, present, and future project cumulative impacts to Forest resources. See AR 19372-599, 20094-98.

The Forest Service's cumulative impacts analysis of large trees was robust. The Forest Service relied on tree data, studies, and modelling, to consider the cumulative impacts on large trees by examining tree density, forest structure, and forest composition. AR 19378-95, 19709-18, 20094-98. Further, the Forest Service considered cumulative impacts at multiple scales, including the Middle Fork John Day subbasin, the Blue Mountain Ranger District, and the entire MNF. AR 19713. Ultimately, the Forest Service concluded that, "[c]umulatively, the acres on which a person may see trees greater than or equal to 21 inches DBH would be increased." AR 19714. A conclusion that remained unchanged when the Forest Service's SIR found that reasonably foreseeable new activities were not significant. AR 27311-14.

Plaintiff takes issue with the Forest Service's analysis for two reasons. First, Plaintiff claims that the Forest Service "failed to analyze the cumulative impacts . . . on the MNF as a whole." Pl.'s Br. 15. Second, Plaintiff claims that "the analysis [the Forest Service] did perform was inadequate" because it purportedly provided "only conclusory statements and no objective quantification of impacts." Id. Plaintiff is mistaken on both fronts.

Contrary to Plaintiff's claim, the Forest Service did analyze cumulative impacts of the

Amendments at the forest scale.[13]  *See* AR 19713.  The FEA explicitly states that the Forest
Service examined cumulative impacts at the MNF scale, in addition to the Blue Mountain
Ranger District scale.  *Id.*; *see also* AR 19709 ("Cumulative effects for this proposed forest plan
amendment are addressed at the ranger district and forest scales").  Beyond the explicit
statements in the FEA, the Forest Service's cumulative impacts analysis is couched in terms of
forest-wide cumulative impacts.  *See*, *e.g.*, AR 19710-12 (Table of past and current projects
*within the MNF* utilizing amendments to the Eastside Forest Plan Amendment 2, Standard 6(d)
Scenario A(2)(a)), 19713 (Observing that "*[a]t the scale of the Malheur National Forest* there
have been 10 previous amendments" and that "[t]he Camp Lick Project (alternative 2) would
increase the acres impacted *on the Malheur National Forest* from approximately 25,435 to
40,852 acres"(emphasis added)), 19714 (Table of reasonably foreseeable projects *within the
MNF* utilizing amendments to the Eastside Forest Plan Amendment 2, Standard 6(d) Scenario
A(2)(a))), 19715 (finding that "*[a]t the Malheur National Forest and Blue Mountain Ranger
District scales* the cumulative effects from removing trees greater than or equal to 21 inches
DBH are expected to be limited or not occur." (emphasis added)); *see also* AR 19715-17.

 Despite the Forest Service's repeated explicit and implicit statements that it considered

---

[13] Citing *Connaughton*, Plaintiff asserts that the Forest Service "is required to analyze the
cumulative impacts of its site-specific amendments at the forest scale." Pl.'s Br. 15. Even if
true, Plaintiff's assertion is of no significance because the Forest Service *did* consider cumulative
impacts at the forest level. In any event, Plaintiff is wrong on the law. "[I]dentification of the
geographic area within which [cumulative effects] may occur[] is a task assigned to the special
competency of the appropriate agenc[y]." *Kleppe*, 427 U.S. at 414. Put simply, there is no *per
se* rule that site-specific amendments must be analyzed for the cumulative impacts at a particular
scale and *Connaughton* does not stand for that proposition. Rather, the court in *Connaughton*
found that the particular site-specific amendment at issue *in that case* must be analyzed for its
cumulative impacts at the forest scale; the court did not hold that *all* site-specific amendments
must be analyzed at the forest scale. *See Connaughton*, 2014 WL 6977611, at *8-9.

cumulative impacts on a forest scale, Plaintiff nonetheless claims that "it is unclear exactly what scale the Service used." Pl.'s Br. 15. Plaintiff attempts to cloud the issue by pointing to a single sentence in the FEA—it reads, "All other past or ongoing projects with amendments to remove trees greater than or equal to 21 inches DBH on the Malheur National Forest are located in different geographical areas than the Camp Lick Project" —to question whether "the Service actually gave [consideration] to the forest-wide impacts." AR 19713; Pl.'s Br. 15. When read in context, this sentence merely reflects the Forest Service's observation that the Camp Lick Project was the first and only project to use site-specific amendments to remove trees greater than ≥21 inches DBH *in the Camp Lick Project area*. AR 19713. It does not suggest the Forest Service limited its cumulative effects analysis to a scale smaller than the Forest.

Plaintiff's second argument—that the Forest Service's cumulative impacts analysis was "inadequate" because it "provid[ed] only conclusory statements and no objective quantification of impacts"—is unconvincing. Pl.'s Br. 15. Plaintiff attempts to draw a comparison between the FEA here and that in *Klamath-Siskiyou Wildlands Center v. BLM*, 387 F.3d 989 (9th Cir. 2004), by noting that "[s]imilar to *Klamath Siskiyou*, here, the Service provided a series of tables containing acreage numbers for the areas impacted by past and future site-specific amendments." Pl.'s Br. 16. But this case is unlike *Klamath-Siskiyou*.

In *Klamath-Siskiyou* there was no "quantified assessment of [other projects'] combined environmental impacts" and "the only substance of the [future foreseeable actions] section [was] a tabulated list of five upcoming projects in the area and an estimate of the number of acres to be harvested." 387 F.3d at 994-95. Here, the tables Plaintiff references (AR 19710-12, 14) are just one piece of the FEA's discussion of cumulative impacts, not the "only substance" as the tables were in *Klamath-Siskiyou*. 387 F.3d at 994. The Forest Service analyzed the cumulative (or

additive) impact of the Camp Lick Project's Amendments and determined, quantitatively, that it "would increase the acres impacted on the Malheur National Forest from approximately 25,435 to 40,852 acres; resulting in approximately 2.4 percent of the 1,700,000-acre Malheur National Forest having been impacted." AR 19713. And contrary to Plaintiff's claim that there is "no useful analysis of the cumulative impact[s]," the FEA devotes numerous pages throughout the FEA to analyzing cumulative environmental impacts to, *inter alia*, climate change, large trees, and wildlife habitat. Pl.'s Br. 16; *see, e.g.*, AR 19697, 19378-95, 19714-17.

At its core, Plaintiff's grievance is not really with the Forest Service's supposed lack of cumulative impacts analysis, it is with the Forest Service's scientific/technical conclusions. For example, Plaintiff asserts that "the fundamental flaw underlying the analysis is it appears to assume the acres where logging large trees ha[ve] not been recently authorized are currently well-stocked with large trees that provide wildlife habitat." Pl.'s Br. 16 (internal quotations omitted). It is true that the Forest Service determined that the project areas *for three of the 10 previous ≥21 inches DBH amendments* (which were authorized in 1996 and 1997) "have likely recovered" and thus the effects of those projects "do not overlap temporally" with the Camp Lick Project. AR 19713. While Plaintiff disagrees (*see* Pl.'s Br. 16-17), the Forest Service reasonably relied on studies and its expertise in reaching that conclusion. SUPPAR 24523 (Study that found that the same or greater number of live trees greater than 21 inches today than in the late 19th century); *see Inland Empire*, 807 F. Supp. at 652 ("Forest management is fairly viewed as the sort of technical field where courts should defer to the findings of specialized administrative agencies." (citation omitted)).

Plaintiff also takes issue with the Forest Service's finding that "[c]umulatively, the acres on which a person may see trees greater than or equal to 21 inches DBH would be increased with

this amendment . . . and [the acres would be] more representative of historical conditions."

AR 19714; *see* Pl.'s Br. 16-17.  But, again, the Forest Service's scientific conclusion is entitled

to deference because it is based on sufficient facts and data.  *See* AR 19374-95,706-18.

Finally, Plaintiff claims the Forest Service used its SIR to "attempt a continuation of the

cumulative impacts analysis," which Plaintiff claims "does not satisfy NEPA's requirements."

