IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PENDLETON DIVISION

BLUE MOUNTAINS BIODIVERSITY
PROJECT, an Oregon nonprofit corporation,

        Plaintiff,

    v.

CRAIG P. TRULOCK, Forest Supervisor,
Malheur National Forest, in his official capacity;
and UNITED STATES FOREST SERVICE, an
agency of the United States Department of
Agriculture,

        Defendant.

Case No. 2:21-cv-01033-HL

**FINDINGS AND
RECOMMENDATION**

_____

HALLMAN, United States Magistrate Judge:

        Plaintiff, Blue Mountains Biodiversity Project ("Blue Mountains"), brings this case

against Defendants, Craig Trulock and the United States Forest Service (referred to collectively

as "Forest Service" or "Service"), challenging a 40,000-acre project in the Malheur National

Forest. Blue Mountains brings claims for relief under the Administrative Procedure Act ("APA")

relating to the Forest Service's alleged violations of the National Forest Management Act

("NFMA") and the National Environmental Policy Act ("NEPA"). This matter comes before the

Court on both parties' motions for summary judgment. ECF 24, 32. The Court heard oral

argument on these motions on December 12, 2022. ECF 51. For the reasons discussed below, the

PAGE 1 – FINDINGS AND RECOMMENDATION

Forest Service's motion should be GRANTED, and Blue Mountains' motion should be DENIED.

**BACKGROUND**

I.    **Administrative Proceedings**

This case is about a logging and forest restoration project in the Malheur National Forest (the "forest") called the Camp Lick Project ("Camp Lick" or the "Project"). Camp Lick is in the Middle Fork John Day River Watershed, a priority for aquatic restoration. Administrative Record ("AR") 27080, 27109, ECF 14. The Service designed the Project to improve forest health and resiliency by returning Camp Lick to a more historical state (i.e., closer to its historical range of variability or HRV). AR 19317. Historically, the Project area had consistent wildfires, leading to more low-density tree stands dominated by dryer tree species (ponderosa pine and western larch) growing to similar heights (old forest single strata). AR 19318–25. After 160 years of fire suppression, the forest structure shifted to a greater frequency of denser stands with trees adapted to shadier conditions (fir trees), growing to varying heights (old forest multi-strata). AR 19318–25. This shift reduces the diversity of forest conditions (heterogeneity) and increases the risk of catastrophic wildfires and disease. AR 19318–25.

To help shift the 170 million-acre Forest to a more historical state, the Service approved the 40,000-acre Camp Lick Project, which has 31,000 acres of prescribed burning and 12,220 acres of forest thinning, including 8,190 acres of commercial logging. AR 19406, 19713, 27086–89, 27097. Part of this thinning involves commercial logging of large fir trees younger than 150 years old and double the dripline or closer to ponderosa pine or western larch trees that are within warm, dry stands. AR 27107. Logging large trees requires a forest plan amendment. AR 2276–77.

The Malheur National Forest has a forest plan ("Forest Plan" or "Plan"). AR 2276–77. The Eastside Screens[1] are part of the Plan that protects two types of large trees: (1) live trees with a diameter greater than or equal to 21 inches and (2) all trees within late and old structure stands that are below the historical range of variability (referred to collectively as "large trees"). AR 2276–77. The Project uses site-specific amendments to allow the logging of large fir trees in dry stands close to ponderosa pine or western larch trees. AR 27107. The Service concluded these site-specific amendments were necessary to achieve its management goals because "[h]ard diameter limits . . . make it difficult or impossible to achieve desired species composition . . . ." AR 19366.

The Plan also authorizes logging in 2,300 acres of riparian areas. This logging is similarly aimed at returning the landscape to its more historical and heterogeneous state. AR 27091–93. Riparian areas are especially important because they affect water quality and aquatic species, including the endangered steelhead population in the John Day River Watershed. AR 27091–93.

The Service has approved seven other logging projects in the Middle Fork John Day Watershed, four of which allow the logging of similar large trees. Suppl. AR 24679, 19912, 12343, 16531, 26425, 24663, ECF 21. These projects can have cumulative impacts on the environment the Service is required to analyze under NEPA. *See infra* Standards § II.A.

An interdisciplinary team in collaboration with public stakeholders developed the Project. AR 27080-81, 27129. The Final Environmental Assessment ("EA") analyzed thirteen

---

[1] "The Eastside Screens . . . are a set of interim riparian, ecosystem, and wildlife standards for timber sales applicable to public lands east of the Cascade Mountains. The Screens prohibit logging late and old seral and/or structural (LOS) trees 21 inches DBH or greater until a long-term strategy for protection and restoration is developed. In essence, the Screens prohibit the harvest of old-growth trees." *League of Wilderness Defs. v. Connaughton*, No. 3:12-CV-02271-HZ, 2014 WL 6977611, at *2 (D. Or. Dec. 9, 2014)

alternatives but eliminated them from detailed study because they would not fulfill the Project's goals of returning the landscape to a historical, heterogeneous state, resilient to wildfire and disease. AR 27109. Two of those alternatives were proposed by Blue Mountains: not amending the Plan to allow the logging of large trees and not allowing commercial logging in riparian areas. AR 20327, 20341–43 (Blue Mountains' Comments); AR 19366–71 (excluding no riparian treatment or commercial treatment in riparian areas and not amending the Screens alternatives from detailed study).

The Service published a Draft Decision Notice and Finding of No Significant Impact ("FONSI") in 2017. AR 27155–56. After receiving objections, the Service modified the treatments. AR 27155–56. The Service also published a Supplemental Information Report ("SIR") to address new information after its EA. AR 27299. The SIR analyzed new forestry projects in the watershed and new stream temperature data. AR 27018, 27299. At the end of the NEPA process, the Service published its Final Decision Notice and FONSI, concluding the Project would not significantly affect the quality of the human environment. AR 27157.

## II.    This Litigation

Blue Mountains filed its Complaint on July 12, 2021. ECF 1. Blue Mountains alleges the Service violated NFMA by using repeated site-specific amendments to address forest-wide management concerns. Compl. ¶¶ 80–81, ECF, 1. Blue Mountains also brings eight NEPA claims related to the scope and sufficiency of the Project's cumulative impact analysis, the baseline stream temperature data, the alternatives analysis, and the decision not to prepare an EIS. Compl. ¶¶ 82–97. Blue Mountains seeks injunctive and declaratory relief stopping the Camp Lick Project until the Service provides a thoroughly robust NEPA analysis and complies

with NFMA. Compl. ¶¶ A–H. Both Parties moved for summary judgment seeking dispositive rulings on all claims based on the administrative record lodged with the Court. ECF 24, 32.

## STANDARDS

### I.    Standards of Review

#### A.    Summary Judgment

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of proving the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik,* 559 F.3d 924, 927–28 (9th Cir.2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan,* 508 F.3d 1212, 1218 (9th Cir.2007) (citing *Celotex,* 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material—*Suever v. Connell,* 579 F.3d 1047, 1056 (9th Cir.2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.,* 658 F.3d 1108, 1112 (9th Cir.2011).

If the factual context makes the nonmoving party's claim for the existence of a material

issue of fact implausible, that party must come forward with more persuasive evidence to support

his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v.. Zenith Radio*

*Corp.,* 475 U.S. 574, 587 (1986).

**B.**    **The Administrative Procedure Act**

All the claims in this case are governed by the Administrative Procedure Act, 5 U.S.C. §§

701–706 ("APA"). Under the APA, a federal court "shall ... hold unlawful and set aside agency

action, findings, and conclusions found to be [:](A) arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law; [or] without observance of procedures required by law

[.]" 5 U.S.C. § 706(2). Under this standard, an "agency must examine the relevant data and

articulate a satisfactory explanation for its action." *Organized Vill. of Kake v. U.S. Dep't of*

*Agric.,* 746 F.3d 870, 974 (9th Cir.2014) (quoting *Motor Vehicle Mfrs. Ass'n of United States,*

*Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). There are four ways an agency's

action could be arbitrary and capricious: (1) the agency overlooks an important aspect of a

problem, (2) the agency's decision is contrary to the evidence, (3) the agency's decision is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise, or (4) the agency's decision is contrary to the governing law. *Id.*

In deciding whether the agency's action complied with the APA, the court "must consider

whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment." *San Luis & Delta–Mendota Water Auth. v. Jewell,* 747 F.3d 581,

601 (9th Cir.2014) (internal quotation marks omitted). The court's "inquiry must be thorough,"

but "the standard of review is highly deferential; the agency's decision is entitled to a

presumption of regularity, and [the court] may not substitute [its] judgment for that of the

agency." *Id.* (internal quotation marks omitted). "Where the agency has relied on relevant evidence such that a reasonable mind might accept as adequate to support a conclusion, its decision is supported by substantial evidence." *Id.* (internal quotation marks and brackets omitted). "Even if the evidence is susceptible of more than one rational interpretation, the court must uphold the agency's findings." *Id.* (internal quotation marks omitted). The Ninth Circuit has endorsed summary judgment motions as "'an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'" *City & Cnty. of San Francisco. v. United States,* 130 F.3d 873, 877 (9th Cir.1997) (quoting *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 770 (9th Cir.1985)).