Pl.'s Br. 17.  While it would be "inconsistent with NEPA for an agency to use a[] SIR, rather

than a supplemental EA" to correct an analysis that should have been included in the EA, that is

not what happened here.  *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir.

2000).  The SIR here was properly used to "review [] new information and changed conditions

that have occurred, and [to] consider[] whether the effects are within the scope and range of

effects considered in the final environmental assessment." AR 27300; *see id.* (noting a SIR is

appropriate "for the purpose of evaluating the significance of new information or changed

circumstances").  Specifically, the Forest Service considered, *inter alia*, two new project

decisions−Summit and Flat− that were signed after the Camp Lick decision was issued (which

increased the authorized ≥21 inches DBH forest plan amendments on the MNF from 10 to 12) as

well as one new reasonably foreseeable project−Rattlesnake.[14]  AR 27312.  Because it addressed

the potentially significance of events that occurred after the Camp Lick decision was issued, the

Forest Service's use of the SIR was proper.

Because the Forest Service analyzed cumulative impacts properly, the Court should grant

---

[14] Plaintiff claims that "the Service incorrectly assert[ed] that 13 projects had been approved with
amendments to allow for the logging of trees greater than or equal to 21" dbh on the MNF . . .
when there were really 14." Pl.'s Br. 17.  The discrepancy is resolved by examining the
language in the SIR which states that "The Rattlesnake Project [] *combined with* the Camp Lick
Project, increases the number of approved Forest Plan amendments to remove trees greater than
or equal to 21 inches diameter at breast height to 13." AR 27312 (emphasis added).

summary judgment to Defendants on Claim II, Count I.

**2.     The Geographic Scope of the Forest Service's Cumulative Effects Analysis is Reasonable and Appropriate (Claim II, Count II).**

Consistent with the NEPA regulations, 40 C.F.R. § 1508.7 (2019), throughout the EA, the Forest Service analyzed cumulative effects on each forest resource. *E.g.*, AR 19378 (forest vegetation), 19381 (tree density), 19454 (redband trout), 19517 (pallid bat), 19535 (elk and big game habitat). The appropriate spatiotemporal scales for analyzing effects depend on a species' life history and ecology. AR 19498. For example, a smaller cumulative effects analysis area is appropriate for species with limited mobility or small home ranges or territories. *Id.* For wide-ranging species, a larger analysis area may be necessary. *Id.* Here, the Forest Service sufficiently described and justified the geographic scope of the cumulative effects analysis area for each resource in compliance with NEPA.

**i.     The Forest Service's Cumulative Effects Analysis of Aquatic Species, Habitats, and the Watershed Resource Complies with NEPA.**

Plaintiff challenges the cumulative effects analysis areas for aquatic species, aquatic habitats, and watershed resources as unclear, unsupported, or otherwise deficient under NEPA. Pl.'s Br. 19-22. These allegations are unfounded.

First, the Forest Service clearly defined the cumulative effects analysis areas for these resources. The spatial scale of cumulative effects for aquatic species and watershed resources is defined in the FEA and SIR as the combined area of the three sub-watersheds—Upper Camp Creek, Lick Creek, and Lower Camp Creek—plus length of the Middle Fork John Day River where Camp Creek flow enters and incrementally mixes with the Middle Fork John Day River waters. AR 19378, 19399, 19421, 19454-55, 27306 (the SIR considers the incremental effect of

the outflow of Camp Creek on the Middle Fork John Day River, which would be limited to roughly ¼ mile below that confluence). In the watershed condition section of the FEA, the Forest Service described the "geographical scale analyzed for cumulative effects [as] extending down to the junction of Camp Creek and the Middle Fork John Day River." AR 19407. The FEA further explains that "the analysis area for aquatic species and the cumulative effects boundary are the same as used for aquatic habitat." *Id*.

Second, the record supports the cumulative effects analysis area boundaries and they are not arbitrary and capricious. Plaintiff incorrectly implies that the "only justification provided for this selected scope is that 'measurable effects from proposed activities are unlikely to extend downstream of this area.'" Pl.'s Br. 19 (quoting AR 19454). While true that the Forest Service concluded that "[m]easurable effects from proposed activities are unlikely to extend downstream of this area," AR 19454, it is false that this was the only basis for the scope of the cumulative effects area. The agency based the selected geographic scope on a myriad of factors, including topography, drainage patterns, and effects analysis:

> Based on topography, drainage patterns, and the effects analysis, the aquatic analysis area (action area) includes the following streams and their tributaries: Camp, Whiskey, Cottonwood, Lick, West Fork Lick, Cougar, Little Trail, Trail, Shoberg, Coxie, East Fork Camp, Sulphur, and Eagle creeks.

AR 19454. In defining the spatial context for the effects analysis, the Forest Service also explained that the analysis area "encompasses all known and potential habitats for threatened, endangered, region 6 sensitive, and [Management Indicator Species] that may be affected by the Camp Lick Project" and "[m]easurable effects from proposed activities are unlikely to extend downstream of this area." *Id*. By contrast, Plaintiff offers little to support their assertion that "[d]ue to the nature of potential impacts and the resources involved, cumulative impacts to

Page 34 -    **Defs.' Mot. for Summ. J & Opp'n to Pl's Mot. for Summ. J.**; *Blue Mountain Biodiversity Project v. Trulock*, Case No. 2:21-cv-01033-HA

aquatic species, aquatic habitat, and the watershed resource should have been analyzed, at a minimum, at the Middle Fork John Day River watershed scale." Pl.'s Br. 20.

Third, contrary to Plaintiff's assertion, the Forest Service did not improperly exclude the Magone and Big Mosquito projects from the cumulative impacts analysis. *See* Pl.'s Br. 20. The Big Mosquito and Magone project areas fall outside the properly defined boundaries of the cumulative effects analysis areas for watershed resources and aquatic species. *See* AR 19399, 19421, 27306 (watershed resources), 19452 (aquatic species).

The Forest Service's conclusions that adverse cumulative effects from Project activities are unlikely is also supported by the fact that the individual effects analyses for silviculture, aspen, and riparian ecological treatments found only short-term, limited, and localized adverse effects. *See* AR 19432 (concluding that implementing the proposed ecological riparian treatments on approximately 2,300 acres would move those areas towards more natural vegetation types and reduce cumulative effects by restoring physical processes and ecological functions.). Improving habitat provides aquatic species with thermal refuge from the often-lethal temperatures in the Middle Fork John Day River water, especially for juvenile steelhead. *Id.* Ultimately, the Forest Service reasoned that the proposed actions combined with the other watershed restoration projects would contribute to the cumulative recovery—not the cumulative harm— of the Lower Camp Creek, Upper Camp Creek, and Lick Creek sub-watersheds. *See* AR 19433 (predicting improvement in riparian and wetland conditions across forested and meadow riparian areas, large woody debris and stream channel shape, and water quality in meadow riparian areas).

Fourth, it is not true that the Forest Service failed to analyze cumulative effects of the proposed activities on redband trout and Middle Columbia River (MCR) steelhead. *See* Pl.'s

Br. 21.  The Forest Service specifically analyzed the effects from the proposed actions on these species and their habitat.[15]  AR 19485-91.  Aquatic impacts are sediment-driven and here the Forest Service found that sediment detached within harvest units is likely to be trapped in surrounding ground cover and is unlikely to be transported beyond unit boundaries.  *See* AR 19406.  Skidding or transporting the cut trees would cause negligible sediment to exit the units, as sediment—even on steep slopes—is slowed by ground cover and is normally deposited less than 15 feet downslope from the skid trails.  *See* AR 19618.  Design criteria will also mitigate the impacts of skidding on aquatic species.  *See* AR 19464, 78 (describing best management practices ("BMPs") and design criteria to minimize impacts and disturbances from skidding through Riparian Habitat Conservation Areas).  In more susceptible, moister areas, design criteria will also minimize effects.  AR 19619-20 (disclosing the relatively small size of impacts from treatments in Riparian Habitat Conservation Areas), 430 (describing BMPs to mitigate against timber haul effects in riparian areas, including hauling only during dry conditions).