## II.     Substantive Law

### A.     National Environmental Policy Act

NEPA has two main aims. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 97 (1983). First, NEPA requires government agencies to "consider every significant aspect of the environmental impact of a proposed action." *Id.* (internal quotation marks omitted). "Second, NEPA mandates that government agencies inform the public of the potential environmental impacts of proposed actions and explain how their decisions address those impacts." *Id*; *Citizens Comm. to Save Our Canyons v. U.S. Forest Serv.,* 297 F.3d 1012, 1021 (10th Cir. 2002).

NEPA is a procedural statute, not mandating particular results but requiring agencies to take a hard look at the environmental consequences of their decisions. *Westland Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004). The hard look requirement includes "both a complete discussion of relevant issues as well as meaningful statements regarding the actual impact of proposed projects." *Earth Island*, 442 F.3d at 1172. Agencies must take a hard

look at both the direct and cumulative impacts of the project. *Kern v. Bureau of Land Mgmt*, 284 F.3d 1062, 1078 (9th Cir. 2002).

NEPA requires the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11 (2019). The potential "significance" of a proposed action is determined by evaluating the context of that action and the intensity of its effects within that proper context. 40 C.F.R. § 1508.27 (2019).

An agency may prepare an EA to determine whether the effects of an action will be significant, and if not, the agency may prepare a FONSI and forego preparation of an EIS. *See* 40 C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9, 1508.13 (2019). The EA itself is a "'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Public Citizen*, 541 U.S. at 757 (quoting 40 C.F.R. § 1508.9(a)).

"Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). The APA does not require perfection. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003); *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1448 ("gaps and imperfections in the [agency's] analysis . . . do not [always] rise to the level of an arbitrary and capricious decision."). The court "may only set aside decisions that have no basis in fact, and not those with which [it] disagree[s]." *Forest Guardians*, 329 F.3d at 1099. In determining whether an agency has prepared a "reasonably thorough discussion," the court may not "fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies." *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996) (internal quotation marks and citation omitted).

B.        National Forest Management Act

Unlike NEPA, which is procedural, NFMA also imposes substantive constraints on the management of forest lands. *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 898 (9th Cir. 2002). NFMA outlines a two-step process for forest planning. *Id.* at 897. First, the Service must develop a land resources management plan (a forest plan). *Id.* The forest plan is then implemented at individual project sites. *Id.* And all projects, including timber sales, must be consistent with the forest plan. *Id.* Each forest plan must "form one integrated plan for each unit of the National Forest System." 16 U.S.C. § 1604(f)(1).

The Forest Service can amend a forest plan in "any manner whatsoever." 16 U.S.C. § 1604(f)(4). Under NFMA, forest plan amendments that result in a "significant change" require the Forest Service to prepare an EIS; non-significant amendments only require a simpler notice and comment process. *See* 16 U.S.C. § 1604(f)(4); *Dombeck,* 304 F.3d at 898; *Lands Council v. Martin,* 529 F.3d 1219, 1227 (9th Cir. 2008). Under the current regulations, an amendment that has a significant environmental effect under NEPA is a significant change in the plan under NFMA. 36 C.F.R. § 219.13(b)(3) ("Except for an amendment that applies only to one project or activity, proposed amendment that may create a significant environmental effect [under NEPA] and thus requires preparation of an [EIS,] is . . . a significant change in the plan for the purposes of . . . NFMA . . . .").[2]

_____

[2] Under the Service's 1982 planning regulations, significance was determined "[b]ased on an analysis of the objectives, guidelines, and other contents of the forest plan," 36 C.F.R. § 219.10(f) (1996), but that standard has been superseded by the Service's 2012 planning regulations, as amended in 2016. 36 C.F.R. § 219.13(b)(3). Under current regulations, plan amendments that "may create a significant environmental effect" are a "significant change" under NFMA. *Id.*

To enact a geographically limited, site-specific amendment rather than amend the forest plan as a whole, the Forest Service must articulate a "rational connection between the facts found and the choice made."" *Martin,* 529 F.3d at 1228. Any rational articulation of why a site-specific amendment is appropriate and consistent with the forest plan deserves deference. *Native Ecosystems Council v. Weldon,* 697 F.3d 1043, 1056 (9th Cir. 2012) (The Service's "interpretation and implementation of its own forest plan is entitled to substantial deference.").

## DISCUSSION

### I.    NFMA (Claim I)

Blue Mountains brings one claim under NFMA, attacking the Service's use of site-specific amendments for the Camp Lick Project. Compl. ¶ 81. Blue Mountains makes two specific arguments for how these site-specific amendments violated NFMA: (1) using site-specific amendments to address a problem that is not unique to the Project site violates NFMA because site-specific amendments are only for truly site-specific issues, Pl.'s Mot. Summ. J. ("Pl.'s Mot.") 7–8, ECF 24; and (2) using similar site-specific amendments for multiple projects amounts to a *de facto* significant change. Reply in Supp. of Pl.s' Mot. Summ. J. ("Pl.'s Reply") 17-20, ECF 38. Blue Mountains asserts that the Service was therefore required to comply with the procedural requirements of 16 U.S.C. § 1604, including preparation of an EIS. Compl. ¶ 81.

For the following reasons, this Court concludes that the Service did not violate NFMA by using site-specific amendments without preparing an EIS, and recommends that summary judgment be denied to Blue Mountains and granted to the Service on Claim I.

### A.    Site-Specific Amendments for Forest-Wide Conditions

Blue Mountains first argues the Forest Service violated NFMA by using site-specific amendments to address forest-wide conditions. Compl. ¶ 81. Blue Mountains argues the Service

should only be able to use site-specific amendments to address problems unique to the Project site. Pl.'s Mot. 7–8. Otherwise, the Service can conduct a piecemeal abandonment of the Forest Plan without analyzing the forest-wide management implications and cumulative environmental impacts through the required EIS and public comment procedures for significant forest plan amendments. *Id.* The site-specific amendments at Camp Lick allow the logging of big fir trees to protect old ponderosa and larch trees from fire, competition, and disease. *Id.* Because the forest composition at Camp Lick is prevalent throughout the Malheur National Forest, Blue Mountains argues that using site-specific amendments to address this management issue violates NFMA. *Id.*

The Forest Service attacks Blue Mountains' NFMA claim on two fronts. First, they argue there is no NFMA requirement that a project site be unique; the Service can support a site-specific amendment with unique or common characteristics of the project site. Defs.' Cross Mot. Summ. J. ("Defs.' Mot.") 13, ECF 32. And second, the Service argues some characteristics at Camp Lick are unique. Defs.' Mot. 16–17.

Under NFMA, to amend at the site-specific level, rather than the general forest, there must be a rational explanation for the site-specific amendment that is supported by the record. *Connaughton*, 2014 WL 6977611, at *6 (holding the Service's explanation of the need for the project that applied to the whole forest failed to explain why it chose a site-specific amendment). But courts must defer to the Service's expertise in amending its forest plan, especially when those amendments are based on site-specific characteristics. *Martin*, 529 F.3d at 1228. This is true even when the site-specific amendment is "likely in other timber sales." *Id.* The Service violates NFMA only when no rational explanation is supported by the record for why a general forest plan amendment is less proper. *Connaughton*, 2014 WL 6977611, at *6 ("[E]xplaining the purpose of the Project . . . [and] stating that the amendment . . . was designed for a specific site,

does not satisfy the rational connection between the facts found and the choice" not to amend the forest plan generally when the Service has failed to show any site-specific characteristic is unique to the project site.).