Plaintiff's allegation that "[l]arge percentages of suitable redband and MCR steelhead habitat . . . will be cumulatively impacted by multiple, back-to-back timber sales in adjacent or nearly adjacent units of the forest[,]" Pl.'s Br. 21, falsely assumes there are riparian habitat conservation areas ("RHCA") treatments similar to those proposed for the Camp Lick Project in all projects across the Forest.  But there are no RHCA treatments within the Magone project and only non-commercial RHCA treatments in Big Mosquito and Ragged Ruby.  *See* SUPPAR

---

[15] Redband trout and MCR steelhead are the same species genetically with different life histories, but similar habitat and water temperature requirements within streams.  *See*, *e.g.*, AR 16344-45, 16392-95.

21285, 21304, 21310, 20864, 20867 (Magone); SUPPAR 19917, 19919, 19924-26 (Big Mosquito); SUPPAR 26428-32 (Ragged Ruby). Plaintiff is also wrong that "the effects on the quality and suitability of redband trout and MCR steelhead habitat are not analyzed in terms of cumulative effects to stream temperature, shading, sedimentation, and other key habitat characteristics in the FEA." Pl.'s Br. 21. The agency analyzed these items, *see* AR 19485, and brought forward those elements for which there was a negative and meaningful measurable effect into the cumulative effects analysis. *See* AR 19490 (finding that road decommissioning and riparian upland watershed restoration would have a short-term negative and meaningfully measurable effect on embeddedness and fine sediment).

It is also not the case that "[t]he Camp Lick Project, in combination with the Big Mosquito, Magone, and Ragged Ruby projects, will potentially affect over 26% of suitable habitat for MCR steelhead across the forest." Pl.'s Br. 21. This falsely assumes that the projects would overlap in time. Although the Forest Service signed the Big Mosquito Project Record of Decision in 2015, the harvest and burning actions have not yet been completed and those that have occurred were only expected to have short-term effects and were completed at least six months ago. Commercial operations for the Magone Project have not begun. Implementation in a large vegetation project such as Camp Lick, Big Mosquito, Magone, and Ragged Ruby can occur over a long time frame, which itself reduces cumulative effects.

### ii.    The Forest Service's Cumulative Effects Analysis of "Resources Critical to Biodiversity" Complies with NEPA.

The Forest Service's cumulative effects analyses for primary cavity excavator species, dead and defective wood habitat, late and old structure forest, old growth habitat, and large trees complies with NEPA. The Forest Service analyzed cumulative effects for cavity excavators, and

performed an individual analysis for some woodpeckers species.  *E.g.,* AR 19509-13.  Other species were included as part of the larger analysis of dead and defective wood habitat.  *See* AR 19538-46.  The Forest Service also separately analyzed cumulative effects for each Management Indicator Species (which includes many woodpeckers).  *See* AR 19527-37.

Plaintiff argues that all of these resources are "interconnected" and therefore should have been analyzed using the same geographic scope for the cumulative effects analysis.  Pl.'s Br. 23. Plaintiff overlooks, however, that for Management Indicator Species the Forest Service analyzes direct impacts at the project level, but a final determination of viability must be made at the forest scale.  AR 19527 (citing 36 C.F.R. § 219.19, which provides "Fish and wildlife habitat shall managed maintain viable populations of existing native and desired nonnative vertebrate species in the planning area").  The "planning area" refers to is the entire MNF Boundary and therefore in order for the Forest Service to make a viability determination at the forest level, the agency must consider effects within the project planning area *and* forest-wide.

Plaintiff is also wrong that the Forest Service failed to identify a consistent geographic scope for primary cavity excavator species and dead and defective wood habitat and used "shifting scales of analysis to hide cumulative effects."  Pl.'s Br. 23-24.  For dead and defective wood habitat, the FEA defined the cumulative effects area to be the Camp Creek watershed and activities within 300 feet of the planning area boundary, and contrary to Plaintiff's assertion, the agency did reach a conclusion about cumulative effects to dead and defective wood habitat, finding there were unlikely to be any long-term negative or adverse impacts and the Project would *not* contribute to a negative trend in viability for any of the cavity excavator species or their habitat).  *See* AR 19544-55.  Plaintiff points out that the Forest Service appears elsewhere to include the Grub Creek-John Day River watersheds in the analysis area for primary cavity

excavators and dead and defective wood habitat, but Plaintiff's observation lacks important context. The Forest Service's methodology for analyzing impacts to those resources includes the "DecAID" database, which operates at the watershed level. AR 19538. Because the Camp Lick planning area encompasses only a portion of the Camp Creek/Middle Fork John Day River watershed, it was necessary for the Forest Service to include an additional watershed when using the database to meet its minimum area size. *See id*.

Plaintiff is also wrong that the Camp Lick Project will reduce existing and future snag habitat for primary cavity excavators. Pl.'s Br. 24. The wildlife specialist's report explains that snag creation is expected over both the short- and long-term, and in the long-term, stand structure is expected to better mimic historical conditions with higher quantities of larger, better quality snags. SUPPAR 23367. While the wildlife specialist's report does acknowledge that "snag habitat is likely to be a limiting factor for pileated woodpeckers in the Ponderosa Pine/Douglas Fir habitat type" it continues on to state that "while DecAID shows a deficit in both small and large Ponderosa/Douglas Fir snags, in the densities preferred by this species, the current levels exceed reference conditions for this wildlife habitat type." SUPPAR 23367. The Forest Service also considered that the proposed action would increase dedicated old growth habitat, reduce the risk of uncharacteristic wildfires, and that forest vegetation spatial data modeling indicates snags in all sizes would continue to *increase,* all of which supported the Forest Service's viability determination for the pileated woodpecker. *See* SUPPAR 23373-74.

Contrary to Plaintiff's assertion, Pl.'s Br. 24, the Forest Service adequately analyzed cumulative effects to woodpecker and other cavity excavators in the NEPA documents. *See* AR 19568, 20090-98 (App'x E containing a detailed Table listing all past, ongoing and foreseeable projects with general description, location and quantity). This analysis included a

consideration of past timber harvests. *See* AR 20094 (Table showing past timber harvests were quantified as occurring across 33% of planning area), 19564-66 (addressing the negative effects, *i.e.*, removal of large trees in past timber harvests on the old growth stands while acknowledging the benefit from other ongoing and foreseeable projects adjacent to this planning area to "reduce hazardous fuels" and "retain and develop future old trees"). The Forest Service separately analyzed cumulative effects from the proposed changes to Management Area 13 (designated old growth habitat) and to MIS species selected to represent old growth habitat, which include the Pacific marten (AR 19571-72) and pileated woodpecker (AR 19568-69). This analysis disclosed how the Project would affect potential habitat for old-growth dependent species. AR 19700-04; *id.* at 19704 (explaining the improvement in "distribution, availability and survivability" of old growth areas so "old growth conditions persist into the long-term" would "support old growth management indicator species populations [including marten] and provide opportunities for those species to disperse across the landscape as specified by the Malheur Forest Plan").

Plaintiff is also incorrect that the Forest Service's cumulative effects analysis was "improperly based" on the Northern Rocky Mountains Bird Conservation Plan (the "Partners in Flight" plan). Pl.'s Br. 24. The Partners in Flight plan is only one of many factors considered in the cumulative effects analysis.[16] *See* AR 19581-84. At bottom, the Forest Service's finding of lack of significant negative cumulative effects is based on the overall positive cumulative effects

---

[16] The Partners in Flight plan assists federal agencies in achieving the direction from Executive Order 13186 "Responsibilities of Federal Agencies to Protect Migratory Birds" to incorporate migratory bird conservation into agency planning processes whenever practical. *See* AR 19584. The FEA discusses the Plan primarily to show alignment with its provisions with respect to anticipated impacts on migratory birds. *E.g.*, AR 19546-60, 85. As Plaintiff acknowledges, the provisions of the plan are not mandatory. *See* Pl.'s Br. 24.

from the County Road 18 prescribed burning project, and Magone, Ragged Ruby, Big Mosquito projects, all of which proposed thinning activities to reduce hazardous fuels and retain and develop beneficial forage habitat for birds like the northern flicker. *See* AR 19558-90. The Forest Service further found that while "in the short term, these projects would not substantially be expected to reduce snag numbers," over the long term these projects would "increase older stand structure which would provide for larger snags" that are important nesting and foraging habitat for primary cavity excavators. *E.g.*, AR 19552-53 (discussing downy woodpecker). While true that the Partners in Flight plan advises the retention of large trees and not all large trees will be retained under the Project, the plan's provisions are not mandatory nor are they intended to be applied in every situation—they are "recommendations that can be incorporated into management practices or implemented on an opportunistic basis within the broader context of ecosystem management." *See* Decl. of Thomas C. Buchele in Supp. of Pl.'s Mot. for Summ. J. ¶ 4, Exhibit A at 19-20, ECF Nos. 29, 29-1.