Unique characteristics at the project site are a quintessential reason why a site-specific amendment will be proper. *Compare Martin*, 529 F.3d at 1228 (upholding a site-specific amendment because it would not be proper across a large majority of the forest) *with Connaughton*, 2014 WL 6977611, at *6 (vacating the Service's decision to address a forest-wide issue with site-specific amendments because it failed to "satisfy the rational connection between the facts found and the choice made" to limit the amendment to the project site). But unique characteristics is not the only conceivable rational basis for the Service to limit the geographic scope of an amendment. *See Dombeck,* 304 F.3d at 890–91, 898 (upholding site-specific amendments of road density standards because of non-unique conditions) (cited six times by *Martin*, 529 F.3d at 1228 to determine whether it was arbitrary for the Service to "enact[] a site-specific amendment . . . , rather than a general amendment").[3]

The Service must use "site-specific characteristics" to provide this "rational connection," and the Service must explain its choice to both amend the Plan *and* geographically limit that amendment to the project site. *Martin*, 529 F.3d at 1228. When the site-specific characteristics supporting the amendment apply to the general forest, those characteristics on their own will not explain the decision to geographically limit the amendment. *Connaughton*, 2014 WL 6977611, at *6. In those circumstances, the Service must do more than "explain[] the purpose of the Project, the desired conditions for the forest, or state that the amendment is . . . designed for a specific

---

[3] This rule stems from *Martin's* citation to *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.,* 265 F.3d 1028, 1034 (9th Cir. 2001), which only requires the "Service articulate[] a rational connection between the facts found and the choice made."

PAGE 12 – FINDINGS AND RECOMMENDATION

site" because none of those reasons support the decision to geographically limit the amendment. *Id.* The Service must also show why the record supports its decision not to amend the Plan generally. *Id.*

This record supports both the Service's decision to amend the Screens at this Project and the decision to geographically limit that amendment to the Project site. First, the rarity of these amendments shows the Service intends to apply the unamended Screens to the forest as a whole. And second, the site-specific tailoring of these rare Screens amendments shows the Service considers individual project nuances when constructing these amendments, which Service experts believe is better done at the site-specific instead of the general forest level.

The Service has shown that these amendments are rare. Only 2.4 percent of the 1.7 million acres of the Malheur National Forest have been impacted by amendments to the Screens. AR 19713. Additionally, it is not as though the Service is removing all large trees in this 2.4 percent area; rather, it is only removing a very small, specific subset of large trees in these areas for very specific reasons. AR 27107; Suppl. AR 24679, 19912, 12343, 16531, 26425, 24663. The limited and specific scope of these amendments supports the Service's choice to geographically limit these amendments and retain the Screens as they are written for the general Forest.

The subtle differences in the amendments also support geographically limiting them because it shows the Service is conducting a nuanced analysis, considering a myriad of different management issues at play in each site and usually not amending, but when it does, tailoring the amendments accordingly. Because this tailoring and nuanced analysis are better conducted at the site-specific level, it provides a rational basis for not amending the Plan generally. The Camp Lick amendment is tailored to the specific area, and the record supports it would not apply to the forest generally. AR 19713. As a result, it differs from the four recent amendments to the

Screens in the John Day Watershed: One project allows additional logging in the cold forest

plant association group beyond double the dripline of ponderosa or larch trees. Suppl. AR 24702.

Another project differs by allowing additional logging in the hot dry plant association group and

beyond double the dripline. Suppl. AR 26442–43. And a third project differs by putting a 28-inch

diameter cap on harvests while allowing ponderosa to be harvested. Suppl. AR 19930–31. The

purpose of Screens amendments has also varied across projects. Defs.' Mot. 26 n.11. The variety

of purposes includes dwarf mistletoe reduction, aspen restoration, fire salvage, rock pit

expansion, restoring historical tree species composition, and improving the survivability of older

trees. Defs.' Mot. 26 n.11.

　　　Unlike in *Connaughton,* the Service here has explained the need for site-specific tailoring

of the Camp Lick amendments. The Service in *Connaughton* only stated that the amendment was

designed for the specific site without addressing why it must analyze these amendments at the

site-specific level and tailor them accordingly in the rare circumstances that it does decide to

amend the Screens. Here, the Service has explained this need and described that these

amendments are too rare and tailored to specific project goals and site characteristics to be used

generally. The rarity and specificity of these amendments provide the rational connection

*Connaughton* and *Martin* require for limiting the geographic scope of these amendments and

dealing with this management issue at the site-specific level.

　　　In sum, the Service has explained a rational connection between the facts found and the

decision made to amend the Screens and limit that amendment's geographical scope. Therefore,

the Court must defer to the Service's expertise because it supported its decision with site-specific

characteristics and has broad discretion in interpreting, applying, and amending its Forest Plan.

Applying that deference, this Court concludes that the Service's use of the site-specific amendments for the Camp Lick Project was not arbitrary and capricious.[4]

### B. *De Facto* Significant Change to the Malheur Plan

Blue Mountains argues that Camp Lick's plan amendments, in compilation with the prior twelve site-specific amendments and the three planned amendments, amount to a *de facto* significant change to the Forest Plan and thus require an EIS under NFMA. Pl.'s Reply 17–20. The Service responds with three arguments for why the Project's amendments are not significant: (1) they are not the same as prior amendments in other projects, (2) all the amendments of the Screens still affect only 2.4 percent of the Malheur National Forest, and (3) the amendments are narrowly tailored. Defs.' Mot. 30–34 (citing *Dombeck,* 304 F.3d 886).

First, this Court questions whether the Service's current regulations provide any basis to separately analyze this issue under NFMA.[5] The current regulations state that "a proposed amendment that may create a significant environmental effect [under NEPA] and thus requires preparation of an [EIS] is . . . a significant change in the plan for the purposes of . . . NFMA . . . ." 36 C.F.R. § 219.13(b)(3). Blue Mountains argues that because "the Project and its multiple site-specific amendments are significant under NEPA[,]. . . under 36 C.F.R. § 219.13(b)(3), the [Malheur Plan] amendments are *per se* a significant change under NFMA." Pl.'s Reply 13 (arguing the 14 site-specific amendments to the Screens is significant under NEPA).

---

[4] This Court is aware that since this Project was approved, the Service has put forth general amendments to the Eastside Screens, reducing them to "guidelines," allegedly without complying with 16 U.S.C. § 1604(d), (e), (f). That action is being challenged in multiple proceedings in this District. *Greater Hells Canyon Council et al. v. Wilkes et al.*, 2:22-cv-00859-HL, (D. Or. 2022); *Blue Mountains Biodiversity Project v. Wilkes et al.*, 1:22-cv-01500-CL (D. Or. 2022). In reaching this conclusion, this Court expresses no opinion on the merits of those challenges.

[5] The Service does not address this issue or the effect of the amended regulations in its briefing, instead focusing on caselaw interpreting the prior regulations.

The Court agrees with Blue Mountains that the NEPA and NFMA analysis is now the same under 36 C.F.R. § 219.13(b)(3). For that reason, however, the Court disagrees with Blue Mountains that NFMA imposes any extra significance requirements apart from those required by NEPA. The plain language of 36 C.F.R. § 219.13(b)(3) does not require the Service to analyze all projects that have amended the Screens together to determine significance under 36 C.F.R. § 219.13(b)(3). This regulation states "*a* proposed amendment that may create a significant environmental effect" under NEPA must be analyzed with an EIS. 36 C.F.R. § 219.13(b)(3) (emphasis added).

Based on the current regulations, NFMA does not impose any *additional* requirements on the Service to analyze the impact of multiple site-specific amendments beyond those imposed under NEPA. Because this Court concludes below that the Service did not violate NEPA when it issued a FONSI and not an EIS, it necessarily follows that the Service did not violate NFMA.[6]

In sum, the Service provided a rational, site-specific basis for its site-specific amendments to the Plan, and these amendments are not significant under NEPA so they are not significant under NFMA. Summary judgment should therefore be denied to Blue Mountains and granted to the Service on Claim I.

---

[6] Blue Mountains' NFMA claim would not fare better under the prior regulations. *Dombeck* assessed regulations requiring the Service to "determine whether a proposed amendment" was "significant" "based on . . . the objectives, guidelines, and other contents of the forest plan . . . ." 36 C.F.R § 219.10(f) (1996). In *Dombeck*, the amendments at issue were more similar, and applied to more similar projects, than the amendments or projects here. 304 F.3d at 900. In rejecting similar challenges, the Ninth Circuit stated that "[t]hese amendments apply to different timber sales throughout the forest, and plaintiffs do not assert that the timber sales themselves are so related as to be, in truth, one sale. Separate analysis of the amendments, then, seems reasonable." *Id*.

II.     **NEPA (Claim II)**

Blue Mountains' second claim alleges eight separate counts of NEPA violations concerning the Camp Lick Project. First, the Service failed to assess the cumulative impacts of past, present, and reasonably foreseeable site-specific amendments in the Malheur National Forest. Second, the Service failed to use the proper geographic scale when assessing the cumulative impacts of four aspects of the Project. Third & Fourth, the Service failed to take a hard look at the Project's direct effects on stream temperatures by failing to analyze baseline stream temperature data sufficiently. Fifth & Sixth, the Service used an unreasonably narrow purpose and need statement for the Project to allow it to exclude many reasonable alternatives from detailed study. Seventh, the Project is significant, requiring an EIS. And Eighth, the Service failed to conduct additional necessary NEPA review based on changed circumstances.