Plaintiff's claim that the Forest Service failed to identify a consistent geographic scope for its cumulative effects analysis of old growth habitat is also without merit. Pl.'s Br. 24-25. *See* AR 19564 (defining the cumulative effects area as the Camp Lick planning area and adjacent sub-watersheds). The final cumulative effects analysis discloses all of the overlapping projects that fall within those adjacent sub-watersheds, *e.g.*, Magone, Ragged Ruby, Big Mosquito. AR 19565. The geographic scale of the cumulative effects analysis area for old growth habitat section is consistent with the Eastside Screens requirement to align connectivity corridors to adjacent subwatersheds outside of the Project area in order to maintain habitat for movement of wildlife from one project area into adjacent areas. AR 19360, 564. For the pileated woodpecker, the agency selected a different cumulative effects scale because "this area is of sufficient size to

contribute to all life history aspects of the species or include suitable habitat for multiple home ranges." AR 19568, 498 ("spatiotemporal scales for analyzing affects can vary by species").

Finally, for reasons already discussed and contrary to Plaintiff's assertion (Pl.'s Br. 25), the Forest Service considered and analyzed cumulative effects to large trees. *See supra* at IV.B.1; AR 19705-15, 27313-14. Plaintiff cites no authority for the proposition that "large tree removal is not reducing short-term impacts to wildlife and allowing for restoration in all ongoing projects." Pl.'s Br. 25.

In sum, the geographic scopes of the Forest Service's cumulative effects analyses complies with NEPA, and the Court should grant summary judgment in favor of the government on Claim II of Count II.

### 3.    The Forest Service Took the Requisite "Hard Look" at Environmental Impacts (Claim II, Counts III & IV).

The purpose of NEPA is to ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed. *Robertson*, 490 U.S. at 350, 352. The APA, however, does not require perfection in an agency's action. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003); *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1448 ("gaps and imperfections in the [agency's] analysis, however, do not [always] rise to the level of an arbitrary and capricious decision."). The Court "may only set aside decisions that have no basis in fact, and not those with which [it] disagree[s]." *Forest Guardians*, 329 F.3d at 1099. In determining whether an agency has prepared a "reasonably thorough discussion," the Court may not "fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies." *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996) (internal quotation marks and citation omitted);

*see Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998).

Plaintiff first argues that the Forest Service's consideration of stream temperatures was flawed. Pl.'s Br. 26. This is false. The desired condition established by the Forest Plan is to reduce stream temperatures in the planning area. AR 19324. Accordingly, the Forest Service included and analyzed all of the available fully processed temperature data in the FEA and concluded that the Project would not increase stream temperatures. AR 19204, 19443-45, 27315-17; SUPPAR 23456. In the SIR, the agency reanalyzed effects using additional data from 2014 and 2016, and concluded "the final environmental assessment will remain consistent with Malheur Forest Plan standards for no measurable increase in maximum water temperature." AR 27307 (impacts to stream temperature remain either "negative, not meaningfully measurable," or "positive, meaningfully measurable" in the Camp Lick planning area). AR 27307.

The Forest Service did not, as Plaintiff allege, use "stale" data in the FEA. The FEA summarized fully processed baseline temperature data with 7-day average daily maximum temperatures for the Project area over a 12-year period. AR 19443-45. Contrary to Plaintiff's assertion, 2014 and 2016 temperature data was not available when the EA was prepared. At that time the 2014 and 2016 data were only partially processed and not yet suitable for analysis or presentation. *See* AR 15556-58, 61-62. In particular, the 2014 and 2016 data did not then include the 7-day average daily maximum temperature data necessary to evaluate compliance with Oregon Department of Environmental Quality ("ODEQ") water quality standards. After the FEA was published, the 2014 and 2016 data were fully processed, and the 7-day average daily maximum data was included and analyzed in the SIR. *See* AR 27299, 307-08, 315-17 (presenting fully processed temperature data from 2016 for Camp reaches 1, 4, 5, 7, 8, 9 and 11),

7315-17.[17]   Further, Plaintiff's assertion that the 7-day temperature averages used in the FEA were "highly inaccurate" is baseless.  Pl.'s Br. 26.  The 7-day average daily maximum is the same metric used by ODEQ for the state's temperature standards.  AR 09342; AR 19417.

Using the available data, the Forest Service was able to measure the effects of the proposed actions on temperature in the FEA by comparing the Project's expected impacts on "resource indicators" to their existing condition, and no supplemental EA was required.  Resource indicators that influence temperature include riparian vegetation (shading, riparian vegetation) and channel form (pool frequency, width to depth ratio, bank stability, large woody debris).  SUPPAR 23424; AR 19168.

Plaintiff also argues, falsely, that the Forest Service failed to consider the direct and indirect effects of logging on RHCAs.  Pl.'s Br. 27.  To the contrary, the Forest Service disclosed and analyzed the impacts of silvicultural treatments in RHCAs on the six primary aquatic species habitat elements for aspen treatments and ecological riparian treatments within those areas.  *See* AR 19471, 74, 77-78, 82, 87-88.  The agency also specifically addressed impacts to RHCAs within the context of the watershed resource.  AR 19426-28.  Further, the areas where the decision allows commercial logging within the RHCAs is actually quite limited, because "[b]oth inner and outer riparian habitat conservation area thinning prescriptions include leave areas [5 to

---

[17] Plaintiff's assertion that the data used in the FEA or SIR is inconsistent with what Plaintiff received in response to a FOIA request in 2019 is not relevant to the question of whether the Forest Service's analysis of stream temperature data complied with NEPA at the time of that analysis.  The 2019 FOIA response is not part of the Administrative Record in this case, and the Court's review of Plaintiff's claims is limited to the record before the agency at the time of the challenged decision.  Further, the records released in response to the 2019 FOIA request included data for draft biological assessments for livestock grazing decisions that were not part of the Camp Lick decision.  There may be differences between the two data sets due to differences in data collection and processing as well as the fact that stream temperatures can vary depending on the time of collection.

65% of the ecological riparian treatment acres] that will not be treated." AR 27157. Further, it is not true, as Plaintiff suggests, that RHCAs will be damaged by heavy equipment for this Project. While "[e]cological riparian treatments include tipping [that] . . . may be completed with heavy equipment that would reduce ground cover in riparian floodplains where treatments are proposed[,] . . . [t]his [effect] would be reduced through implementation of project design criteria including rehabilitation of all disturbed areas after work activities have been completed, using seed mixes, jute matting, adding slash cover, or other techniques." AR 19427.

It is also not true that the Project would "remove significant forest cover and impact runoff, erosion, sediment loading in streams, stream bank stability, large woody debris retention, and stream temperatures." Pl.'s Br. 28 (citing AR 19426–27, 19429-31). In fact, the Project calls for maintaining the ground cover over much of the area, which will slow and absorb runoff and trap sediment. AR 19427. Further, there is no mention of significant impacts related to forest cover, erosion, or sediment loading—rather, the Forest Service found that the treatments will have beneficial effects over the long-term. *See* AR 19429–31.

The Forest Service's conclusions that mitigation measures would reduce any short-term impacts to aquatic and riparian resources were not an attempt "to obfuscate the need for a direct effects analysis." Pl.'s Br. 28. Project design criteria are an integral part of the selected alternative, as modified. AR 19362, 27101. The Forest Service explained how design criteria included in the Project decision would minimize impacts to aquatic and riparian resources, particularly to MCR steelhead and their critical habitat, by reducing sediment input to streams, for example through RHCA buffers, implementation requirements to reduce erosion, and avoidance of heavy equipment on steep slopes. AR 27092, 219-91. The Forest Service's analysis was more than "a mere listing of mitigation measures, without supporting analytical

data." Pl.'s Br. 28 (quoting *Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 33-36 (9th Cir. 2001)).