For the following reasons, this Court recommends summary judgment for the Forest Service on all of Blue Mountains' NEPA claims and counts.

A.      **Cumulative Impacts of Site-Specific Amendments to the Eastside Screens**

In Count 1, Blue Mountains alleges that the Service failed to assess the cumulative impacts of past, present, and reasonably foreseeable site-specific amendments in the Malheur National Forest. Compl. ¶¶ 83–85. Specifically, Blue Mountains argues the Service provided an insufficient cumulative impact analysis of the Camp Lick Project's effect on large trees in two ways: (1) it failed to consider the cumulative impacts on the Malheur National Forest scale, and (2) it provided only conclusory statements without objective quantification. Pl.'s Mot. 15.[7] The

---

[7] Blue Mountains also disagrees with the Service's assumption that large tree density has recovered on previously logged parcels over the last 20 years. Pl.'s Mot. 17. But this conclusion was supported by studies and Service expertise. AR 19713; Suppl. AR 24523. Blue Mountains also argues the SIR the Service published is not a NEPA document. Pl.'s Mot. 15, 24. But as

Service responds that it did not have to analyze the cumulative impacts at the forest scale, that it did regardless, and that its analysis was sufficient because it relied on data and scientific models to reach the statements Blue Mountains argues are merely conclusory. Defs.' Mot. 12–13.

An EA must fully analyze cumulative impacts. *Kern*, 284 F.3d at 1078. "[T]he determination of the scope of an analysis area requires application of scientific methodology and, as such, is within the agency's discretion." *Dombeck*, 304 F.3d at 902 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976). However, in exercising this discretion, the agency "must provide support for its choice of analysis area" in the record. *Id; see, e.g.*, *Connaughton*, 2014 WL 6977611, at *8–9 (holding the Service violated NEPA when it provided no support in the record for not analyzing the cumulative impacts of a site-specific amendment at the forest scale).[8] "[P]roper consideration of a project's cumulative impacts requires some quantified or detailed information[.]" *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). "[G]eneral statements about possible effects and some risk do not constitute a hard look absent" an explanation of "why more definitive information could not be provided." *Id.* (holding that the Service did not sufficiently analyze cumulative impacts when, in

---

discussed below, the Service properly used the report to review changed conditions to see if they aligned with those already considered in the EA.

[8] The parties disagree over the required geographic scope the Service's cumulative impact analysis needs to take place on. *Compare* Pl.'s Mot. 15 (arguing the analysis of any site-specific amendment needs to take place on the forest scale); *with* Defs.'s Mot. 29 n.13 (arguing this is not a *per se* rule). The Court agrees with the Service. Blue Mountains cites *Connaughton* for the proposition that the "Service is required to analyze the cumulative impacts of site-specific amendments at the forest scale." Pl.'s Mot. 15. But *Connaughton* held the Service's cumulative impact analysis was insufficient because the Service failed "to provide an explanation as to why it did not examine cumulative impacts on a forest-wide scale." *Connaughton*, 2014 WL 6977611, at *8–9. *Connaughton* never stated that the Service must always analyze the cumulative impacts of site-specific amendments on the forest scale. *Id.* Instead, *Connaughton* cited *Kelppe* and *Dombeck* for the proposition that determining "the scope of" a cumulative impact analysis "is within the agency's discretion. However, . . . the agency must provide support for its choice of analysis area in the record." *Id.* (citations and quotations omitted).

only twelve pages, the Service just provided a project's harvested acres, miles of constructed road, and unsupported conclusions about cumulative impacts).

Blue Mountains focuses on two statements to assert that the Service did not analyze cumulative impacts of the amendments on the forest scale: (1) "Because the effects from these past and foreseeable projects do not overlap spatially with the Project, there would not be a cumulative impact." AR 19717 (quoted by Pl.'s Reply 16) (alterations omitted). And (2) "All other past or ongoing projects with amendments to remove trees greater than or equal to 21 inches DBH [in] the Malheur are located in different geographical areas than camp lick." AR 19713 (quoted by Pl.'s Mot. 15). These statements were taken out of their context. The section of the EA these statements are in analyzes all amendments to the Eastside Screens throughout the Malheur National Forest. AR 19709–17 (providing data on all projects within the Malheur with amendments to the Eastside Screens; observing the Camp Lick Project would "increase the acres impacted [by Eastside Screens amendments in] the Malheur National Forest from approximately 25,435 to 40,852 acres; resulting in approximately 2.4 percent of the 1,700,000-acre Malheur National Forest having been impacted."). When read in context, these statements clarified how the amendments would interact over temporal and geographic space—the statements did not define the geographic scope of the Service's analysis.

Blue Mountains also argues that the analysis is merely conclusory, providing only acres of affected land and no useful analysis of cumulative impacts. Pl.'s Reply 16. Blue Mountains would be correct if total acres of affected land was the only analysis of cumulative impacts the Service did provide. However, a main reason the Service is concluding this Project will have little to no cumulative impact is because it found "[c]umulatively, the acres on which a person may see trees greater than or equal to 21 inches DBH would be increased with this amendment.

PAGE 19 – FINDINGS AND RECOMMENDATION

Over time, the quality of trees greater than or equal to 21 inches DBH would be enhanced and more representative of historical conditions." AR 19714.

The Service supported this conclusion with many scientific studies and analyses of the Project site. AR 19318–21 (citing multiple scientific studies, data, and Forest Service reports to discuss the need to thin the forest and return it to its more historical state to protect old-growth ponderosa pine and western larch trees from fire and disease); AR 19378–95 (considering cumulative impacts on large trees by examining tree density, forest structure, and forest composition through data, studies, and models). The entire purpose behind these amendments is that returning the forest to a more historical state with thinner stands, composed of similar-height trees, adapted to dryer conditions will preserve these large stands from fire and disease. And this preservation will increase the acreage of large trees in the long run and increase the amount of historical habitat the wildlife has adapted to. The Service has backed this conclusion with scientific studies, data, and forest reports—the Court is in no position to override it. *California v. Block*, 690 F.2d at 761 (If the agency has taken a hard look, the NEPA analysis is over); *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen,* 615 F.3d 1122, 1130 (9th Cir. 2010) (A court's "deference is highest when reviewing an agency's technical analyses and judgments . . . .").

The Service also provided additional cumulative impacts analysis throughout the EA, including impacts related to the loss of large trees. *See* Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Ex. 1 (table listing Service's cumulative impact analysis of 36 different forest resources, many of which relate to the loss of large trees). And the Court does not find that the Screens amendments force the Service to analyze every cumulative impact related to these amendments at the forest scale. The Service only has to take a hard look at cumulative impacts and

determining "the scope of" a cumulative impact analysis "is within the agency's discretion . . .

[as long as] the agency provide[s] support for its choice of analysis area in the record."

*Connaughton*, 2014 WL 6977611, at *8–9. (citing *Kelppe* 427 U.S. at 414 and *Dombeck,* 304

F.3d at 902). While the Service in *Connaughton* violated NEPA by "not provid[ing] any

explanation for limiting the scope of the cumulative impacts analysis . . . to the Eagle Creek

Watershed [,]" here the Service supported its determination that it needed to analyze different

forest resources on different scales and explained each scale it chose. *See infra* Discussion § II.B.

The Court does not find that the Service failed to take a hard look simply because the cumulative

impact analysis of some resources that can be affected by the loss of large trees, like wildlife,

were not analyzed at the forest scale.[9]

In sum, this Court concludes that the Service provided a reasonable assessment of the

cumulative impacts of the multiple site-specific amendments to the Eastside Screens. This Court

therefore recommends that summary judgment be granted to the Service on Count 1 of Claim II.

## B.    Geographic Scope of the Cumulative Impacts Analyses

In Count 2, Blue Mountains argues the Service failed to effectively analyze the

cumulative impacts of different aspects of the Project by failing to use the proper geographic

scope. Each of these aspects is addressed below.[10]

---

[9] At oral argument, Blue Mountains emphasized there is no wildlife analysis in the Screens amendments section of the EA, which makes it insufficient because the Screens were designed to protect critical wildlife habitat. In response, at oral argument, the Service argued that there was sufficient wildlife analysis in the EA, it was just not reiterated in the Screen's cumulative impacts section. While Blue Mountains argues an additional wildlife analysis should have been provided or reiterated in the Screen's amendments section, there is no NEPA requirement that the Service restate its analysis in additional sections.