In sum, the Forest Service took the requisite hard look at the direct and indirect impacts of the Project and the Court should grant summary judgment in favor of the government as to Counts III and IV of Claim II.

### 4.    The Forest Service's Purpose and Need Statement is Not "Too Narrow" (Claim II, Count V).

NEPA requires agencies to "briefly specify the underlying purpose and need" for a project and to propose alternatives to the proposed action." 40 C.F.R. §§ 1502.13-.14.  Agencies enjoy "considerable discretion to define the purpose and need." *Friends of Se.'s Future*, 153 F.3d at 1066.  A purpose and need statement, however, may not narrow the agency's consideration of alternatives so as to make the outcome preordained.  *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070-72 (9th Cir. 2010) (finding BLM's purpose and need statement to be too narrow because three of the four goals for a land exchange were objectives of a private third-party set to benefit from the proposed exchange, which necessarily foreclosed the consideration of alternatives that did not meet that party's needs). "Courts review purpose and need statements for reasonableness giving the agency considerable discretion to define a project's purpose and need." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013).  An agency is not required to study alternatives that do not meet the project's purpose and need. *See City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986) ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.").

Here, the FEA states that the "[t]he purpose and need for the Camp Lick Project was developed by comparing the management objectives and desired conditions in the Malheur Forest Plan to the existing conditions in the planning area related to forest resiliency and function." AR 19316. It then goes on to list five core purposes and needs to help move the existing conditions in the planning area closer to the desired conditions:

1. Maintain and improve landscape vegetation resiliency and resistance to disturbances such as wildfire, drought, and insects and diseases by managing for desirable forest composition, stocking levels, and pattern;

2. Promote the resistance and resiliency of forest stand structure, composition, and density given the historical fire regime, to reduce the potential impacts of wildfire;

3. Maintain or improve biodiversity and habitat for fish and wildlife species present in the planning area, taking into account changes in climatic conditions;

4. Protect and maintain historical properties; and

5. Contribute to the social and economic health of those enjoying multiple uses in the Camp Lick planning area.

AR 19317-18. Under each of the five principal purposes and needs the Forest Service included specific related goals in bullet-point format, *e.g.*, under the second, resiliency purpose and need, the Forest Service included "protect firefighter safety and improve readiness to manage wildfires through safe public access improvements." *See id.* None of these bullet points is a specific action or activity authorized by the decision. The Forest Service's approach is permissible and consistent with the Forest Plan Handbook, which describes the purpose and need statement as follows: "The need for action discusses the relationship between the desired condition and the existing condition in order to answer the question, 'why consider taking any action?'"; the Handbook goes on to say that "[a] well-defined 'need' or 'purpose and need' statement narrows the range of alternatives that may need to be considered." Forest Service Handbook 1909.15,

Ch. 10, § 11.21—Purpose and Need, pp. 7-8, *available at* https://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsh?1909.15 (last visited Apr. 26, 2022).

The Forest Service identified and analyzed a no action alternative (alternative 1) and the proposed action (alternative 2). AR 19339-65. The Forest Service also identified a number of other alternatives, but eliminated them from detailed study because they did not meet the purpose and need for the Project. *See* AR 19365-71. In response to public comment on the proposed decision, the Forest Service modified the proposed action and included additional project design criteria, rather than develop additional action alternatives, because the agency found that other alternatives would not fully meet the purpose and need or achieve the desired future condition for the Camp Lick planning area. AR 19339.

This case is distinguishable from *National Parks Conservation Association v. BLM*, 606 F.3d at 1058, where the court found the purpose and need statement to be so narrow as to improperly constrain the outcome of the agency's alternatives analysis. In that case, the proposed action was a land exchange to allow a private company to build a landfill on what was then BLM land. BLM had four stated goals for the action, three of which were specific benefits that would flow only to the private company and only from the land exchange and planned landfill. *Id.* at 1070. What the court found objectionable about the purpose and need statement was that private interests defined the scope of the proposed project. *See id.* That is not the case here.

The Forest Service's purpose and need statement for the Project is not too narrow, and the Forest Service properly explained why it eliminated other alternatives. This is all NEPA requires. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). The Court should grant summary judgment for the government on Claim II, Count V.

### 5. The Forest Service Gave Meaningful Consideration to a Reasonable Range of Alternatives (Claim II, Count VI).

"NEPA requires federal agencies to 'study, develop, and describe appropriate alternatives to recommended courses of action'" in any proposal which involves unresolved conflicts concerning alternative uses of available resources. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 915 (9th Cir. 2012) (quoting 42 U.S.C. § 4332(2)(E)). The required range of alternatives is "dictated by the nature and scope of the proposed action." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (citation omitted). "Alternatives that do not advance the purpose of [a project] will not be considered reasonable or appropriate." *Native Ecosystems Council*, 428 F.3d at 1247 (citation omitted).

Importantly, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Id.* This is because "whereas with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' with an EA, an agency only is required to include a brief discussion of reasonable alternatives." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citations omitted). An EA must consider a "no action" alternative and a "preferred alternative." *See Native Ecosystems Council*, 428 F.3d at 1245-46. But beyond that, there is no "numerical floor on the alternatives to be considered," *id.* at 246, and consideration of only these two alternatives is "generally sufficient," *Idaho Conservation League v. Bonneville Power Admin.*, 667 F. App'x 214, 215 (9th Cir. 2016) (per curiam) (citation omitted); *Bark v. U.S. Forest Serv.*, 393 F. Supp. 3d 1043, 1060 (D. Or. 2019), *rev'd on other grounds*, 958 F.3d 865 (9th Cir. 2020) ("There is no 'numerical floor on alternatives to be considered,' and it is usually sufficient to consider only the preferred and no action alternatives" in an EA (citation omitted)). *See also Earth Island Inst. v. U.S.*

*Forest Serv.*, 697 F.3d 1010, 1021-22 (9th Cir. 2012) (noting since Native Ecosystems Council, "we are aware of no Ninth Circuit case where an EA was found arbitrary and capricious when it considered both a no-action and preferred action alternative."); 36 C.F.R. § 220.7(b)(2)-(3) (no particular number of alternative required).

Here, the FEA considered the potential environmental effects of a no-action alternative and a proposed action alternative designed to meet the purpose and need to move the resiliency and function of the Project area towards the desired conditions set forth in the Forest Plan. The FEA also evaluated thirteen other action alternatives—two of which the agency added in response to public comment on the preliminary EA—and eliminated them from detailed study. AR 19340-43, 27109. The FEA describes in detail the thirteen total alternatives considered and eliminated from detailed study. *See* AR 19365-71. The DN/FONSI likewise describes the review and consideration of all of the alternatives considered, modifications that were made to the proposed action in response to public comment, and the issues raised during the objection process. *See* AR 27080-81, 106. An agency is permitted to reject alternatives that do not meet the purpose and need of the proposed project, so long as it has not defined the project so narrowly as to foreclose a reasonable consideration of alternatives. *Friends of Se.'s Future*, 153 F.3d at 1067; *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180 (9th Cir. 1990).

Here, the Forest Service's explanation for the agency not considering other alternatives in detail, along with its detailed consideration of two alternatives, satisfy NEPA. *See Earth Island Inst.*, 697 F.3d at 1022 (two alternatives suffice where "Forest Service explained that its proposed alternative was better at accomplishing its goals than Plaintiffs' proposed alternative was."); *see also Bark v. Northrop*, 607 F. App'x 652, 654 (9th Cir. 2015) (consideration of two alternatives for thinning project on Forest satisfied NEPA); *Conservation Cong. v. U.S. Forest*

*Serv.*, No. 2:16-cv-00864-MCE-AC,  2018 WL 2427640, at *16 (E.D. Cal. May 30, 2018) (two alternatives satisfied NEPA).

> i.  **Plaintiff's argument that "unresolved conflicts surrounding project resources" compel the analysis of additional alternatives is without merit**.