[10] As a general matter, this Court notes that the cumulative impacts analysis in this case is much more thorough than *Klamath-Siskiyou*, 387 F.3d at 994, where the Service only conducted a total of twelve pages of cumulative impacts analysis, provided no justification of its geographic scope, and applied an inconsistent scope by including a project in a different watershed while excluding

1.      **Aquatic Habitat**

The Service supported its aquatic habitat geographic scope by demonstrating that the

effects of the Camp Lick Project on aquatic habitat would not be measurable outside of this

scope. AR 19407.

The Service's analysis of aquatic habitat is similar to that of its cumulative impacts

analysis for multiple site-specific amendments. The Service concluded that returning the forest to

its historical state through many restoration efforts would lead to the cumulative recovery of

affected watersheds. AR 19432–33, 19494 (concluding after almost 100 pages of aquatic habitat

and species analysis along with a separate biological opinion that the Project "would improve

quantity, function, sustainable productivity, and distribution of recreational fisheries."). Because

of this net positive effect, the Service focused on the short-term negative impacts of increased

sun and sedimentation due to Project implementation. AR 19454 (stating stream shading may be

slightly worse in the short term but not anticipating a measurable effect on water temperature;

stating a one-year increase in sedimentation may occur during Project implementation but then

will steadily decline long term). The Service then confined the geographic scope of its

cumulative impact aquatic habitat analysis to the largest area where these effects may be

measurable. AR 19407 (after analyzing twenty-three different past, present, and future actions

that could affect the watershed, stating adverse effects on aquatic habitat will remain in the

geographic area analyzed and will be unmeasurable outside the analyzed area when compared to

the no action alternative—even after severe runoff events). Additionally, the Service developed

---

neighboring projects in the same watershed. Here, the Service provided a detailed cumulative
impacts analysis for each resource, with an identified scale, which the record supports. *See* Defs.'
Reply Ex. 1 (table listing Service's cumulative impacts analyses by forest resource and showing
the geographic scope of each analysis).

mitigation tactics to reduce these short-term risks. AR 19436 ("Short-term . . . negative . . . . effects would be minimized through implementation of a thorough set of" mitigation tactics.).

The Service has provided "a reasoned decision and support for [the] chosen" geographic scope of its aquatic habitat and species analysis—thus, it complied with NEPA. *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014); *see also Fed'n of Fishermen's*, 265 F.3d at 1036 ("Any project that maintains or restores fish habitat presumably would not jeopardize the survival of the species. However, a project that degrades habitat at the project level must be included in any realistic study at the watershed scale.").

### 2.    Aquatic Species: MCR Steal Head and Red Band Trout

Blue Mountains argues that even if the cumulative impacts scope is sufficient to analyze aquatic habitat changes, this same scope is insufficient to analyze effects to the species because some degraded habitat here, there, and elsewhere could add up to a significant effect on the species at a larger geographic scale. Pl.'s Reply 18–23. The Service responds with three arguments: first, stating it has wide discretion to determine the geographic scope of its cumulative impact analysis, second, arguing the scope was reasonable here because it aligned with the Service's habitat analysis, and finally, emphasizing the direct effects of the Project were so limited that they were not likely to contribute to cumulative impacts on aquatic habitat or species beyond this geographic scale. Defs.' Reply 7–9.

The only negative measurable impact from the Project was a short-term increase in fine sediment and embeddedness from Project implementation. *See, e.g.*, AR 19475 ("Aquatic habitat restoration activities . . . may result in short-term cumulative impacts [from] . . . increases in fine sediment.). The Ninth Circuit has stated it can be unreasonable to perform a perfunctory analysis of cumulative impacts by not considering nearby and similar projects that could add up to a

significant negative impact on a species. *See Klamath-Siskiyou*, 387 F.3d at 994. Still, the court

must defer to an agency's chosen geographic scope if it supports its analysis area because this

determination is a scientific and technical process where the agency must balance the need for

comprehensive analysis with practical considerations. *Weber*, 767 F.3d at 943. Here, the Service

supported the geographic scope of its aquatic species analysis. AR 19454 (aligning the aquatic

species analysis area with the aquatic habitat area because the "area encompasses all known and

potential habitats for threatened, endangered, region 6 sensitive, and MIS species that may be

affected by the Camp Lick Project."). This alignment of geographic scope between aquatic

habitat and species makes sense because the Service uses the habitat analysis to determine the

Project's effect on species. AR 19436 (stating the analysis of impacts on aquatic species looks at

. . . "six primary habitat elements . . . used as a surrogate to determine effects of the Camp Lick

Project on threatened, endangered, and Region 6 sensitive (TES) species . . . ."). Because the

Service has supported its decision of geographic scope in the record, the Court will defer to it as

long as it's reasonable.

Blue Mountains' point is well taken that the geographic scope for a species should not

always align with its habitat analysis because some habitat degradation in several projects could

add up to a much greater impact on a larger scale. *Klamath-Siskiyou*, 387 F.3d at 994.

But the Court does not find that the Service's choice to align the geographic scope of the

aquatic habitat analysis with the aquatic species analysis was unreasonable for this Project given

the limited effect on the species. The Service designed this Project to restore the fishery and

concluded after almost 100 pages of aquatic habitat and species analysis that the Project would

improve the fishery. AR 19432–33, 19494. The only measurable negative impact on the fishery

the Service found was a very short-term increase in fine sediment and embeddedness from

Project implementation disturbing riparian soil. AR 19454 ("An increase of fine sediment is anticipated immediately after restoration activities *within the first year* followed by a steady decline to background levels or less over 5 years.") (emphasis added). The Service found this increase would not be measurable outside the cumulative impacts area, designed its Project implementation process to reduce fine sediment, and fine sediment was only one of six habitat metrics the Service used to analyze the Project. AR 19407, 19436.

When considering all habitat metrics in total, the Service concluded the Project would not only have long-term but also short-term benefits for these species. AR 19488 ("The Camp Lick Project would restore riparian processes and functions resulting in a strong positive *short- and long-term* effect on aquatic TES and MIS species."). Given the Service's determinations that the Project would fulfill its goals of improving the fishery, short and long term, it was not arbitrary and capricious for the Service to not conduct a Forest-wide cumulative impacts analysis on these species to ensure the Project's one very limited and very short-term negative effect did not decimate the species to an extent that would offset the Project's long-term benefits. The Service must rely on its expertise to weigh several factors including the need for a comprehensive analysis, with practical considerations, and the possibility of diluting the Project's effects by using a larger scale. *Weber*, 767 F.3d at 943. The Court cannot find that the Service's chosen scale was arbitrary or capricious given the Project's limited and short-term effects on the species.

### 3.    Large Tree Removal

Blue Mountains challenges the Service use of different scales to analyze cumulative impacts for certain species and forest resources. Pl.'s Mot. 22–25. Defendants respond that setting the cumulative impact's scope per forest resource was reasonable and that every chosen scale is supported by the record. Defs.' Mot. 37–42. The Court finds that the Service did not

need to analyze the cumulative impacts of every species and forest resource at the same scale and that there is sufficient support in the record for the Service's chosen scales.

Through a six-step analysis process of many species, the Service also concluded that returning Camp Lick to its more historical state would benefit wildlife habitat in the long run. AR 19496–98 (describing analysis process, including the analysis of cumulative impacts on different "spatiotemporal scales . . . for each species"); AR 19499 (describing the extensive list of species analyzed); AR 19502–04 (describing a positive overall effect of the Project on wildlife because "transition[ing] . . . towards species composition and stand structure reflective of historical conditions," would benefit "[w]ildlife dependent on open mature pine-dominated habitat" and large snags while "[v]ariable density thinning . . . and a network of connectivity corridors with denser forest areas [would] retain heterogeneity [providing diverse] habitat types across the landscape and retention of existing snags.").

Blue Mountains points to the summary of the cumulative impacts of excavator habitat that was analyzed within the Camp Creek watershed and 300 feet of the planning area boundary. Pl.'s Reply 24. Blue Mountains argues that because this cumulative impact area is smaller than the area the Service used in the direct effects analysis, it is arbitrary and capricious. But the Service used a larger area in the direct effects analysis because the software it needed to analyze direct effects only operated on that larger scale. AR 19538. Blue Mountains has failed to show how use of the smaller area was arbitrary.