Plaintiff argues that the Forest Service was forced to consider a "constrained" range of possible alternatives because its purpose and need statement was too narrow.  Pl.'s Br. 31-32.  This is untrue.  Using input from a variety of public stakeholders, the Camp Lick interdisciplinary team developed a long and detailed list of issues that it used to compare and evaluate alternatives.  AR 19335-38; *see* AR 19364-65 (Tbl. 6 summarizes the comparison of alternatives).  For example, these issues included whether the proposed activities would reduce fuel loading in the planning area, the amount of soil disturbance expected from project activities, whether the proposed activities would improve forest resiliency, and the impact of the proposed actions on RHCAs.  AR 19336-37.  In response to these issues identified and developed through public comment, the Forest Service considered two alternatives in detail and considered—but eliminated from detailed study—thirteen other alternatives.  AR 19335-43, 19365-71, 27106.  The thirteen alternatives were eliminated because they did not comply with the law, regulations, or policies, were not feasible to implement, did not meet the purpose and need, or were not supported by best available science.  *See* AR 19365-71.

The Forest Service also made a number of modifications to the activities proposed in the preliminary EA.  AR 19339-43.  Contrary to Plaintiff's argument, modifying the proposed action rather than developing additional free-standing alternatives at the FEA stage was not arbitrary and capricious.  The Forest Service explained that modification was appropriate "because the scope of proposed activities had already been narrowed and developed based on diverse input

from the public and the BMFP collaborative," and other alternatives would not fully meet the purpose and need for action or achieve the desired forest conditions. AR 19339-43, 27081, 27109. Further, the agency's modification approach is consistent with the Forest Service Handbook, which provides that "[t]he description of the proposal and alternative(s) may include a brief description of *modifications* and incremental design features developed through the analysis process to develop the range of alternatives considered." Forest Service Handbook 1909.15, Ch. 10, § 14.3—Alternative Documentation Options, p. 15.

Plaintiff is wrong that the Forest Service's adoption of the Amendments to allow trees greater than 21 inches DBH to be harvested triggered an obligation to analyze additional alternatives. Pl.'s Br. 33. The Forest Service's reason for adopting the Amendments was to increase the health of large and old trees—a key issue (AR 19336)—and the allowance for certain trees greater than 21 inches DBH meets a primary purpose and need of the project to maintain and improve landscape vegetation resiliency. AR 19317, 19333, 19705-09, 27086-87. The FEA considered and eliminated from detailed analysis an alternative that would not amend the Eastside Screens, Standard 6(d)(2)(a) (*i.e.*, the 21 inch rule). AR 19366-67. The FEA also analyzed the no action alternative where, of course, no removal of trees greater than or equal to 21 inches DBH would occur. AR 19706-07. Finally, the DN/FONSI sought to address some commenters' concerns over logging large trees by modifying the Amendments by limiting removal of larger trees to those within double the dripline of ponderosa pine or western larch. AR 27107.

Plaintiff is also wrong that the Forest Service proposes to commercially log in RHCAs to remove trees that provide shade for streams. Pl.'s Br. 33. Trees felled in the outer RHCA will not negatively affect stream shading and water temperature, and trees felled in the inner RCHA

are to be felled or tipped into the stream where feasible following primary shade guidelines, so that they shade that portion of the stream. AR 19471. The decision does not authorize commercial removal in inner RHCA areas. AR 19349. The FEA considered and eliminated alternatives that would not authorize treatments in riparian areas or commercial treatments in any riparian areas, in addition to the no action alternative, because, among other reasons, the Forest Service found most of the stands in riparian areas are overstocked and at moderate to high risk for insect and disease mortality and crown fire. AR 19369, 401. Ultimately, the Forest Service determined that the proposed riparian treatments met a purpose and need for the Project to enhance and protect riparian habitat. AR 19317, 27085. There are no "unresolved conflicts" with respect to this resource.

> ## ii. The Forest Service appropriately rejected certain proposed alternatives.

Plaintiff's argument that the Forest Service improperly rejected reasonable proposed alternatives is without merit. The Forest Service considered a total of thirteen alternatives in addition to the no action alternative and the proposed alternative, including alternatives suggested by Plaintiff that did not involve forest plan amendments, involved less logging, and included more restoration. The Forest Service properly addressed and analyzed all of these alternatives in the FEA and DN/FONSI. AR 19365-71, 27109-110.

The Forest Service's decision to eliminate an alternative that would not allow any commercial treatments in riparian areas was not arbitrary and capricious. This alternative was eliminated from detailed study because cutting and leaving materials on the ground and/or girdling all the trees and leaving the girdled trees standing would not meet the purpose and need

for desirable species composition, stocking levels, or maintaining and improving biodiversity. AR 19369.

The Forest Service's decision to eliminate an alternative that did not include a Forest Plan amendment to the 21-inch rule was also not arbitrary and capricious. This alternative was eliminated from detailed study, because it would reduce future heterogeneity and resiliency on the landscape and do nothing to reverse conifer encroachment due to fire suppression, primarily in Warm Dry stands. AR 19366. The Forest Service explained that removing large trees can be necessary to restore species composition towards historical levels away from grand/white fir and Douglas-fir types to favor pines and western larch. *Id.* Hard diameter limits, such as a 21-inch DBH limit, can make it difficult or impossible to achieve the desired composition in mixed-conifer forests, like the MNF. *Id.* (citing Franklin et al. 2013). The agency rejected this alternative, because leaving all large fir trees would increase shade within forested stands, thereby compromising the future resilience of these stands—an outcome that would not meet the purpose and need of the Project to create a healthier forest that is more resilient to disturbances in the long term. *See id.*

In sum, the Forest Service's consideration and elimination of alternatives complies with NEPA, and the Court should grant summary judgment in favor of the government on Count VI of Claim II.

### C.     The Forest Service was not required to prepare an EIS (Claim II, Count VIII).

Not every proposed federal action requires an EIS. If it is unclear whether a proposed action significantly will affect the quality of the human environment, an agency may prepare an EA, a concise public document that provides "sufficient evidence and analysis for determining

whether to prepare an [EIS] or a finding of no significant impact." *See* 40 C.F.R. §§ 1501.3(b), 1501.4, 1508.9(a)(1) (2019).

In determining whether a project will have a significant environmental impact, the NEPA regulations direct agencies to consider the project's "context and intensity." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27 (2005)). Context refers to the setting in which intensity is analyzed and intensity refers to the severity of impacts, as measured by ten nonexclusive factors. 40 C.F.R. § 1508.27(a), (b)(1)– (10) (2019). These factors include the "[u]nique characteristics of the geographic area," the "degree to which effects on the quality of the human environment are likely to be highly controversial," and the "degree to which the action may establish a precedent for future actions with significant effects." *Id.* § 1508.27(b)(3)-(4), (6) (2019).

Here, the Forest Service considered the context and intensity of project impacts and concluded that the Project will not cause significant environmental impacts. AR 27156-164. It was therefore not required to prepare an EIS. Because that decision is rooted in scientific determinations about the impacts the Project is anticipated to have on Forest resources, that decision is entitled to deference and should not be set aside unless it is arbitrary and capricious. *See Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 378 (1989) (agency decision not to supplement an EIS is a "classic example of a factual dispute the resolution of which implicates substantial agency expertise."); *see also Bahr v. Regan*, 6 F.4th 1059, 1075 (9th Cir. 2021) (where agency action involves issues of fact and the documents require a high level of technical expertise courts "defer to the informed discretion of the responsible federal agencies." (citation omitted)).

Plaintiff argues that an EIS was required for the Camp Lick Project because the Forest Service prepared one for the Ragged Ruby and Galena Projects. Pl.'s Br. 36. This argument is without merit. Putting aside the fact that the Court is without the administrative records for those projects on which to evaluate such a comparison, the forest plan amendments adopted for those projects are distinguishable from Camp Lick in ways that may militate in favor of an EIS in those cases. *See* SUPPAR 26441-43 (proposed Ragged Ruby amendments would not maintain connectivity between all late and old structure and old growth stands and approximately 2,200 acres of wildlife connectivity corridors will be designated as part of project); SUPPAR 16535-38 (Galena amendments included an amendment for further reducing satisfactory cover, already below Forest Plan standards for big game cover).