The chosen area encompasses the cumulative impacts area for the excavator species. AR 19544 (defining the geographic scale for excavator habitat as the camp creek watershed and within 300 feet of the planning area boundary); AR, 19550, 19552, 19548, 19559 (describing cumulative impacts area for 5 primary excavator species as within either camp creek watershed

or 300 feet of the planning area; explaining the Service chose this geographic scope because it is large enough for all life history aspects of these species or includes multiple home ranges for each species). This analysis area is reasonable because it includes multiple home ranges for these species. *Weber*, 767 F.3d at 943 (accepting the geographic scope for lynx analysis because it included three or four home ranges for the species). All other primary excavator species only had a larger geographic scope for their cumulative impacts analysis because the Service again needed to use its software that only operates at this larger scale. AR 19557, 19575. Thus, this larger geographic scope does not undercut the rationality behind the chosen scope of the dead and defective habitat analysis.

While it may have been helpful for the Service to explicitly state its reasoning for choosing the geographic area for the cumulative impacts on dead and defective habitat in that section of the EA, the Court is not here to fly-speck the document. *Swanson*, 87 F.3d at 343. There is support for the chosen analysis area in the record, and thus the Court's review is at an end. *California v. Block*, 690 F.2d at 761.

Blue Mountains also challenges the Service's determinations of the Project's effect on certain species like the piliated woodpecker and pine martin. Pl.'s Mot. 24. But the Service specifically analyzed the Project's effect on pine marten and piliated woodpeckers, along with their habitat, and discussed cumulative impacts. AR 19571–72 (pine marten; explaining the geographic scope of cumulative impacts area is large enough to provide for connectivity alignment between pine martin habitat); AR 19568–69 (piliated woodpecker; explaining geographic scope of cumulative impacts area as large enough for all life history aspects and includes multiple home ranges). The Service concluded the Project would have a beneficial impact on pine martin because it would increase LOS habitat, downed wood in riparian areas,

and improve the resiliency and vigor of large trees. AR 19572. The Service also found the

Project would benefit piliated woodpeckers by increasing and further protecting LOS habitat and

large trees. AR 19569. Thus, the Project would push cumulative impacts on these species in a

beneficial instead of a negative direction.[11]

In sum, there is sufficient support in the record for the chosen geographic area of every

cumulative impact analysis for resources critical to biodiversity, and Blue Mountains has failed

to show that using a different geographic scope for individual forest resources was arbitrary and

capricious. This Court recommends that summary judgment be granted to the Service on Count 2

of Claim II.

## C.    Hard Look at Direct Effects on Stream Temperature (Counts 3 & 4)

In Counts 3 & 4, Blue Mountains alleges that the Service failed to take a hard look at the

direct effects of the Project by failing to collect sufficient baseline data. Compl. ¶¶ 87–88. In

support of these counts, Blue Mountains argues that the Service used stale stream temperature

data to analyze the direct effects of the Project, and thus violated NEPA. Pl.'s Mot. 26–27. The

Service responds that it used all fully processed data and then reanalyzed stream temperatures

when more recent fully processed data became available. Defs.' Reply 11.

When a project will degrade a component of the environment, "baseline conditions [are]

critical to any NEPA analysis" because without the baseline there is no way of knowing how

significant the impact on that environmental component will be. *Great Basin Res. Watch v.*

*Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (finding unexplained baseline

---

[11] Blue Mountains also faults the Service's analysis for LOS stands by arguing the Service never defined its cumulative scope, Pl.'s Reply 25. But in an entire section dealing just with cumulative impacts of Forest amendments, the Service analyzed the LOS amendments at the forest and ranger district scale. AR 19715–18.

recommendation insufficient for the analysis of an open pit mine's impact on air pollution)

((citing *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)

(analyzing ocean dumping of dredged material); *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562,

570 (9th Cir. 2016) (analyzing the negative impact of a wind farm on sage grouse)). An agency's

analysis of baseline conditions must be reasonable and based on accurate available information.

*Great Basin Res. Watch*, 844 F.3d at 1101.

In this case, the Service's analysis of baseline stream temperature constituted a "hard

look" for two reasons: (1) the Service used accurate available information and reanalyzed the

temperatures as new temperature information became available, and (2) the purpose of the

Service's baseline analysis here was to identify high temperatures as an environmental concern

this Project needed to address. This is a very different purpose for the data than the cases

Plaintiff cites. In those cases, the agency was using the baseline data to ensure the project did not

degrade the environment to a significant or unreasonable extent, making the baseline data's

accuracy and specificity critical to that analysis. *Great Basin Res. Watch*, 844 F.3d at 1103

(providing no data for zero air pollutant baseline to approve 80-year open pit mine project);

*Cascade Forest Conservancy v. Heppler*, No. 3:19-CV-00424-HZ, 2021 WL 641614, at *18 (D.

Or. Feb. 15, 2021) (analyzing mineral prospecting project that would pollute groundwater); *N.

Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011) (not

collecting aquatic species baseline data in EIS process to approve a railroad project that would

cause negative vibration effects on an endangered fish species.).

The Service identified high stream temperatures as a concern and designed the Project to

reduce stream temperatures over time. AR 19226 ("While shade may be slightly diminished over

the short-term, adding wood and increasing hyporheic flows may incrementally cool base stream

flows. The net result of the proposed action [is] . . . improve[d] resilience to wildfire for treated and adjacent riparian areas . . . ensur[ing] tributaries provide cold water inputs from their spring sources to downstream high-quality aquatic habitat."). The Service concluded the short-term losses to stream shade would not result in a meaningfully measurable increase in temperatures because of the minimal short-term decrease in shade and the Project's restoration activities. AR 23451. The Service based this conclusion on "professional knowledge of the planning area, data collected from . . . Stream Surveys, road condition surveys, stand exams, and Forest Vegetation Simulator . . . outputs," and twenty-six different scientific studies, reports, or management practices or plans. AR 19173, 19231–32. Blue Mountains does not challenge either the long-term decrease in temperature or the not meaningfully measurable short-term increase conclusion.

The Service used the baseline temperature data to identify these high temperatures as an ecological risk this Project needed to address. AR 19204 (using 2014 data set before public comment in watershed report); AR 19443–44 (EA analyzing most comprehensive data set from 2004). After more up-to-date data was processed and available to the scientists working on this Project, they analyzed it. AR 27307, 27315–17 (Supplemental Information Report ("SIR") analyzing 2016 data). They analyzed this new data even though it would not change their conclusions because they expected it to be higher than the previous data, had identified high and increasing stream temperatures as an ecological concern, and had designed the Project to address this concern by lowering temperatures in the long run and using mitigation tactics to reduce short-term effects. AR 19226, 19324, 19418 (identifying stream temperature as a management concern and factors that have led to temperature increases); AR 19436 ("Short-term . . . negative . . . . effects [to aquatic species] would be minimized through implementation of a thorough set

of" mitigation tactics); AR 26725 ("[F]ish bios were probably aware of" the likely temperature increases "and the fish bio's analysis and conclusions would have been the same . . . .").

The Service provided appropriate analysis of baseline stream temperatures by analyzing available data and then reanalyzing stream temperatures as more data became available. This analysis was especially sufficient given that the purpose of this analysis was to identify stream temperatures as a management concern this Project would address by having only an unmeasurable short-term impact and a positive long-term impact. Because the Service took the required hard look at stream temperatures and analyzed sufficient baseline data, Summary judgment should be denied to Blue Mountains and granted to Defendants on Counts 3 & 4 of Claim II.

### D.    Purpose and Need Statement (Counts 5 & 6)

Blue Mountains alleges that Camp Lick's purpose and need statement is too narrow and that the Service failed to effectively consider a reasonable range of alternatives. Compl. ¶¶ 89–90. Blue Mountains specifically argues the Service's improperly narrow purpose and need statement led to the exclusion of a reasonable range of alternatives without sufficient study. Pl.'s Mot. 28–35. The two alternatives Blue Mountains focuses on are not amending the Screens and not allowing commercial logging or any logging in riparian areas. Pl.'s Mot. 34–35.

#### 1.    The Project's Goals

"Agencies enjoy considerable discretion to define the purpose and need of a project." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010) (quotations omitted). But the purpose and need statement these alternative exclusions are based on must be reasonable. *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066–67 (9th Cir. 1998). Agencies cannot draft purpose and need statements in an unreasonably

narrow fashion to circumvent the reasonable alternative analysis. *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 667 (7th Cir. 1997) (holding agency unreasonably defined purpose of a project as supplying two cities from one water source, when there was no rational basis for considering one water source a purpose of the project instead of a means); *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1070 (it is unreasonable for a "majority of the[] purposes and needs [to] respond to [a private business's] goals, not those of the [agency] . . . .").