Plaintiff also argues that the context and intensity of the Project require the preparation of an EIS. For the reasons explained below, the Camp Lick EA is sufficient under NEPA.

### 1.    The "context" of Camp Lick does not require an EIS.

With respect to the context prong of significance, the Forest Service determined that because the Camp Lick planning area is limited in size and the proposed activities are limited in duration and designed to minimize adverse environmental effects, the effects of the Project will be local in nature and not likely to significantly affect regional or national resources. AR 27158-59. A large project area does not necessarily equate to a significant effect. Put into the context of the Forest as a whole, the Camp Lick planning area is approximately 40,000 acres within the 1.7 million-acre MNF. AR 27157. And only about 31 percent (12,360 acres) of the 40,000 acre Camp Lick planning area will receive any silvicultural treatments—this amounts to less than 5 percent of the Blue Mountain Ranger District and less than 1 percent of the Malheur National Forest as a whole. *Id.* Underburning will also affect less than 5 percent of the Blue Mountain

Ranger District and less than 2 percent of the MNF. *Id.* Design features and mitigation measures will further minimize adverse impacts. AR 27161. The Forest Service thus reasonably concluded that the effects of the Project would be "localized," and the proposed activities were not likely to significantly affect regional or national resources. AR 27159.

Plaintiff argues that the Forest Service was wrong to examine the context of the Project using different scales. Pl.'s Br. 37-38. In reality, the opposite is true. Significance can and generally should be measured at multiple scales depending on the resource. For example, while the subwatershed scale is appropriate for some resources like hydrology (AR 19399), others are better analyzed on a smaller scale (*e.g.*, rare plant populations scale is their documented occurrences AR 19629; soil erosion scale is the silvicultural (logging) unit AR 19622). Further, species viability of Management Indicator Species is evaluated at the larger, Forest-wide scale. *See* AR19527 (explaining that the NFMA regulations, 36 C.F.R. § 219.19, require agencies to maintain fish and wildlife species in the "planning area"; because "planning area" refers to entire MNF boundary, viability determination must be made within project planning area *and* forest-wide). *See* AR 19490-92 (discussing viability for aquatic species). *See also* 19497-98 (explaining the need for a multi-scale analysis for wildlife resources). Using a single scale would understate impacts on some resources and overstate impacts on others.

In addressing the "context" prong of significance, the Forest Service examined RHCAs impacted by riparian thinning on two scales—the Camp Lick Planning Area (Table 5) and the Middle Fork John Day River Subbasin (Table 6). AR 27157-58. The Forest Service used the same two scales for MCR Steelhead impacted by riparian thinning. *Id* (Tbls. 7-8). For both of these resources on the subbasin level, the Forest Service also disclosed riparian thinning in the planning area for the Big Mosquito Project, because shade and water temperature can affect

MCR steelhead, which are distributed widely in the Middle Fork John Day River. *Id*. Plaintiff takes issue with the Forest Service providing information as to the impacts of riparian treatments on multiple scales, but NEPA does not forbid the agency from providing data showing the percentage of acres treated at project area, District, and Forest level to provide context for the geographic scope of treatment activities. *See* AR 27157-58. Indeed, by doing so, the Forest Service provides a more complete picture of the proposed riparian treatments to support its finding that project effects are not likely to be felt beyond the planning area. *See* AR 27159.

### 2.    The "intensity" of the Camp Lick Project does not require an EIS.

The Forest Service addressed each of the ten intensity factors and correctly determined an EIS was not required. AR 27159-64.

Plaintiff wrongly argues that an EIS was required because "the adoption of a site-specific forest plan amendment[] is broadly recognized to be controversial." Pl.'s Br. 39. While true that the amendments to the Eastside Screens were of "great] interest to the public," AR 27161, public interest does not equate to controversy. "Controversy" means a dispute "over the size or effect of the action itself, not whether or how passionately people oppose it." *Wild Wilderness v. Allen*, 871 F.3d 719, 728 (9th Cir. 2017). The mere existence of some disagreement does not render a project highly controversial. "If this type of disagreement were all that was necessary to mandate an EIS, the environmental assessment process would be meaningless." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir. 1992).

As explained in the DN/FONSI, the Forest Service "reviewed the comments and scientific literature submitted by commenters [regarding the proposed amendments] and did not find there to be any *scientific controversy*" regarding effects. AR 27161 (emphasis added). The interdisciplinary team relied upon "approximately 150 scientific literature sources to support the

project analysis, in addition to responding to and determining the relevancy of over 350 scientific articles submitted as part of public comments in Appendix D to the Final EA." *Id.* Based on its review of all of this material, the Forest Service found no indication that the environmental effects of the selected alternative, including the site-specific amendments, are likely to be highly controversial. *Id.* And "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh,* 490 U.S. at 378. This Court's "deference is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen,* 615 F.3d 1122, 1130 (9th Cir. 2010) (citation omitted).

Plaintiff is also incorrect that the cumulative impacts of the Project require an EIS. Pl.'s Br. 40. As previously explained, the Forest Service sufficiently addressed cumulative effects resource-by-resource in the FEA and did not find them to be significant for a myriad of reasons, including the lack of special and temporal overlap between the projects, the planned use of BMPs and mitigation measures, and the expected long-term environmental benefits of the project activities. AR 27159, 62; *see supra* at IV.B.1.

Plaintiff's argument that expected impacts to MCR steelhead require an EIS is also without merit. Pl.'s Br. 40. The Forest Service's "may affect, likely to adversely affect" finding under the Endangered Species Act does not equate to significance under NEPA and is based primarily on *short-term* impacts from road maintenance and haul and associated crossings, the use of roads in riparian areas for haul, and potential fuel treatment impacts. AR 27163-64. In the long-term, however, the Project will have beneficial effects to the MCR steelhead and critical habitat. *Id.* In particular, the biological opinion concluded that small amounts of shade removal

from vegetation treatments would occur initially, but hardwood species regeneration and growth of larger trees would *improve* shade and other riparian functions over the no-action alternative in the relatively near future. *Id*. Based on a review of the entire record, including the biological assessment, biological opinion, FEA, and the attendant analyses, the Forest Service determined the Project was not likely to significantly adversely impact steelhead. AR 27164 (noting specifically that the implementation of terms and conditions in the biological opinion as well as best management practices and project design criteria in the selected alternative will minimize adverse effects in the short-term).

Finally, the Project does not threaten any violation of law, including the Clean Water Act. Pl.'s Br. 41. The FEA addressed the Project's compliance with the Clean Water Act and found it complied based on a 2014 Memorandum of Understanding with ODEQ directing that the Forest Service not further degrade water-quality impaired streams (although short-term adverse impacts that occur with long-term benefits are allowed). AR 19435; SUPPAR 16916 Further, in response to an objection to the proposed decision, the Forest Service sought and obtained a letter from ODEQ confirming that the Project was consistent with Total Maximum Daily Loads (TMDLs) objectives and past water quality impaired (*i.e.*, CWA § 303(d)) listed streams. AR 27117. The SIR considered the 2018 modification to the section 303(d) list of water quality impaired waterbodies, which reclassified Camp Creek as a category 5 stream, and determined that the proposed activities would still comply with the Clean Water Act. *Id*.

Finally, contrary to Plaintiff's assertion, the Forest Service incorporated TMDL implementation strategies in the FEA, "which outline how stream shade is provided from riparian vegetation, channel form, and aspect . . . and how water flows through the streambed if a large woody debris jam is present, allowing hyporheic flow to incrementally cool water

temperatures." AR 09336-37; *see* AR 19418.  For example, the FEA explains that while ecological riparian treatments may result in short-term reductions in stream shade, planned design criteria requiring the retention of primary shade and the utilization of tree felling, thinning or tipping, as a means of aquatic restoration will minimize impacts.  Additionally, the Forest Service will place enough wood in streams to meet PACFISH large woody debris objectives before removing commercial wood from the site.  AR 19475.  This will provide shade, slow water velocities, increase groundwater recharge and hyporheic exchange, increase riparian vegetation cover by elevating water tables in floodplains, and add complexity to channel form— these changes combined reduce stream temperatures.  *See* AR 19417-20, 30, 34 (addressing water temperature impacts), 29-30 (addressing large wood and stream channel shape effects).  Accordingly, the Forest Service's ultimate conclusions that there will not be measurable stream heating from solar radiation due to commercial byproduct removal, AR 27117, is well supported, and, contrary to Plaintiff's assertion at pp. 41-42 of their brief, there is nothing in the record about "non-commercial" trees being removed from riparian areas.  *See* AR 19348-51.