Blue Mountains first challenges the number of pages (and bullet points) the Service used to describe the Project's purpose and need, arguing that this overly detailed purpose and need statement was used to improperly exclude many alternatives from detailed study. Pl.'s Mot. 30. Blue Mountains fails to show that any of this analysis (or any specific bullet point) was unreasonable. The Service may rationally design projects to improve resiliency, heterogeneity, and aquatic habitat by returning the landscape to a more historical state. *See* AR 19318–19325 (further describing need for the Project and supporting the Project's stated purposes). The fact that the Service included 24 bullet points of elaboration does not render the purpose and need statement unreasonable, particularly when the Service also did not need to rely on any of these bullet points to exclude the alternatives Blue Mountains argues for.[12]

Blue Mountains also objects to the Service's discussion of the need to amend the Screens for the Project. Pl.'s Mot. 46 (citing AR 19327). But the Service did not use this need to justify its exclusion of an alternative, nor did the Service consider it a purpose of the Project. The

---

[12] *See* AR 19366 (excluding no amendment alternative because "[t]he purpose and need of the Camp Lick Project includes trending the landscape pattern of stand structures towards those which fall within the historical range of variability, and improving landscape resiliency and resistance to disturbances" to exclude the no amendment alternative); AR 19369 (excluding no commercial logging alternative in riparian areas because "these alternatives would not meet the needs to maintain and improve landscape resiliency and resistance to disturbances by managing for desirable forest composition, stocking levels, and pattern . . . .").

Service only chose to elaborate on why these amendments are needed for this Project to meet the Project's purpose in another section of its EA, providing more support for its exclusion of this alternative from detailed study. AR 19327.

In sum, the Service's purpose and need statement was not unreasonably narrow, nor did it use much of the detail Blue Mountains points to exclude alternatives. Summary judgment should be denied to Blue Mountains and granted to Plaintiffs on Count 5 of Claim II.

### 2.    Alternatives

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). "Although an agency must still give 'full and meaningful consideration to all reasonable alternatives' in an environmental assessment, the agency's obligation to discuss alternatives is less than in an EIS." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008)).

The "substance of the alternatives" analysis is the bellwether of reasonableness, "not the sheer number of alternatives considered." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). There is no minimum number of alternatives the Service must consider. Yet "[t]he existence of a viable but unexamined alternative renders an [EA] inadequate." *Id.* (quoting *Westlands Water Dist.*, 376 F.3d at 868).

The agency need not consider an alternative that will not achieve a project's purpose. *Morrison*, 153 F.3d at 1067 ("[W]hen the purpose of the project is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.") (alterations omitted). When excluding alternatives, the agency must show that the excluded

alternative will not meet the project's purpose. *Abbey*, 719 F.3d at 1052 (holding agency did not show how a lower grazing alternative would fail to support the purpose of the project by increasing adequate vegetative cover).

Blue Mountains specifically argues the Service failed to sufficiently consider two alternatives: not amending the Screens by excluding it from detailed study, and not considering a no logging in riparian areas alternative. Pl.'s Mot. 34–35; Pl.'s Reply 32–33.

The Service concluded not amending the Screens would limit the Project's purpose of "trending the landscape pattern of stand structures towards those which fall within the historical range of variability, and improving landscape resiliency and resistance to disturbances." AR 19366; *see also* AR 19333. This is because "[h]ard diameter limits, such as a 21-inch DBH limit, can make it difficult or impossible to achieve desired species composition in many Mixed-Conifer Forests, which would compromise their future resilience." AR 19366. Thus, the Service provided a rational explanation for why the no-amendment alternative would fail to meet the Project's goals. *See Bark v. United States Forest Serv.*, 393 F. Supp. 3d 1043, 1060 (D. Or. 2019), *rev'd on other grounds*, 958 F.3d 865 (9th Cir. 2020) (Holding the Service's alternatives analysis was sufficient "[b]ecause the [Service] articulated a rational connection between the purposes of the . . . Project and the reasons for rejecting [the] proposed alternative[]. . . ."); *see also Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1022 (9th Cir. 2012) (Stating that since *Native Ecosystems*, it is rare for the Ninth Circuit to find an "EA . . . arbitrary and capricious when it considered both a no-action and preferred action alternative.").

The Court is also not persuaded that the Service improperly rejected consideration of Blue Mountains' no commercial logging alternative. "NEPA does not require federal agencies to consider alternatives that are substantially similar to other alternatives. *Native Ecosystems*

*Council*, 428 F.3d at 1249; *see also Westlands Water Dist.,* 376 F.3d at 868 ("Nor is an agency

required to undertake a 'separate analysis of alternatives which are not significantly

distinguishable from alternatives actually considered, or which have substantially similar

consequences.'" (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.,* 914 F.2d 1174, 1181 (9th

Cir.1990)).

     Here, the Service analyzed thirteen alternatives and excluded them from detailed study

because they would not achieve the Project's goals. AR 19365–71. One of those alternatives was

no commercial logging in riparian areas where the Service examined cutting and leaving trees

and girdling. AR 19369. The other noncommercial logging alternative the Service considered

was not commercially logging at all under the no-action alternative. *E.g.* AR 19364 (directly

comparing all acres of commercial thinning under proposed alternative with the zero acres of

commercial thinning under the no-action alternative).

     The Service effectively considered the impact of commercial logging through the

alternatives chosen because the EA continually addresses commercial logging's impact

throughout the entire analysis. AR 19303–19470 (discussing commercial treatments 105 times

throughout the EA). The Service need not create an independent alternative for any combination

of the Project's 24 proposed activities. *See* AR 19364–65 (listing 24 different proposed activities

for the Project); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir.

1999) ("NEPA does not require the Forest Service to consider every possible alternative to a

proposed action . . . .") (quotations omitted). The record shows the alternatives chosen allowed

the Service to take the required hard look at the Project's commercial logging and that logging's

effect on riparian areas.

Because the Service's exclusion of the two alternatives was reasonable, Summary judgment should be denied to Blue Mountains and granted to the Service on Count 6 of Claim II.

### E.   Environmental Impact Statement (Count 8)

Blue Mountains argues the Service must prepare an EIS for the Project for three reasons: (1) the Service has prepared an EIS for similar projects, (2) the Service failed to analyze the effect of the Project in the right spatial context, and (3) the intensity of the Project mandates an EIS because of the site-specific amendments[13] and threat to endangered steelhead. Pl.'s Mot. 35–42. As noted above, the potential "significance" of a proposed action is determined by evaluating the context of that action and the intensity of its effects within that proper context. 40 C.F.R. § 1508.27 (2019). Each of Blue Mountains' arguments is analyzed below.

#### 1.   EIS for Similar Projects

NEPA requires agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(C). But NEPA does not impose as tight of restrictions to prevent an agency from conducting an EIS when it could have possibly issued an EA and FONSI. 40 C.F.R. § 1501.3 (2019) (stating agency *may* prepare EA but it is unnecessary if it will prepare EIS). Because agencies have more discretion and are not as scrutinized in the choice to conduct an EIS, Service decisions to conduct EISs in other projects provide little support for its duty to conduct an EIS here. Moreover, there are material differences between this Project and the other two Projects' Blue Mountains references that could have justified the Services' decision to conduct an EIS. *See* Suppl. AR 26441–43 (proposed

---

[13] Blue Mountains points to its prior NFMA arguments about multiple site-specific amendments being a *de facto* significant impact and a violation of NFMA through piecemeal abandonment of the Forest Plan to support this contention. Pl.'s Mot. 40. The Court has already analyzed this argument and concluded the Service did not violate NFMA.

Ragged Ruby amendments would not maintain connectivity between all late and old structure and old growth stands and around 2,200 acres of wildlife connectivity corridors will be designated as part of the project); Suppl. AR 16535–38 (Galena amendments included an amendment for further reducing satisfactory cover, already below Forest Plan standards for big game cover). For these reasons, the Service was not required to conduct an EIS here based on its more discretionary decision to conduct an EIS in these other two projects.

### 2.    Spatial Context for the Project

Blue Mountains next argues that the Service's analysis of the context of the Project was unreasonable because it failed to properly address the significance of the local impacts of the Project. Pl.'s Mot. 37.

Significance "must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, *and the locality*," and it "varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a) (2019) (emphasis added). For "a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole." *Id.* It is improper for an agency to ignore recognized, and likely substantial, negative impacts by analyzing them on an inappropriately larger spatial scale. *Fed'n of Fishermen's*, 265 F.3d at 1035–36 (disregarding recognized short-term effects on endangered fish that may endanger their survival); *Cascadia Wildlands v. Bureau of Land Mgmt.*, 410 F. Supp. 3d 1146, 1158 (D. Or. 2019) (failing to analyze increased fire risk from a project). *Anderson v. Evans*, 371 F.3d 475, 492 (9th Cir. 2004) (agency failed to evaluate significance of authorized whaling on local whale population).