In sum, the Forest Service's decision not to prepare an EIS was sound, and the Court should grant summary judgment in favor of the government on Claim II, Count VIII.

**D.    A Supplemental EIS or EA is not Required (Claim II, Count VII)**.

Agencies must supplement an EA if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(d)(1).  Where an agency reviews the relevant factors and determines that supplementation is not necessary, a court should defer to the agency's determination.  *See Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509-12 (9th Cir. 1997); 40 C.F.R. § 1502.9(d)(1)(ii).   "[A]n agency need not supplement an EIS

every time new information comes to light after the EIS is finalized. To require otherwise would render agency decision making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh*, 490 U.S. at 373 (footnote omitted).

Here, the Forest Service reviewed new information and changed conditions in a SIR and determined additional NEPA analysis was not warranted because the effects of the changed conditions and new information were within the scope and range of the direct, indirect, and cumulative effects analyzed in the FEA. AR 27314; *see Idaho Sporting*, 222 F.3d at 567 (a SIR is appropriate "for the purpose of evaluating the significance of new information or changed circumstances"). Plaintiff argues that adjacent and nearby projects−Austin, Rattlesnake, and Cliff Knox− that have been developed since the FEA was published will have negative individual and cumulative impacts to RHCAs and threatened and sensitive species that require the preparation of a supplemental EA. Pl.'s Br. 43. This is incorrect.

The Rattlesnake Project is a Healthy Forest Restoration Act project intended to retain old-growth forest structure and large trees. SUPPAR 25368. The Rattlesnake Decision Notice approved a Forest Plan Amendment to remove trees greater than 21 inches DBH but less than 30 inches DBH within 62 acres of aspen stands, and to remove grand fir/white fir trees greater than or equal to 21 inches DBH but less than 30 inches DBH within 502 acres of upland forest. SUPPAR 25371. The Forest Service reasonably determined the advent of that project did not require the Forest Service to conduct supplemental NEPA analysis for the Camp Lick Project, because the final Rattlesnake decision significantly limited large tree removal and dropped commercial treatments in the RHCAs. AR 27302, 304-14; SUPPAR 25369-70.

At the time the Forest Service prepared the SIR, draft EISs with descriptions of

amendments and acreages were not yet available for the Austin and Cliff Knox Projects. *See* AR 27303-04. Nonetheless, the Forest Service considered both projects in an interdisciplinary review to determine if the projects and other new information or changed circumstances were within the scope and range of effects considered in the Camp Lick FEA. AR 27299-320. In the end, the Forest Service determined additional environmental review was not necessary because all effects were within the scope and range of effects considered. AR 27314.

It is therefore not true that the Camp Lick SIR was deficient in its analysis of the cumulative effects of the Rattlesnake, Cliff, and Austin Projects. The Austin and Cliff Knox projects were scoped but did not have quantitative information to consider in the SIR. And for the resources in the Rattlesnake Project, the Forest Service found that they did not overlap in time or space or occur within the identified cumulative effects boundary identified in the Camp Lick FEA, or, that the cumulative effects fell within the scope of effects evaluated in the Camp Lick FEA. AR 27304-20.

It is also not true that the SIR does not adequately analyze new temperature data. After considering stream temperature data from 2014 and 2016, the Forest Service found stream temperature effects are still expected to be either "negative, not meaningfully measurable," or "positive, meaningfully measurable" in the Project area. AR 27307. After reviewing the 2014 stream temperature data, the existing condition for stream temperatures would still exceed the suitable range for salmonid present, except for six stream reaches. AR 27307.

Finally, Plaintiff claims the SIR did not address the impacts of the Ragged Ruby Project on MCR steelhead and RHCAs. Pl.'s Br. 44. This is true, but only because at the time the Forest Service prepared the SIR the Ragged Ruby project design did not include any harvest within the RHCAs. SUPPAR 25612-26419, 26420-529. The Decision Notice for Ragged Ruby

was not executed until December 2020. *See* AR 27318-20 ("Expected Decision 2020"). To the

extent that it could, the Forest Service did consider Ragged Ruby. *See* AR 27311-13, 18-20.

Ultimately, the final Ragged Ruby Decision did include a minor component of non-commercial

thinning within RHCAs, which the Forest Service anticipates will result in a short-term negative,

but not meaningfully measurable, effect and a long-term positive benefit. SUPPPAR 24551-52,

24635-36. Importantly, the Ragged Ruby Final EIS did consider the Camp Lick Project in its

cumulative effects analysis. *See* SUPPAR 25899 (aquatic species), 26089 (removal of trees ≥21

inches DBH), 26093-94 (harvest within late and old structure stands). Thus, even if

supplemental environmental review was required, it was performed in the newer (Ragged Ruby)

project. *See Sierra Nevada Forest Prot. Campaign v. U.S. Forest Serv.*, 166 F. App'x 923, 928

(9th Cir. 2006) (Fletcher, J. concurring) ("The cumulative impact of the MVP and any future

project will necessarily be considered in the EIS or EA of the future project; that is the

appropriate time for such cumulative impact analysis to be conducted.").

 In sum, Court should grant summary judgment in favor of the United States on Count VII

of Claim II, because the agency's decision not to prepare a supplemental EA was correct.

## V. Should the Court Grant Any Relief, Defendants Request the Opportunity for Further Briefing on Remedy.

 As discussed above, there has been no violation of law. But even were the Court to find a

legal violation, every flawed agency decision "need not be vacated." *Cal. Cmtys. Against Toxics*

*v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Thus, should the Court find any violation of

law, Defendants request the opportunity to address whether vacatur is justified through separate

remedy briefing. *See, e.g., Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 388

(E.D. Cal. 2007) (ordering supplemental briefing on the appropriate remedy and noting that "it is

not prudent to impose a remedy without further input from the parties."). When "equity demands," courts may leave in place an agency action "while the agency follows the necessary procedures to correct" its error. *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (internal quotation marks and citation omitted). Vacatur depends on "how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Id.* (citation omitted).

Both of these considerations are informed by the Court's decision on the merits. *See Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur requires a "fundamental flaw[]" that would prevent the agency from adopting the same conclusion if the matter were remanded). Courts have ordered remand without vacatur in cases of both NEPA and NFMA violations. *See, e.g., All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156-57 (D. Mont. 2019) (ordering remand without vacatur where a large percentage of the project area geographically was unaffected by the Service's NFMA error and even within the affected area, the project authorized other work which could proceed); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019) (declining to order vacatur where "the probability that [BLM] will be able to justify retaining [its prior leasing decisions] is sufficiently high . . . ." (internal quotation marks and citation omitted)). Accordingly, in the event the Court finds any error, Defendants respectfully request the opportunity to address remedy in supplemental briefing.

## VI.   Conclusion

For the foregoing reasons, the Court should deny Plaintiff's Motion for Summary Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment. In the event the Court finds any violation of law, Defendants request supplemental briefing on remedy.

DATED:  April 29, 2022.

TODD KIM
Assistant Attorney General
United States Department of Justice

*/s/ Dustin J. Weisman*
DUSTIN J. WEISMAN (CO Bar No. 44818)
Trial Attorney
ERIKA NORMAN (CA Bar No. 268425)
Senior Trial Attorney
United States Department of Justice
Natural Resources Section
150 M Street NE
Washington, DC 20002
Telephone:  (202) 598-9063  (Weisman)
Telephone:  (202) 598-0475  (Norman)
Facsimile:  (202) 305-0506
dustin.weisman@usdoj.gov
erika.norman@usdoj.gov

*Attorneys for Defendants*