Blue Mountains has failed to show the Service did not address the significance of the local impacts of the Project. The Project was designed to protect and preserve Camp Lick—at the

local level—by trending the Project area towards historical species compositions. And the Service repeatedly found the Project would achieve this goal throughout its analysis. Moreover, an agency using multiple different spatial contexts to analyze the effect of a decision is not a *per se* NEPA violation. Rather, the Agency must provide a reasoned analysis for the scale it uses. The Service explained that the proper spatial context of analysis can differ between forest resources. *See, e.g.*, AR 19497–98 (explaining the need for different spatial contexts of analysis for each species). The Service analyzed the Project's effects on multiple scales throughout the EA and found the Project's effects will be local and not likely to significantly affect regional resources. AR 27158–59. Blue Mountains has not shown a specific effect of the Project that should have been analyzed at the local level, was insufficiently analyzed, and could have a significant impact mandating an EIS. Accordingly, the Service reasonably concluded that the context of the Project did not require an EIS.

### 3.    Intensity

Blue Mountains argues the site-specific amendments to the Screens are controversial. Pl.'s Mot. 39–40.

There are many factors agencies can consider when determining a Project's intensity, including how controversial the Project is, its cumulative impacts, effects on endangered species, and possible violations of environmental protections. 40 C.F.R § 1508.27 (2019). Under NEPA, a "[c]ontroversy" is a dispute "over the size or effect of the action itself, not whether or how passionately people oppose it." *Wild Wilderness v. Allen*, 871 F.3d 719, 728 (9th Cir. 2017) (holding plaintiff's "evidence . . . did not rise to the level . . . of [a] scientific controvers[y] that would substantially undermine the reasonableness of the Forest Service's conclusions."); *see*

*also Native Ecosystems Council*, 428 F.3d at 1240 (a project is highly controversial when there is a significant scientific dispute about the project's environmental effects).

Blue Mountains first argues, "[a]s a general matter, the adoption of site-specific forest plan amendments is broadly recognized to be controversial" and references prior litigation and guidance from the regional forester. Pl.'s Mot. 39. This Court disagrees. This is a question of scientific controversy regarding environmental impacts, not whether similar amendments have led to NFMA violations in other cases, leading the Service to respond through changes in the regional Forester's Guidance letters. Amendments to the Forest Plan are not *per se* controversial. For this specific 40,000-acre Project, the Service's interdisciplinary team analyzed 150 scientific sources and over 350 scientific articles submitted by public comment to conclude the Project's size and effect were not in dispute. AR 27161. It concluded that this specific Project would not be highly controversial. *Id*. This Court must analyze the controversy surrounding this decision— not the adoption of site-specific Forest Plan amendments generally.

Blue Mountains next argues that the cumulative impacts analysis demonstrates that this Project is highly controversial. 40 C.F.R. § 1508.27(b)(7) (2019) (another consideration is "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."). The Court has already concluded the Service's cumulative impacts analysis was reasonable. *See supra* Discussion § II.A–B.[14] And after closely examining the

---

[14] The Court understands that "a significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 CFR § 1508.27 (b)(1). However, the benefits the Court found persuasive in the Services' cumulative effects analysis protected these resources and returned them to historical conditions, which is much less likely to be a significant change than damaging these resources to possibly unprecedented or recoverable extents. Accordingly, the Service's determinations regarding beneficial effects are relevant to the significance analysis. Also, these benefits were analyzed resource by resource; the Service was not making overarching conclusions about the Project's effects being beneficial "on balance."

project's cumulative impacts, the Service concluded these impacts were not significant. AR 27162.

Blue Mountains argues these amendments are controversial because they will allow logging of trees that can take decades to develop, Pl.'s Reply 35, but the Service recognized this effect and incorporated it into the Service's wildlife analysis consistently. *See, e.g.*, AR 19514 ("The proposed action allows for removal of some trees greater than or equal to 21 inches in diameter and less than 150 years of age in some locations, which could result in the loss of some trees which could become hollow and useful for roosting."). Blue Mountains has failed to show there is a significant scientific controversy regarding the Project's environmental effects.

Blue Mountains argues the effect on endangered steelhead is significant. But the record shows the Service closely analyzed this effect. *See* AR 27163 (discussing relevant analysis). Through that analysis, the Service concluded there would be insignificant short-term effects on the species and beneficial long-term effects. AR 27163–64. The Service also discussed the mitigation tactics it developed to reduce all short-term effects on the species. AR 27163–64.

Blue Mountains finally argues that the site-specific amendments and failure to include total maximum daily load implementation strategies in the Service's Final EA "threatens a violation of" environmental protection laws, which is another intensity factor. The Court has already concluded the Service did not violate NFMA. *See supra* Discussion § I. And the Oregon Department of Environmental Quality decided this action was consistent with the Clean Water Act's total maximum daily load regulations because it would not increase temperatures and use best management practices. AR 19435, 27117.

In sum, this Court defers to the Service's conclusion that neither the context nor the intensity of the Project warranted preparation of an EIS, and summary judgment should be denied to Blue Mountains and granted to the Service on Count 8 of Claim II.

### F.    Further NEPA Analysis (Count 7)

In Count 7, Blue Mountains argues the Service must prepare a second EA or EIS because circumstances after the Final EA were insufficiently analyzed in the Service's SIR, Decision Notice, and FONSI. Compl. ¶¶ 91–94. Blue Mountains specifically challenges the SIR's cumulative impacts and stream temperature analysis. Pl.'s Mot. 44. In response, the Service argues that its decision not to supplement the EA was reasonable because the changed conditions and new information were within the scope and range of the direct, indirect, and cumulative impacts analyzed in the final EA. Defs.' Mot. 62.

Agencies must supplement an EA if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1). When an agency reviews the relevant factors and determines that supplementation is unnecessary, a court should defer to the agency's determination. *See Price Rd. Neighborhood Ass'n v. U.S. Dep 't of Transp*., 113 F.3d 1505, 1509–10 (9th Cir. 1997 (stating "[a] supplemental EA is not automatically required . . . but rather . . . dependent upon the findings and conclusions reached by the [agency] through its reevaluation process."). A SIR is appropriate "for the purpose of evaluating the significance of new information or changed circumstances." *Idaho Sporting Congress*, 222 F.3d at 567.

As the Court stated, the final aquatic cumulative impacts scope and stream temperature analyses were reasonable. *Supra* Discussion §§ II.B.1–2, II.C. The Service then determined that the changed conditions and new information were within the scope and range of the direct,

indirect, and cumulative impacts analyzed in the final EA. AR 27314. This conclusion was

reasonable and supported. AR 27302 (finding supplemental NEPA process unnecessary for

Rattlesnake project because it significantly limited large tree removal and dropped riparian

treatments); AR 27303–04, 27314 (noting acreage was unavailable for Cliff Knox project and

finding all effects of the new project were within the scope and range of effects the Service had

considered).[15] This is particularly true given the Service's conclusion the Project would improve

forest health, so it would not significantly push cumulative impacts in a positive rather than

negative direction by protecting the resource. The Service's use of a SIR to analyze changed

circumstances and conclude that they were not significant because they were within the scope

and range of impacts previously analyzed was reasonable, and the Service is entitled to

deference. *See Idaho Sporting Congress*, 222 F.3d at 567 (stating the use of a SIR to analyze

changed circumstances and conclude they are not significant is reasonable). Accordingly,

summary judgment should be denied to Blue Mountains and granted to the Service on Count 7 of

Claim II.

---

[15] Blue Mountains also argues that the SIR did not address the impacts of the Ragged Ruby project. Pl.'s Mot. 44. But that is because the Ragged Rugy project did not plan to conduct any logging treatment in riparian habitat at the time of the SIR and after this was changed the Service adequately analyzed this cumulative impact in the Rugged Ruby EIS. Suppl. AR 25612-26529; Suppl. AR 25899 (Ragged Ruby EIS considering Camp Lick in cumulative impact analysis); *see Sierra Nevada Forest Prot. Campaign v. U.S. Forest Serv.*, 166 F. App'x 923, 928 (9th Cir. 2006) (Fletcher, J. Concurring) (the cumulative impact of the "future project will necessarily be considered in the EIS or EA of the future project; that is the appropriate time for such cumulative impact analysis to be conducted.")

**RECOMMENDATION**

The Forest Service's Motion for Summary Judgment, ECF 32, should be GRANTED, and Blue Mountains' motion, ECF 24, should be DENIED.

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from Service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to de novo consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.

DATED this 27th Day of April, 2023.

ANDREW HALLMAN
United States Magistrate Judge